No. 25-3889

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

————————————————

CITY AND COUNTY OF SAN FRANCISCO, et al.,

Plaintiffs-Appellees,

v.

DONALD J. TRUMP, et al.,

Defendants-Appellants.

————————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

————————————————

**OPENING BRIEF FOR APPELLANTS**

————————————————

BRETT A. SHUMATE
  *Assistant Attorney General*

CRAIG H. MISSAKIAN
  *United States Attorney*

DANIEL TENNY
JOSHUA WALDMAN
  (202) 514-0236
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7527*
  *U.S. Department of Justice*
  *950 Pennsylvania Ave., N.W.*
  *Washington, D.C.  20530*

## Table of Contents

Page

INTRODUCTION ............................................................................1

STATEMENT OF JURISDICTION .....................................................4

STATEMENT OF THE ISSUE ...........................................................4

STATEMENT OF THE CASE .............................................................5

I.     LEGAL BACKGROUND ...........................................................5

     A.    Executive Order 13,768 and this Court's Prior Decision ..............5

     B.    Executive Order 14,159 ...................................................8

     C.    Executive Order 14,218 .................................................10

II.    DISTRICT COURT PROCEEDINGS.........................................12

STANDARD OF REVIEW ...............................................................21

SUMMARY OF ARGUMENT ..........................................................21

# Table of Contents (cont'd)

Page

ARGUMENT ...................................................................24

I.  THE DISTRICT COURT MISCONSTRUED THE EXECUTIVE
    ORDERS ..................................................................24

    A.  Executive Order 14,159 Applies Narrowly to Programs
        Administered by the Departments of Justice and
        Homeland Security and Only on a Grant-by-Grant Basis .........26

        1.  *The Plain Text of Section 17 Limits Its Scope*.........................26
        2.  *The Bondi Directive Confirms the Order's Narrow Scope* .....27
        3.  *The Government's Implementation Confirms the Order's
            Narrow Scope*..........................................................29
        4.  *The Interpretive Principles of* San Francisco
            *Do Not Apply.* ........................................................32

    B.  Executive Order 14,218 Applies to Federal Public Benefits
        for Individuals Governed by Federal Statute, Not Grants
        to States and Their Subdivisions....................................38

# Table of Contents (cont'd)

Page

II. PLAINTIFFS' CLAIMS ARE MERITLESS ............................................46

    A.    The Executive Orders Direct Only "Lawful" Actions ...............48

    B.    Separation of Powers ..........................................................51

    C.    Spending Clause ................................................................58

        1.    *Unambiguous Conditions*.........................................59
        2.    *Sufficient "Nexus."*................................................61

    D.    Tenth Amendment ..............................................................63

    E.    Fifth Amendment ..............................................................66

        1.    *Vagueness*.............................................................66
        2.    *Procedural Due Process.* ........................................70

    F.    Administrative Procedure Act ...........................................72

        1.    *Final Agency Action.* ............................................72
        2.    *Reasonable Explanation.* .......................................76

III. PLAINTIFFS CANNOT SHOW IRREPARABLE HARM ...................78

IV. THE INJUNCTION IS IMPRECISE AND OVERBROAD ...................80

CONCLUSION .......................................................................................86

CERTIFICATE OF COMPLIANCE
CERTIFICATE OF SERVICE
STATEMENT OF RELATED CASES

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Bassidji v. Goe,*
    413 F.3d 928 (9th Cir. 2005).........................................................................26

*Bennett v. Spear,*
    520 U.S. 154 (1997) ...................................................................................72

*Building & Const. Trades Dept. v. Allbaugh,*
    295 F.3d 28 (D.C. Cir. 2002) ....................................................................49

*City & County of San Francisco,*
    897 F.3d 1225 (9th Cir. 2018)....................................... 3, 6-8, 32-38, 49-52

*City of Providence v. Barr,*
    954 F.3d 23 (1st Cir. 2020) .......................................................................55

*County of Santa Clara v. Trump,*
    250 F. Supp.3d 497 (N.D. Cal. 2017) .........................................................6

*Credit Suisse First Bos. Corp. v. Grunwald,*
    400 F.3d 1119 (9th Cir. 2005)....................................................................21

*Department of Education v. California,*
    145 S. Ct. 966 (2025) .................................................................................79

*Holder v. Humanitarian Law Project,*
    561 U.S. 1 (2010) ........................................................................... 67, 68, 69

# TABLE OF AUTHORITIES (cont'd)

Page(s)

## Cases

*Kashem v. Barr,*
941 F.3d 358 (9th Cir. 2019) .........................................................69

*Mathews v. Diaz,*
426 U.S. 67 (1976) ......................................................................43

*National Endowment for the Arts v. Finley,*
524 U.S. 569 (1998) .....................................................................68

*National Fed'n of Indep. Bus. v. Sebelius (NFIB),*
567 U.S. 519 (2012) .............................................................. 63, 65

*New York v. U.S. Department of Justice,*
951 F.3d 84 (2d Cir. 2020) ....................................................... 9, 56

*Pimentel v. Dreyfus,*
670 F.3d 1096 (9th Cir. 2012) (per curiam) ..................................... 11, 40

*South Dakota v. Dole,*
483 U.S. 203 (1987) .......................................................... 58, 59, 65

*Trump v. American Federation of Government Employees,*
-- S. Ct. ----, 2025 WL 1873449 (July 8, 2025)...........................................56

*Winter v. Natural Res. Def. Council, Inc.,*
555 U.S. 7 (2008) .......................................................................21

# TABLE OF AUTHORITIES (cont'd)

Page(s)

**Statutes**

6 U.S.C. § 113(a)(1)(D) ................................................................31

6 U.S.C. § 313 ..............................................................................31

7 U.S.C. § 2015(f) ........................................................................41

8 U.S.C. § 1373................................................. 5, 7, 9, 51, 52, 55, 66

8 U.S.C. § 1601 ......................................................................... 10, 62

8 U.S.C. § 1601(2)(A) ..................................................................39

8 U.S.C. § 1601(3) ........................................................................39

8 U.S.C. § 1601(6) ................................................................... 39, 44

8 U.S.C. § 1611(a) ........................................................................40

8 U.S.C. § 1611(c)(1) ....................................................................40

8 U.S.C. § 1611(c)(1)(B) ...............................................................42

8 U.S.C. § 1641(b) ........................................................................40

28 U.S.C. § 1292(a)(1) ....................................................................4

28 U.S.C. § 1331.............................................................................4

28 U.S.C. § 1346.............................................................................4

## TABLE OF AUTHORITIES (cont'd)

<u>Page(s)</u>

**Statutes**

42 U.S.C. § 1436a(a) ........................................................42

42 U.S.C. § 11382 ............................................................45

42 U.S.C. § 11386(b)(8) ...................................................54

Byrne JAG grant statute,
  34 U.S.C. §§ 10151-10158 ...........................................56

**Executive Orders**

Executive Order 13,768,
  82 Fed. Reg. 8799 (Jan. 30, 2017) ........................... 5-8, 13, 32, 33

Executive Order 14,159,
  90 Fed. Reg. 8443 (Jan. 29, 2025) ............................ *passim*

Executive Order 14,218,
  90 Fed. Reg. 10,581 (Feb. 25, 2025)......................... *passim*

Executive Order 14,287,
  90 Fed. Reg. 18,761 (Apr. 28, 2025).........................27

# TABLE OF AUTHORITIES (cont'd)

Page(s)

**Regulations**

2 C.F.R. § 200.340(c) ...................................................................71

2 C.F.R. § 200.342 ........................................................................71

24 C.F.R. § 578.1(b) .....................................................................45


**Rules**

Federal Rule of Appellate Procedure 4(a)(1)(B) ...........................4

Federal Rule of Civil Procedure 65(c) ........................................79

Federal Rule of Civil Procedure 65(d)(1)(B) ..............................80

Federal Rule of Civil Procedure 65(d)(1)(C) ..............................80

# INTRODUCTION

This is a challenge to two Executive Orders that plainly constitute the legitimate exercise of oversight authority over the Executive Branch. Executive Order 14,159 directs the Departments of Justice and Homeland Security to "evaluate" their own programs on a grant-by-grant basis to determine if withholding funds for sanctuary jurisdictions would be "lawful action" and to "undertake" such a condition in a particular context only after determining it to be appropriate and lawful. The record confirms that before the district court's injunction, those Departments were in fact conducting program-by-program reviews to determine the grants to which the sanctuary jurisdiction condition should apply, including identification of the specific statutes authorizing the condition and their nexus to immigration. Executive Order 14,218 restricts the payment of federal public benefits to individuals who are aliens unlawfully present in the United States and does so pursuant to longstanding statutory requirements.

With a proper understanding of the Executive Orders, Plaintiffs'
arguments — all of which turn on the mistaken view that the Orders
impose a government-wide mandate instructing all federal agencies to
withhold the entirety of federal funding from sanctuary jurisdictions in an
indiscriminate or wholesale manner — are meritless.  Even the district
court agreed that "the Government is entitled to identify particular grants
and funding programs that it believes should be conditioned upon
compliance with immigration-related objectives, and to litigate its
position."  ER-12.  Any potential challenges based on individual sanctuary-
jurisdiction grant conditions would present a ripe claim only if a putative
funding recipient alleged a specific funding condition imposed by a
particular agency that was imposed in an assertedly unlawful manner.  But
no such challenge could properly be directed at the Executive Orders
themselves, nor have Plaintiffs in this litigation brought any such
individualized challenges in this case.

Nonetheless, seizing on isolated phrases in the Executive Orders the district court leapt to the conclusion that these Executive Orders mirrored a prior Executive Order from eight years ago enjoined because the prior Order (in this Court's view) "threaten[ed] to withdraw all federal grants." *City & County of San Francisco*, 897 F.3d 1225, 1239 (9th Cir. 2018). Based on the district court's perfunctory, incorrect analysis, it wrongly concluded that Plaintiffs are likely to succeed on the merits and that they suffer irreparable harm warranting an injunction.

In addition, the district court abused its discretion by entering an injunction that was both vague and vastly overbroad, imprecisely covering anything that violates either "the *letter* of the Preliminary Injunction" or "its *spirit*," or that reflects an "end run around the Preliminary Injunction Order," ER-14, ER-18, and broadly applying to "any … Government action," or "*any* … agency directive" that imposes a sanctuary-jurisdiction condition on federal funding, whether based on the Executive Orders

3

challenged in this litigation or not, ER-14, ER-18. That injunction should be vacated.

## STATEMENT OF JURISDICTION

Plaintiffs invoked the district court's jurisdiction under 28 U.S.C. §§ 1331 and 1346. ER-152. The district court entered a preliminary injunction on April 24, 2025, ER-85-90, a further order regarding its preliminary injunction on May 3, 2025, ER-19-84, and an order clarifying the preliminary injunction on May 9, 2025, ER-11-18. Defendants filed a timely notice of appeal on June 20, 2025. ER-262-264; *see* Fed. R. App. P. 4(a)(1)(B) (60-day time limit). This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUE

Whether the district court abused its discretion in entering a preliminary injunction barring Defendants from enforcing certain provisions of Executive Orders 14,159 and 14,218 and the related Attorney General Directive implementing Executive Order 14,159.

4

## STATEMENT OF THE CASE

**I.     LEGAL BACKGROUND**

    A.    <u>Executive Order 13768 and this Court's Prior Decision</u>

Eight years ago, the President issued Executive Order 13768, 82 Fed. Reg. 8799 (Jan. 30, 2017). ER-102-106. That Order stated, in relevant part, that "[i]t is the policy of the executive branch to ensure, to the fullest extent of the law, that a State, or a political subdivision of a State, shall comply with 8 U.S.C. 1373." ER-104. "In furtherance of this policy," the Order directed that "the Attorney General and the Secretary [of Homeland Security], in their discretion and to the extent consistent with law, shall ensure that jurisdictions that willfully refuse to comply with 8 U.S.C. 1373 (sanctuary jurisdictions) are not eligible to receive Federal grants, except as deemed necessary for law enforcement purposes by the Attorney General or the Secretary." ER-104.

The district court for the Northern District of California issued a preliminary injunction barring the government from enforcing that provision against jurisdictions the government deemed to be sanctuary

5

jurisdictions. *County of Santa Clara v. Trump*, 250 F. Supp.3d 497, 540 (N.D. Cal. 2017). This Court affirmed in relevant part. *City & County of San Francisco*, 897 F.3d 1225 (9th Cir. 2018).[1] In the Court's view, Executive Order 13,768 "plainly commands" the "withdraw[al]" of "essentially all federal grants," "plainly threatens all federal grant money," and "[o]n its face" "threatens to withdraw all federal grants from [sanctuary] jurisdictions the Administration deems noncompliant with § 1373." *Id.* at 1239, 1242. Although the Government argued that the Order applied narrowly to "a limited number of grant programs," this Court held that such a narrow interpretation was not "grounded … in the text of the Executive Order." *Id.* at 1238.

Based on its expansive understanding of the Executive Order's scope, this Court held that the plaintiffs had standing and their claims were ripe for adjudication. Specifically, this Court determined that those plaintiffs

---

[1] This Court vacated the injunction to the extent it applied nationwide to non-parties. 897 F.3d at 1244-45.

had shown a "concrete" and "imminent" "loss of funds," 897 F.3d at 1236, based on the "wholesale defunding" that would result from the Executive Order as the Court understood it, *id.* at 1237.

On the merits, this Court held that the Executive Order "violates the Separation of Powers," 897 F.3d at 1233, because "the Administration has not even attempted to show that Congress authorized it to withdraw federal grant moneys" across-the-board from sanctuary jurisdictions, *id.* at 1234. While Executive Order 13,768 was predicated on sanctuary jurisdictions' non-compliance with 8 U.S.C. § 1373, that Order "direct[ed] Executive Branch administrative agencies to withhold funding that Congress has not tied to compliance with § 1373." *Id.* "Because Congress did not authorize withholding of funds, the Executive Order [13,768] violates the constitutional principle of the Separation of Powers." *Id.* at 1235.[2]

---

[2] This Court declined to reach the district court's other bases for its preliminary injunction, including the Spending Clause and the Fifth and Tenth Amendments. 897 F.3d at 1235 n.5.

On the balance of harms, this Court again relied on its expansive interpretation of Executive Order 13,768.  Because the Court "disagree[d] with the Administration's interpretation of the Executive Order," it "therefore disagree[d] with its argument regarding the propriety of the injunction."  897 F.3d at 1244.  Specifically, because that Executive Order threatened "[a] total loss of federal funding," the would-be "catastrophic" effect constituted an irreparable injury harmful to the public interest that warranted a preliminary injunction.  *Id.*

B.      Executive Order 14,159

On January 20, 2025, the President issued Executive Order 14,159, 90 Fed. Reg. 8443 (Jan. 29, 2025).  ER-96-101.  Section 17 of the Order states that "[t]he Attorney General and the Secretary of Homeland Security shall, to the maximum extent possible under law, evaluate and undertake any lawful actions to ensure that so-called 'sanctuary' jurisdictions, which seek to interfere with the lawful exercise of Federal law enforcement operations, do not receive access to Federal funds."  ER-99.

8

On February 5, 2025, the Attorney General issued a memorandum "for all Department employees" stating that "the Department of Justice will ensure that, consistent with law, 'sanctuary jurisdictions' do not receive access to Federal funds from the Department." ER-146 (Bondi Directive). "So-called 'sanctuary jurisdictions' include state or local jurisdictions that refuse to comply with 8 U.S.C. § 1373, refuse to certify compliance with § 1373, or willfully fail to comply with other applicable federal immigration laws." ER-147. "Consistent with statutory authority and past practice, the Department will require any jurisdiction that applies for certain Department grants to be compliant with 8 U.S.C. § 1373(a)." ER-147. The Bondi Directive notes that in doing so, "[t]he Department will … impose any conditions of funding that do not violate applicable constitutional or statutory limitations," ER-146. The Bondi Directive cited *New York v. U.S. Department of Justice*, 951 F.3d 84 (2d Cir. 2020), in which the Second Circuit held that the Department of Justice was statutorily authorized to impose

conditions on certain grants requiring, among other things, compliance with Section 1373.

The Bondi Directive instructed the Associate Attorney General, in coordination "with components that provide Department grants," to "report to the Attorney General" "[w]ithin 30 days" "the grants to which this requirement applies."  ER-147.  Prior to the district court's injunction, the Department of Justice had not identified any specific Department grants to which the sanctuary jurisdiction condition would apply.

### C.    Executive Order 14,218

On February 19, 2025, the President issued Executive Order 14,218, 90 Fed. Reg. 10,581 (Feb. 25, 2025).  ER 94-95.  That Order notes that "[t]he plain text of Federal law, including the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (Public Law 104-193) (PRWORA), generally prohibits illegal aliens from obtaining most taxpayer-funded benefits."  ER-94.[3]  PRWORA declared a "national policy" "to remove the

---

[3] PRWORA, 8 U.S.C. § 1601 *et seq.*, is commonly known as the "Welfare Reform Act," and generally bars aliens who are not lawfully

10

incentive for illegal immigration provided by the availability of public benefits." ER-94. But, as the Executive Order explained, "numerous administrations have acted to undermine the principles and limitations directed by the Congress through that law." ER-94.

Titled "Preserving Federal Public Benefits," Section 2 of the Order is consistent with PRWORA's national policy "[t]o prevent taxpayer resources from acting as a magnet and fueling illegal immigration to the United States," and seeks "to ensure, to the maximum extent permitted by law, that no taxpayer-funded benefits go to unqualified aliens." ER-94. Section 2(a)(i) of Executive Order 14,218 directs "the head of each executive department or agency" to "identify all federally funded programs administered by the agency that currently permit illegal aliens to obtain any cash or non-cash public benefit, and, consistent with applicable law, take all appropriate actions to align such programs with the purposes of

---

admitted from receiving federal benefits. *See Pimentel v. Dreyfus*, 670 F.3d 1096, 1099-1100 & nn. 1-7 (9th Cir. 2012) (per curiam).

this order and the requirements of applicable Federal law, including the PRWORA." ER-94. Section 2(a)(ii), in a similar vein, directs the heads of each executive department or agency to "ensure, consistent with applicable law, that Federal payments to States and localities do not, by design or effect, facilitate the subsidization or promotion of illegal immigration, or abet so-called 'sanctuary' policies that seek to shield illegal aliens from deportation." ER-94.

## II.    DISTRICT COURT PROCEEDINGS

On February 7, 2025, Plaintiffs filed a complaint in district court alleging that Executive Orders 14,159 and 14,218 violate the Separation of Powers, the Spending Clause, Due Process, the Tenth Amendment, and the Administrative Procedure Act (APA). ER-190-197, ER-223-234, ER 280. Plaintiffs sought, among other relief, a preliminary injunction barring Defendants from enforcing Section 17 of Executive Order 14,159, Section 2(a)(ii) of Executive Order 14,218, and relevant portions of the Bondi Directive. ER-235.

12

Plaintiffs contend that "[l]ike Executive Order 13,768 before it, Executive Order 14,159 contains both a restriction on funding … and an enforcement directive … against jurisdictions they deem 'sanctuary jurisdictions,'" and as a result "[i]n substance, both orders are the same." ER-182.

The district court granted the preliminary injunction. ER-85-90. The court agreed with Plaintiffs' assertion that the current Executive Orders and the Order from eight years ago were effectively the same, and any dissimilarity was "a distinction without a difference." ER-88. Noting that eight years earlier it had enjoined enforcement of Section 9(a) of Executive Order 13,768, the court opined that "[h]ere we are again" with an Executive Order that, in the court's view, has "the language and purpose … which mirror EO 13,768." ER-85; *see* ER-60 ("Executive Order [13,768] is nearly identical to those challenged today."). Accordingly, the district court entered a preliminary injunction, repeating its conclusion from eight years

13

earlier that the Executive Order is unlawful in every way alleged by Plaintiffs.  ER-88-89.

The district court's injunction was followed by a further order explaining the court's reasoning in more detail.  ER-19-84.  With virtually no textual analysis of the Executive Orders, the district court repeated and emphasized its conclusion that "EO 14,159, like its 2017 predecessor, threatens *all* 'Federal funds'" destined for so-called 'sanctuary' jurisdictions," ER-21 (emphasis added), and both Orders "target federal funds and payments *at large*," ER-53 (emphasis added).  According to the district court, "[t]he clear and specific language of the 2025 Executive Orders communicates that their intent is to direct executive agencies to withhold *all* federal funds from sanctuary jurisdictions," ER-66, even though the court later stated that "neither the 2025 Executive Orders nor the Bondi Directive identify *which* federal funds arising from *what* grants will be frozen absent certified compliance with Section 1373."  ER-80.  The court did not explain how those two statements could be reconciled.

14

The district court stated that Plaintiffs have standing and their claims are ripe, because Plaintiffs have policies that "fit squarely within the scope" of the sanctuary jurisdictions to which the Executive Orders apply, which "would arguably trigger loss of federal funding under the 2025 Executive Orders." ER-49, ER-51. Moreover, the Executive Orders constitute a sufficient "warning or threat to initiate proceedings," ER-62, and "[t]he mere possibility that [Plaintiffs'] reasonable fears are not realized does not defeat standing," ER-52.

On the merits, the district court's conclusions were all premised on its construction of the Executive Orders and Bondi Directive to duplicate the Executive Order from eight years ago. With respect to the Separation of Powers, the court repeated its conclusion that "[t]he 'clear and specific' language of the 2025 Executive Orders … withhold[s] *all* federal funds from sanctuary jurisdictions." ER-66. According to the district court, "[t]he 2025 Executive Orders and Bondi Directive" are not "targeted … conditions," but instead "are universal funding freezes" and "direct … a

15

freeze on *all federal funding* to sanctuary jurisdictions." ER-67. Based on that understanding, the court held that the Government has "no defense" on the Separation of Powers argument because it "has identified no statutory basis or Congressional authorization" to withhold all federal funding from sanctuary jurisdictions on a categorical and government-wide basis. ER-66-67.

The district court's Spending Clause analysis is of a piece. The court repeated its premise that "both the executive orders and the Bondi Directive …. condition *all* federal funding and federal payments and *all* DOJ funding" on sanctuary-jurisdiction status. ER-69. Based entirely on that premise, the court reasoned that Plaintiffs "were unaware of" any sanctuary-jurisdiction conditions, ER-68, and that the required "nexus is lacking" because "most of the categories of federal funding have *nothing to do* with immigration enforcement," ER-69. As a result, the Executive Orders and Bondi Directive "violat[e] … the Spending Clause." ER-69.

16

The district court's Tenth Amendment analysis was predicated on the same understanding. Because "[t]he 2025 Executive Orders … order[] that *all* federal funding … be withheld unless these 'sanctuary' jurisdictions change their policies," "[t]hey, like EO 13,768, wield critical federal funding as a cudgel with which to coerce localities." ER-71 (emphasis added); *see* ER-80 ("[W]ith respect to coercion," "[t]he loss of *all* DOJ grants requires different analysis than loss of only [one particular] grant[].") The court's APA reasoning was similar: the court concluded that "the Bondi Directive fails to offer a reasonable explanation of the *breadth of funding withheld*" or "a plausible reason for why a *total freeze* on *all DOJ funding* is necessary to advance the 2025 Executive Orders." ER-78 (emphases added). The court likewise held that the Bondi Directive exceeds statutory authority because "the Government has offered no statutory or caselaw authority supporting its right to impose *a total funding freeze*" on sanctuary jurisdictions. ER-80 (emphasis added). The court's due process analysis similarly turned on the view that "the 2025 Executive Orders command executive agencies to

17

identify sanctuary jurisdictions and ensure that they receive *no federal funding*," which violates due process because "they provide no process for notifying jurisdictions about such a determination and no opportunity to be heard." ER-75.

Finally, the district court's irreparable harm analysis was equally premised on the court's conclusion that "the 2025 Executive Orders and Bondi Directive … threaten *all* federal funding" and thus "the harm [Plaintiffs] face is real and imminent." ER-81 (emphasis added). In a similar fashion, the court balanced the equities in Plaintiffs' favor in large part because of the "broad … language" in the Executive Orders and Bondi Directive. ER-82.

Days later, the district court issued a further order clarifying its preliminary injunction. ER-11-18. The court once again made it clear that all its conclusions turned on its expansive understanding of the Executive Orders and Bondi Directive: "the litigation may not proceed with the coercive threat to end *all federal funding*" and "that is why they are

18

enjoined." ER-11 (emphasis added). It repeated its view that the Orders and Bondi Directive "threatened to withhold *all* federal funding from sanctuary jurisdictions," ER-13; *see* ER-14 ("withhold *all* federal funds"), and explained that "[t]hese provisions' respective broad scopes drove my conclusion," ER-15. *See also* ER-16 (describing "problems … pertaining to the overbreadth of EO 14,159 and EO 14,218").

The district court then stated that "[w]hile the *letter* of the Preliminary Injunction refers to specific sections of EO 14,159, EO 14,218, and the Bondi Directive, its *spirit* enjoins the kind of coercion that was evident … in the language of those sections." ER-14. Accordingly, the court construed its injunction to "reach[] any subsequent Executive Order or Government action that poses the same coercive threat to eliminate or suspend federal funding based on the Government's assertion that a jurisdiction is a 'sanctuary' jurisdiction." ER-14. The court held that no "Government action that postdates the Preliminary Injunction can be used as an end run around the Preliminary Injunction Order," and the injunction

19

"shall be read to apply to *any* Executive Order or agency directive that purports to attempt to cut off federal funding from States or localities that meet the Government's definition of 'sanctuary' jurisdiction in the wholesale, overly broad and unconstitutional manner threatened by" the Executive Orders.  ER-18.

The district court nonetheless explained that "the Government is entitled to identify particular grants and funding programs that it believes should be conditioned upon compliance with immigration-related objectives, and to litigate its position."  ER-12.  If the Government "identifi[ed] the funds the Government believes are at issue … in a constitutionally targeted way … following an evaluation of the type of funding involved to determine if there is a nexus between the funding stream, the jurisdiction's policies, and the desired immigration-related conditions," doing so "may resolve some of the problems" identified by the court.  ER-16.

Defendants filed a timely notice of appeal.

20

## STANDARD OF REVIEW

To obtain the "extraordinary remedy" of a preliminary injunction, a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20, 22 (2008). This Court reviews an order regarding preliminary injunctive relief for abuse of discretion. *Credit Suisse First Bos. Corp. v. Grunwald*, 400 F.3d 1119, 1126 n.7 (9th Cir. 2005). Any "underlying issues of law," however, are reviewed de novo. *Id.*

## SUMMARY OF ARGUMENT

The district court's entire analysis was predicated on its mistaken understanding of the scope of the Executive Orders and the Bondi Directive. The plain text of Executive Order 14,159 does not apply to all federal grants throughout the Executive Branch but instead limits its scope to the Departments of Justice and Homeland Security, and those agencies, in turn, are directed to conduct a grant-by-grant or program-by-program

21

analysis to determine whether a sanctuary-jurisdiction condition should apply and whether imposing such a condition would be lawful. That limited scope is confirmed by the pre-litigation Bondi Directive, the Government's pre-injunction implementation of the Order, and the interpretive principles applied by this Court in *San Francisco*.

The district court misunderstood Executive Order 14,218 as well. That Order does not apply to federal grants to States and localities at all but applies only to federal public benefits for individuals who are aliens unlawfully present in the United States and imposes a restriction pursuant to longstanding federal law. The Order's limited scope is again confirmed by the Government's pre-injunction implementation of that Order.

The district court's mistaken understanding of the Executive Orders and Bondi Directive led to its erroneous holding that Plaintiffs are likely to succeed on the merits and that they will suffer irreparable harm in the absence of an injunction. The Orders merely direct Executive Branch officers to take *lawful* actions in imposing any sanctuary-jurisdiction

22

conditions on grants, and to follow existing law with respect to the payment of federal public benefits. That alone is a sufficient basis for vacating the injunction, but even without that express limitation the Executive Orders, as properly and narrowly understood, easily satisfy constitutional and APA requirements.

Compounding its error, the district court purported to "clarify" that its injunction would extend not only to the Executive Orders and Bondi Directive at issue in this litigation, but to any other potential future government action that falls within the "spirit" of its injunction. The court thus contravened principles of equitable relief and Federal Rule of Civil Procedure 65 by adopting an amorphous and sweeping standard for overseeing a broad swath of Executive authority, improperly inserting itself between the President and his subordinate officers, and effectively requiring the agencies to seek preclearance from the district court even for discrete grant-specific sanctuary-jurisdiction conditions. Accordingly, this Court should vacate the injunction as an abuse of discretion.

23

## ARGUMENT

Plaintiffs cannot establish any of the elements required for a preliminary injunction. Under a proper understanding of the Executive Orders and Bondi Directive, they cannot show a likelihood of success on the merits or that they will suffer irreparable harm. As properly understood, the Executive Orders and Bondi Directive are narrow and direct agencies only to take lawful actions. With that proper understanding, Plaintiffs' legal arguments largely resolve themselves.

## I. THE DISTRICT COURT MISCONSTRUED THE EXECUTIVE ORDERS

The district court mistakenly assumed that the new Executive Orders were effectively duplicates of the prior Executive Order enjoined in *San Francisco* merely because Executive Order 14,159 refers to "'sanctuary' jurisdictions" and "Federal funds" and Executive Order 14,218 refers to "'sanctuary' policies" and "Federal payments." As discussed below, examination of the text of the Orders, the Government's implementation of the Orders prior to the injunction, and this Court's reasoning in *San*

24

*Francisco* lay bare the district court's error — an error that then inexorably led to the district court's mistaken holding that Plaintiffs are entitled to a preliminary injunction.

Executive Order 14,159 does not apply to all federal funding. Rather, it applies only to the Departments of Justice and Homeland Security and does not require those two Departments to withhold all of their funding from sanctuary jurisdictions but only to "evaluate" their own programs on a grant-by-grant basis, "undertak[ing] any lawful actions," and "employ[ing] all lawful means," in determining which programs should be subject to a sanctuary jurisdiction condition. ER-96, ER-99. Executive Order 14,218 does not apply to federal funding to States and localities at all but instead restricts the provision of federal public benefits to individuals who are unlawfully present in the United States and to do so pursuant to longstanding statutory requirements.

A. <u>Executive Order 14,159 Applies Narrowly to Programs Administered by the Departments of Justice and Homeland Security and Only on a Grant-by-Grant Basis</u>

1. *The Plain Text of Section 17 Limits Its Scope.* "[T]he interpretation of an Executive Order begins with its text." *Bassidji v. Goe*, 413 F.3d 928, 934 (9th Cir. 2005). Contrary to the district court's understanding, the text of Section 17 of Executive Order 14,159 does not impose a government-wide, all-encompassing directive to withhold from sanctuary jurisdictions the entirety of federal funds from every single federal agency. Rather, on its face, Section 17 is a directive to "[t]he Attorney General and the Secretary of Homeland Security," and even within those agencies it does not require a termination of all funding but instead directs the agencies to "evaluate" both whether a sanctuary jurisdiction condition is appropriate and whether doing so would be a "lawful action[]." ER-99. Only if a Department deems a condition appropriate after that evaluation is the agency to "undertake" imposing the condition. ER-99.

26

The focus on the Departments of Justice and Homeland Security makes sense given the central role those Departments play in enforcing federal immigration law.  Moreover, where the President intends for his Executive Order to apply throughout the Executive Branch, he states so explicitly.  For example, Section 2 of Executive Order 14,218 and Section 3 of Executive Order 14,287 each contain a directive to "the head of each executive department or agency."  ER-92, ER-94.  The text in Section 17, referring solely to the Attorney General and Secretary of Homeland Security, conveys a more limited meaning.

And as noted, even within the Departments of Justice and Homeland Security, the Order does not contemplate a sanctuary-jurisdiction condition on each and every grant or program.  Instead, the Order directs the Attorney General and Secretary to "evaluate" both the appropriateness and legality of conditions on a case-by-case basis.

2.     *The Bondi Directive Confirms the Order's Narrow Scope.*  The Bondi Directive is consistent with, and confirms, the limited scope of Executive

27

Order 14,159.  That Directive — addressed to "all Department employees" as opposed to all employees of the Executive Branch — states that "the Department of Justice will ensure that, consistent with law, 'sanctuary jurisdictions' do not receive access to Federal funds *from the Department.*" ER-146 (emphasis added).  In doing so, "[t]he Department will exercise *its own authority* to impose any conditions of funding," ER-146 (emphasis added), and will do so "in coordination with components that provide *Department* grants," ER-147 (emphasis added).  The Bondi Directive, like the Executive Order, also emphasized that the Department should do so "consistent with law" and "[c]onsistent with applicable statutes, regulations, court orders, and terms."  ER-146.

Consistent with the Executive Order's instruction to "evaluate" the Department's grants, ER-99, the Bondi Directive instructed the Associate Attorney General, in coordination with components that provide Department grants, to "report to the Attorney General the grants to which this requirement applies," ER-147.  The district court conceded that prior to

28

its injunction, the "Bondi Directive" had yet to "identify *which* federal funds arising from *what* grants will be frozen absent certified compliance with Section 1373," ER-80, which only underscores that the Executive Order and the Bondi Directive did not impose sanctuary-jurisdiction conditions on each and every program administered by the Department of Justice.

3.      *The Government's Implementation Confirms the Order's Narrow Scope.*  The Government's implementation of Executive Order 14,159 — prior to the district court's preliminary injunction — further confirms this narrow understanding.

As just noted, the Bondi Directive called for a "report" on the "grants to which [the Directive] applies," ER-147, and prior to the injunction the Department of Justice had yet to identify any grants to which the condition would apply, ER-80.  Those facts confirm that the Order was not intended to be, and was not taken by the Department to be, an instruction to impose a sanctuary jurisdiction condition on every grant administered by the

29

Department of Justice, rather than undertake an individualized assessment on a grant-by-grant basis.

The Department of Homeland Security (DHS) similarly understood the Executive Order merely to require a grant-by-grant evaluation of DHS-administered grants, rather than applying to every grant across the government (or even within DHS). The Secretary's directive explained that sanctuary jurisdictions "should not receive a single dollar of *the Department's* money unless Congress has specifically required it" and directed "[a]ll components … *to review* all federal financial assistance awards to determine if *Department funds* … are going to sanctuary jurisdictions." ER-144-145 (emphases added); *see* ER-145 ("Within 30 days, each component shall *provide a report* to the Undersecretary for Management with a summary of actions taken to comply with this memorandum.") (emphasis added). And like the savings clause in the Executive Order, the Secretary specified that sanctuary-jurisdiction conditions should be applied only "[t]o the extent consistent with relevant

30

legal authorities and the applicable terms and conditions of each award."
ER-145.

Consistent with those instructions, the Federal Emergency
Management Agency (FEMA), a component agency within DHS, 6 U.S.C.
§§ 113(a)(1)(D), 313, sent to the Secretary of Homeland Security its
recommendation "[i]n compliance with" DHS's instructions that identified
grant programs for which "sanctuary jurisdiction conditions should
apply."  ER-110.

Rather than apply the wholesale approach the district court believed
to be required by the Executive Order, FEMA recommended conditions or
restrictions be placed only on awards for 12 specific programs, and even
for those programs "application of conditions or restrictions will vary
based on the structure or authority of each respective program."  ER-111.
Those 12 programs were identified either because "the purpose of the grant
has a nexus to immigration activities, law enforcement, or national
security" or because the governing statute "does not limit how FEMA

31

implements the program." ER-111. For example, FEMA identified programs that fund "local governments for the purpose of border protection and border security," "services to aliens in immigration removal proceedings," or activities related to "aliens following their release from DHS," ER-130-132, and identified other programs and grants that are "[d]iscretionary" with "no statutory award criteria," ER-130-132.

By contrast, FEMA recommended a blanket exemption under which "conditions or restrictions on sanctuary jurisdictions <u>not</u> apply to disaster grants, non-disaster mitigation grants, and grants to fire departments and organizations that comprise the National Urban Search and Rescue Response System." ER-111. FEMA also identified dozens of other specific grant programs for which it did *not* recommend the application of any sanctuary jurisdiction condition or restriction. ER-114-118.

4. *The Interpretive Principles of* San Francisco *Do Not Apply.* This Court in *San Francisco* held that Executive Order 13,768 "plainly" applied to "essentially all federal grants," 897 F.3d at 1242, even though that Order

32

(like Executive Order 14,159) was similarly directed only to "the Attorney General and the Secretary" of Homeland Security, ER-104; *see* 897 F.3d at 1239. *San Francisco* also declined to give weight to an Attorney General Memorandum that purported to narrow the scope of Executive Order 13,768. *See* 897 F.3d at 1240-43. However, the interpretative principles invoked by this Court as a basis for construing Executive Order 13,768 more broadly, and its reasons for declining to give weight to an Attorney General Memorandum, have no application to Executive Order 14,159.

*Interpretive Principles*.

The prior Executive Order instructed the Director of the Office of Management and Budget (OMB) "to obtain and provide relevant and responsive information on all Federal grant money that currently is received by any sanctuary jurisdiction." ER-104. This Court reasoned that "[t]here would be little reason for the Director to perform such a comprehensive review if the Executive Order [were] meant only" to be

33

directed at programs administered by the Departments of Justice and Homeland Security. *San Francisco*, 897 F.3d at 1239.

But Executive Order 14,159 contains no such provision directing OMB to create a comprehensive list of all federal grant money for sanctuary jurisdictions or anything similar. OMB is mentioned in that Order only with respect to funding for "*non-governmental* organizations," ER-100 (emphasis added), or the provision of public benefits "to any illegal alien," ER-100, neither of which pertain to the federal funding to States and localities at issue in this case. Nor do those provisions require the kind of government-wide comprehensive catalog of federal funding required in the prior Executive Order.

The prior Executive Order also directed that sanctuary jurisdictions are not eligible to receive federal grants "except as deemed necessary for law enforcement purposes by the Attorney General or the Secretary." ER-104. This Court reasoned that "[b]y specifically excluding grants 'deemed necessary for law enforcement purposes,'" the prior Executive Order

34

implicitly "directs the Attorney General and the Secretary to cut *all other* grant programs." *San Francisco*, 897 F.3d at 1239 (emphasis added). Whatever force that interpretative canon had in *San Francisco*, it has no application here. Section 17 of Executive Order 14,159 does not contain any similar exception for grants deemed necessary for law-enforcement purposes, and thus no similar inference can be drawn in this case.

*Attorney General Memorandum.*

This Court previously declined to defer to an Attorney General Memorandum narrowly construing the scope of the prior Executive Order from eight years ago, *San Francisco*, 897 F.3d at 1240-43, but the Court's reasons for doing so have no application here.

To begin with, for the reasons discussed above (*supra* at 32-35), *San Francisco* construed the prior Executive Order to apply broadly to *all* federal grants. The *San Francisco* Court declined to defer to an Attorney General Memorandum's narrower interpretation because it would have been at odds with the plain language of the Executive Order as understood

35

by the Court. 897 F.3d at 1242. In this case, the opposite is true: the Bondi Directive is not at odds with text of Executive Order 14,159 but is consistent with, and in fact confirms, the Order's limited application to the Departments of Justice and Homeland Security.

Second, this Court noted that where "an agency's interpretation involves an issue of 'deep economic and political significance,' it may not be entitled to deference." *San Francisco*, 897 F.3d at 1242. That may be true in the context of a broad, unprecedented, and sweeping authority perceived to be required by the prior Executive Order, but here the Bondi Directive asserts a narrowing interpretation, consistent with the Order's text, limited to programs administered by the Department of Justice, and designed to *avoid* the concerns identified by this Court in *San Francisco*. Indeed, there is no reason to adopt a broad reading of the Executive Order when doing so would force a conflict with this Court's decision in *San Francisco* and be at odds with a narrower understanding adopted by the Executive Branch.

36

Third, the *San Francisco* Court noted that the Attorney General's construction of the prior Executive Order purported to narrow the Order's scope with respect to the entire Executive Branch, even though that Memorandum can have "no force outside of the Department of Justice." 897 F.3d at 1242. Although, "[a]s a general rule, we give significant weight to an agency interpretation of an executive order," *id.* at 1241-42, this Court was loath to apply the Attorney General's narrowing construction to other parts of the Executive Branch over which the Attorney General had no authority. The present circumstances are different. Executive Order 14,159 by its terms applies only to the Departments of Justice and Homeland Security, and therefore the Bondi Directive's narrow understanding of the Order is aligned with the plain scope of the Executive Order.[4]

Finally, this Court concluded that the Attorney General Memorandum in *San Francisco* was a "*post hoc* justification adopted in

---

[4] The Department of Homeland Security's guidance similarly confirms the Order's limited scope. *See supra* at 30-31.

response to litigation," issued months after the Executive Order and only after the district court issued its preliminary injunction. 897 F.3d at 1242; *see id.* at 1240. Once again, the opposite is true here: the Bondi Directive was issued a mere 16 days after Executive Order 14,159, and before a complaint was filed in this litigation. The Bondi Directive was prompted by the Executive Order (not this litigation) and was directly responsive to the Order's directive to perform grant-by-grant analysis.[5]

> ### B. Executive Order 14,218 Applies to Federal Public Benefits for Individuals Governed by Federal Statute, Not Grants to States and Their Subdivisions

The district court also misunderstood the scope of Executive Order 14,218. While that Order applies government-wide, *see* ER-94 ("the head of

---

[5] *San Francisco* also relied on statements from the President and members of his Administration in broadly construing the prior Executive Order. 897 F.3d at 1237-38, 1241, 1243. But as this Court acknowledged, "the Administration's statements cannot alter the plain meaning of the Executive Order," *id.* at 1243; *see id.* at 1249 (Fernandez, J, dissenting) ("[T]he plain language of the Executive Order should [not] be ignored in favor of comments made dehors the order itself."), and for the reasons noted above that plain meaning confines the Order's scope and does not apply to all federal grants throughout the Executive Branch.

each executive department or agency"), it is not directed at federal grants or programs that fund *States and localities*.  Rather, the Order implements longstanding statutory authority restricting the payment of federal public benefits *for individuals* who are aliens unlawfully present in the United States.

Nearly 30 years ago, Congress enacted the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA).  *See supra* 10-12.  In that statute, Congress enacted a "national policy with respect to welfare and immigration" specifying that "aliens within the Nation's borders [should] not depend on public resources to meet their needs."  8 U.S.C. § 1601(2)(A).  The statute noted that, notwithstanding that policy, "aliens have been applying for and receiving public benefits from Federal, State, and local governments at increasing rates" and explained that "[i]t is a compelling government interest to remove the incentive for illegal immigration provided by the availability of public benefits."  8 U.S.C. § 1601(3), (6).

39

Under PRWORA, with certain exceptions, "an alien who is not a qualified alien … is not eligible for any Federal public benefit." 8 U.S.C. § 1611(a). In general, an alien is not qualified if he or she is not lawfully admitted to the United States. *Id.* at § 1641(b). "Federal public benefits" include "any … welfare, health, disability, public or assisted housing … food assistance … or any other similar benefit for which payments or assistance are provided to an individual, household, or family eligibility unit by an agency of the United States or by appropriated funds of the United States." *Id.* at § 1611(c)(1). Under that definition, such payments are governed by PRWORA's restrictions "even if administered by a state or local agency" or are made through "a joint federal-state cooperative partnership." *Pimentel v. Dreyfus*, 670 F.3d 1096, 1099 n.4 (9th Cir. 2012) (per curiam).

The entire text of Executive Order 14,218 makes clear that its purpose is to implement the longstanding restrictions on the provision of federal public benefits to individuals that Congress enacted in PRWORA. The

40

Order begins by noting that PRWORA "generally prohibits illegal aliens from obtaining most taxpayer-funded benefits" and announces as its purpose upholding the core restrictions in that statute.  ER-94.

Section 2 of the Order — entitled "Preserving Federal Public Benefits," ER-94 — also makes clear that its purpose is to implement PRWORA's conditions.  Section 2(a)(i) of the Order, in order to "prevent taxpayer resources from acting as a magnet and fueling illegal immigration to the United States" and "to ensure … that no taxpayer-funded benefits go to unqualified aliens," instructs the head of each executive department or agency to "identify all federally funded programs administered by the agency that currently permit illegal aliens to obtain any cash or non-cash public benefit" and "take all appropriate actions to align such programs with … the requirements of applicable Federal law, including the PRWORA."  ER-94.[6]

---

[6] Other statutes similarly restrict federal benefits for aliens not lawfully admitted to the United States.  *See, e.g.*, 7 U.S.C. § 2015(f)

41

Section 2(a)(ii) of the Order — the provision enjoined by the district court — further directs all heads of departments and agencies to ensure that "Federal payments to States and localities" do not, "by design or effect, facilitate the subsidization or promotion of illegal immigration" or "abet so-called 'sanctuary' policies that seek to shield illegal aliens from deportation." ER-94. This subsection, like the rest of the Order, also implements and enforces PRWORA's existing restrictions. Though Section 2(a)(ii) does not expressly refer to PRWORA, it applies to "Federal payments," ER-94, and PRWORA itself uses similar language in referring to the restrictions on federal public benefits. *See* 8 U.S.C. § 1611(c)(1)(B) (restricting "payments" "by an agency of the United States or by appropriated funds of the United States"). In addition, Section 2(a)(ii) refers to federal payments "to States and localities," ER-94, which in the context of a section entitled "Preserving Federal Public Benefits" naturally

_____

(Supplemental Nutrition Assistance Program); 42 U.S.C. § 1436a(a) (federal financial assistance related to housing).

refers to federal public benefits to individuals that are administered through States and localities, which are likewise governed by PRWORA's restrictions. *See supra* at 40.

Notably, unlike Executive Order 14,159, which refers to whether "'sanctuary' jurisdictions … receive access to Federal funds," ER-99, Executive Order 14,218 does not direct agencies to withhold federal funding. Instead, that Order speaks in terms of "ensur[ing] … that Federal Payments … do not" have a certain "effect," such as "subsidiz[ing] … illegal immigration," ER-94, which reinforces the fact that Executive Order 14,218 addresses existing restrictions on which *individuals* may receive federal public benefits, rather than addressing federal funding for States and localities. Nor is there anything unlawful in restricting the receipt of federal public benefits to ensure that providing those benefits does not frustrate the federal government's interests in combatting illegal immigration. *Cf. Mathews v. Diaz*, 426 U.S. 67, 80-83 (1976).

43

Section 2(a)(ii)'s reference to federal payments that "by design or effect, facilitate the subsidization or promotion of illegal immigration, or abet so-called 'sanctuary' policies that seek to shield illegal aliens from deportation," ER-94, echoes PRWORA's stated purpose.  Congress noted that providing federal public benefits to aliens unlawfully present in the United States creates an "incentive for illegal immigration" that the statute was intended to "remove."  8 U.S.C. § 1601(6).  The Executive Order similarly notes that providing "taxpayer resources … act[s] as a magnet … fueling illegal immigration" and the Order is designed "[t]o prevent" that effect.  ER-94.  Likewise, sanctuary jurisdiction policies may "by design or effect" "abet" the same incentive for illegal immigration or frustrate the federal government's efforts to combat illegal immigration through deportation, and in that way the Executive Order also mirrors and reinforces the existing policies Congress enacted in PRWORA.  In the final analysis, the Executive Order simply reflects a renewed commitment to uphold and enforce — in sanctuary jurisdictions and non-sanctuary

44

jurisdictions alike — the restrictions on federal public benefits Congress enacted nearly 30 years ago.

The Government's implementation of Executive Order 14,218 (prior to the preliminary injunction) further confirms this understanding. The Secretary of Housing and Urban Development (HUD) issued a letter — addressed to all HUD grantees and stakeholders (not just sanctuary jurisdictions) — reiterating that the Executive Order "reinforces" PRWORA, and that the statute "unequivocally prohibits illegal aliens from receiving certain federal public benefits, including many forms of assistance provided under HUD programs." ER-109. The letter also noted that separate federal law also "prohibits HUD from making financial assistance available to persons other than United States citizens or certain categories of eligible noncitizens." ER-109; *see supra* note 6.

Subsequently, HUD issued its Grant Agreement for its Continuum of Care Program, which relates to funding for homeless individuals. 42 U.S.C. § 11382; 24 C.F.R. § 578.1(b). That Grant Agreement stated that

45

"[t]he recipient must administer its grant in accordance with all applicable immigration restrictions and requirements, including [PRWORA] and any applicable requirements that HUD, the Attorney General, or the U.S. Center for Immigration Services may establish from time to time to comply with PRWORA, Executive Order 14218, or other Executive Orders or immigration laws."  ER-108.  The Government's pre-injunction implementation of Executive Order 14,218 thus confirms that the Order is directed at enforcing the restrictions contained in pre-existing federal law under PRWORA with respect to federal public benefits.  Executive Order 14,218 is not, as the district court believed it to be, a directive to withhold all federal funding government-wide for any sanctuary jurisdiction.

## II.    PLAINTIFFS' CLAIMS ARE MERITLESS

As explained below, with a proper understanding of the narrow scope of Executive Orders 14,159 and 14,218, Plaintiffs' various constitutional and APA arguments are meritless.  Accordingly, Plaintiffs

46

cannot show any likelihood of success on the merits and the preliminary

injunction is an abuse of discretion for that reason alone.

Even the district court recognized that "the Government is entitled to

identify particular grants and funding programs that it believes should be

conditioned upon compliance with immigration-related objectives, and to

litigate its position." ER-12. That recognition suffices to defeat any facial

challenge to Executive Order 14,159. Any challenges to individual

applications of the Executive Order to particular grant programs would

present a ripe controversy only if a particular putative funding recipient

alleged that the government's identified source of authority to impose that

condition was inadequate. But the potential for such challenges — which

are not presented here — is no basis for the district court's sweeping

conclusions or injunction.

And none of the district court's reasoning applies to Executive Order

14,218, which merely directs agencies to enforce pre-existing federal law.

Again, if Plaintiffs or others believe that the federal government has

47

applied PRWORA erroneously in a particular instance, that may give rise

to a ripe challenge in a particular factual scenario. But that, too, would not

be a challenge to the Executive Order but rather to a discrete agency action

that would depend on the interpretation of PRWORA or other applicable

law.

A.    The Executive Orders Direct Only "Lawful" Actions

Executive Order 14,218 directs agencies and departments to act

"consistent with applicable law," ER-94 — namely, to follow the

restrictions in PRWORA — and nothing in that instruction could be

unlawful or warrant an injunction of any kind. The district court did not

even purport to examine whether an order to comply with PRWORA

would violate the Constitution or the APA in the way Plaintiffs alleged.

Executive Order 14,159, for its part, directs that Executive Branch officers

"shall employ all *lawful* means" to carry out the Order, ER-96 (emphasis

added), and should "undertake any *lawful* actions," ER-99 (emphasis

added), with respect to funding conditions on sanctuary jurisdictions. The

48

Order itself does not direct specific funding decisions; rather, it calls on the Departments of Justice and Homeland Security to "evaluate" whether any lawful actions should be undertaken. ER-99.

Where, as here, an Executive Order "is not self executing," and instructs subordinate officers to take action only to the extent permitted by law, "[t]he mere possibility that some agency might make a legally suspect decision … to deny funding for a project does not justify an injunction." *Building & Const. Trades Dept. v. Allbaugh*, 295 F.3d 28, 33 (D.C. Cir. 2002). It cannot be unlawful for a President to direct his subordinate officers to carry out his policies consistent with all applicable law, and an injunction prohibiting such instructions is seriously at odds with the President's Article II authority. Courts should be especially reluctant to enjoin such instructions before Executive Branch agencies even have an opportunity to carry out the President's instructions in a lawful manner.

*San Francisco* does not compel a different conclusion. 897 F.3d at 1239-40. As understood by that Court, the prior Executive Order

49

"unambiguously command[ed] action," *id.* at 1240, by "plainly

command[ing]" the "withdraw[al]" of "essentially all federal grants," *id.* at

1242, which, in the Court's view, meant that there was "more than the mere

possibility" of unlawful agency decision-making, *id.* at 1240. Executive

Order 14,159, by contrast, does not command the withdrawal of all federal

grants. It merely instructions the Departments of Justice and Homeland

Security to "evaluate" funding on a grant-by-grant basis, and to impose

such a condition only if "lawful." ER-99. The Order's savings clause does

not render "judicial review a meaningless exercise, precluding resolution of

the critical legal issues." *San Francisco*, 897 F.3d at 1240. Rather, to the

extent individual agencies make grant-specific decisions about sanctuary-

jurisdiction conditions, meaningful judicial review of those discrete

decisions would be available to resolve the critical legal issues. *See supra* at

47-48. Even accepting *San Francisco* as circuit precedent, as the panel must,

it should not be extended to stand for the proposition—in contrast to the

D.C. Circuit's precedent—that directives to conform Executive Branch conduct to the law should be ignored as a general matter.

Even independent of the Order's savings clause, however, the preliminary injunction should be reversed because Plaintiffs' arguments on the merits are baseless.

B.   Separation of Powers

Plaintiffs' Separation of Powers argument, and the district court's preliminary injunction, turn on whether the President's Executive Orders directed agencies to take actions without regard to whether they were authorized by statute. *San Francisco*, 897 F.3d at 1231-35; ER-64-67.  In concluding that the prior Executive Order at issue in *San Francisco* violated the Separation of Powers, this Court focused on three related points.  First, as noted above (*supra* at 6, 32, 49-50), the Court understood the prior Executive Order to "plainly" apply to "essentially all federal grants."  897 F.3d at 1242.  Second, the scope of authority claimed by the prior Executive Order rested on a single federal statute, 8 U.S.C. § 1373.  *San Francisco*, 897

51

F.3d at 1239 ("withdraw[s] all federal grants from [sanctuary] jurisdictions … noncompliant with § 1373"); *see* ER-104 ("jurisdictions that willfully refuse to comply with 8 U.S.C. 1373 (sanctuary jurisdictions) are not eligible to receive Federal grants").  The mismatch between withdrawing all federal funding from every agency based on Section 1373, which the Court saw as a narrow basis, led this Court to conclude that "there is no reasonable argument that the President has not exceeded his authority." 897 F.3d at 1234-35.  Third, although the prior Executive Order purported to limit its scope to applications "consistent with law," ER-104, this Court held that such a "savings clause" could not "be given effect" when it "would override clear and specific language" in the Order, 897 F.3d at 1239.

The Executive Orders at issue in this case are the opposite in each relevant way.  First, neither Order asserts the kind of broad authority that this Court understood to have been claimed by the prior Executive Order. As explained above, Executive Order 14,159 applies only to programs

52

administered by the Departments of Justice and Homeland Security, and even within those Departments federal funds are evaluated on a grant-by-grant or program-by-program basis, rather than in any blanket or categorical fashion. Indeed, as the district court acknowledged, the Department of Justice has yet to identify any specific funding to be withheld from sanctuary jurisdictions. ER-80 ("[N]either the 2025 Executive Orders nor the Bondi Directive identify *which* federal funds arising from *what* grants will be frozen absent certified compliance with Section 1373."). And FEMA (under the direction of DHS) has identified only 12 programs that might be subject to a sanctuary jurisdiction condition and announced dozens more that will *not* be subject to any such restriction (in addition to a blanket exemption for disaster grants and non-disaster mitigation grants). As for Executive Order 14,218, that Order does not apply to federal grants to States and localities at all but applies only to federal public benefits for individuals, and then only for individuals who are aliens unlawfully present in the United States.

53

Second, unlike the prior Order, the current Executive Orders are not predicated exclusively on the statutory authority in Section 1373. Executive Order 14,218 expressly relies on the long-standing authority under PRWORA, and HUD's implementation of that Order (prior to the injunction) expressly invoked PRWORA, and other relevant federal statutes restricting public benefits for unlawful aliens. *See* ER-109; ER-108. HUD is also statutorily authorized to require Continuum of Care applicants "to comply with such other terms and conditions as the Secretary may establish to carry out this subtitle in an effective and efficient manner." 42 U.S.C. § 11386(b)(8). As for Executive Order 14,159, unlike the Order eight years earlier, it is not expressly and exclusively predicated on the authority in Section 1373; instead, the Order leaves the Departments of Justice and Homeland Security free to enforce the provisions of the Order "to the maximum extent possible under law" by taking "any lawful actions" authorized by statute. ER-99. And FEMA's pre-injunction implementation, in identifying 12 specific grants for which the sanctuary-

54

jurisdiction condition might apply, invoked specific statutes other than Section 1373 that, in the agency's view, authorized it to impose such a condition. ER-130-132.

Of course, the Bondi and Noem Directives define sanctuary jurisdictions in part by reference to a refusal to comply with Section 1373, ER-146-147, and the Fiscal Year 2025 DHS Standard Terms and Conditions § IX(1)(a), also would require recipients to certify compliance with Section 1373, ER-136. But whether a particular grant requires compliance with Section 1373 as a condition of funding does not mean that the *statutory authority* for imposing that condition derives from Section 1373 itself. Rather, statutory authority is determined with reference to whatever authority an agency invokes to impose the condition at issue, typically the statute that itself authorizes the agency to award the grant. *See, e.g.*, *City of Providence v. Barr*, 954 F.3d 23, 30-45 (1st Cir. 2020) (authorization for grant condition requiring compliance with Section 1373 assessed by whether that condition was authorized under the Byrne JAG grant statute, 34 U.S.C.

55

§§ 10151-10158).  In addition, the mere fact that an agency requires

compliance with Section 1373 as a condition for awarding a grant does not

necessarily render that condition unlawful as a statutory or constitutional

matter.  *New York v. U.S. Dep't of Justice*, 951 F.3d 84 (2d Cir. 2020).

Finally, as discussed above, Executive Order 14,159's savings clause

— to "undertake any *lawful actions*," and "employ all *lawful* means to

ensure the faithful execution of the immigration laws of the United States."

ER-96, ER-99 (emphases added) — can be given effect if necessary to avoid

Separation of Powers concerns.  *Cf. Trump v. American Federation of*

*Government Employees*, -- S. Ct. ----, 2025 WL 1873449 (July 8, 2025)

(Sotomayor, J., concurring in the grant of stay) ("[T]he relevant Executive

Order directs agencies [to act] 'consistent with applicable law'" and

because the agencies' implementation plans "are not before this Court, at

this stage … we have no occasion to consider whether they can and will be

carried out consistent with the constraints of law.").  Because Executive

Order 14,159 has a carefully circumscribed scope, giving effect to its

56

savings clause to further narrow that Order would not override the plain

text of the Order as this Court held would have been the case in *San*

*Francisco*.  To the extent that any theoretical Separation of Powers concern

might arise with respect to a particular grant and the statutory authority on

which it is predicated, the Order's savings clause would mitigate any such

concerns.  The same is true for the Order's severability provision, which

can likewise be given effect if necessary to sever any unlawful applications

of the Order.  ER-100.[7]

This appeal, however, does not present an occasion for this Court to

analyze any proposed grant restriction implementing the Executive Orders

(to the extent partial implementation was undertaken by certain agencies

prior to being enjoined).  The district court entered an across-the-board

injunction prohibiting any enforcement of those Orders or the Bondi

---

[7] For the same reasons that the Executive Orders and Bondi Directive
do not violate the Separation of Powers, the district court also erred in
concluding that the Bondi Directive violates the APA because it is in excess
of statutory authority.  *See* ER-79-80.

57

Directive based on its erroneous conclusion that they assert the same broad and comprehensive authority claimed by the prior Executive Order and thus violate the Separation of Powers for the same reasons. The district court's conclusion can and should be reversed solely because of that fundamental error. Plaintiffs could, of course, assert that particular and discrete restrictions imposed under either Executive Order are unlawful, but Plaintiffs have not done so in this litigation (*see supra* at 47) and such an analysis played no part in the district court's judgment. Accordingly, the district court's preliminary injunction was an abuse of discretion regardless of how any program-by-program scrutiny might turn out in a future case.

C.     Spending Clause

Under the Spending Clause, Congress has broad power to "attach conditions on the receipt of federal funds." *South Dakota v. Dole*, 483 U.S. 203, 206 (1987). However, "if Congress desires to condition the States' receipt of federal funds, it must do so unambiguously, enabling the States to exercise their choice knowingly, cognizant of the consequences of their

participation." *Id.* at 207. In addition, "conditions on federal grants might be illegitimate if they are unrelated to the federal interest in particular national projects or programs." *Id.* The district court concluded that the Executive Orders violated these principles because Plaintiffs "were unaware of and therefore could not have assented to [the relevant conditions] when choosing to receive federal funding," and because the Executive Orders impose conditions "without a nexus to the affected funds." ER-68. The district court's conclusions are meritless.

      1.   *Unambiguous Conditions.*

Any conditions imposed pursuant to the Executive Orders are clear and unambiguous. Executive Order 14,218 merely implements the requirements Congress imposed 30 years ago in PRWORA. Those requirements — that federal public benefits, even when administered through a State or locality, should not be provided to aliens unlawfully present in the United States — are clearly set forth in federal law, and there is no credible argument that Plaintiffs were unaware of those decades-old

statutory conditions.  Moreover, the relevant conditions are restated

explicitly in HUD's Grant Agreement for its Continuum of Care Program.

*See* ER-108; *supra* at 45-46, 54.

As for Executive Order 14,159, model sanctuary-jurisdiction

conditions are likewise stated unambiguously in the DHS Standard Terms

and Conditions, ER-136; *see* ER 24-25, and apply unless specific grant

agreements specify otherwise, and any other conditions imposed pursuant

to that Executive Order would be clearly set forth in the relevant grant

terms.[8]  Ultimately, because the district court erroneously concluded that

the Orders "apply to *all* 'federal funds' and 'federal payments,'" ER-68

---

[8] The DHS Standard Terms and Conditions "apply unless otherwise
specified in the terms and conditions" of particular grants.  ER-133.  As
further explained on the DHS website linked in the Standard Terms and
Conditions, *see id.*, "[n]ot all of DHS's Standard Terms and Conditions
apply to every DHS grant program[].  DHS directs individuals to review
the program's NOFO [Notice of Funding Opportunity] and/or FEMA-State
Agreement to determine which Terms and Conditions apply to a particular
grant."  *See* https://www.dhs.gov/publication/dhs-standard-terms-and-
conditions.

(emphasis added), it assumed that any funding conditions derive from the Executive Order itself rather than from individual grant conditions issued on a program-by-program by the relevant agencies, and therefore the court never considered whether agency-specific grant conditions could satisfy Spending Clause requirements. Absent that erroneous premise, there is no basis for any determination that any conditions would be imposed without Plaintiffs' knowledge.[9]

### 2. Sufficient "Nexus."

The district court's "nexus" rationale is equally erroneous. That conclusion was likewise premised on the court's wrong understanding that the Orders apply government-wide to all funding and payments. When Executive Order 14,218 is read properly, there can be no doubt that it is closely tied to a federal interest in the relevant federal payments. In PRWORA, Congress recognized that a restriction on federal public benefits

---

[9] Any concern with retroactive "after-the-fact" conditions on federal funds that were "already appropriated," ER-68, are addressed *infra* at 73-76.

to unlawful aliens is part of the "national policy with respect to welfare and immigration," 8 U.S.C. § 1601, and the Order simply reaffirms and reinforces existing policy and accompanying federal statutory restrictions. With respect to Executive Order 14,159, the Government's pre-injunction implementation in fact identified the nexus the district court believed to be lacking — all in keeping with the Order's direction to "undertake any lawful actions." ER-99. As noted above, *supra* at 31-32, FEMA identified 12 programs to might be subject to a sanctuary jurisdiction condition pursuant to the Order, and did so for programs "where the purpose of the grant has a nexus to immigration activities, law enforcement, or national security" or where the "statute does not limit how FEMA implements the program." ER-111. The district court acknowledged as much, ER-24, but nonetheless held that a "nexus is lacking" because the Order "condition[s] *all* federal funding … on local assistance with federal immigration enforcement," ER-69. Once again, the district court's reading of the Order is mistaken, and

62

precipitated its erroneous conclusion that the Order violates the Spending Clause.[10]

D. Tenth Amendment

Congress may use its Spending Clause power "to grant federal funds to the States, and may condition such a grant upon the States' taking certain actions that Congress could not require them to take." *National Fed'n of Indep. Bus. v. Sebelius (NFIB)*, 567 U.S. 519, 576 (2012) (plurality opinion). But even where those conditions otherwise comply with Spending Clause requirements, if "pressure turns into compulsion," those conditions may "run[] contrary to our system of federalism" and violate the Tenth Amendment. *Id.* at 577-78. To do so, the conditions must be extreme: "weapon[s] of coercion, destroying or impairing the autonomy of the states," putting a proverbial "gun to the head." *Id.* at 579, 581.

---

[10] The district court also held that the Orders violate the Spending Clause because of their coercive effect. ER-69-70. That analysis is addressed below with respect to the Tenth Amendment.

The district court acknowledged that conditions that "d[o] not involve threats to *all* federal funding" might pose no Tenth Amendment problem, ER-71, and that "with respect to coercion," "[t]he loss of *all* DOJ grants requires different analysis than loss of only [one particular type of] grant[]," ER-80.  But according to the district court, the Executive Orders crossed the permissible Tenth Amendment threshold "by ordering that *all* federal funding … be withheld unless these 'sanctuary' jurisdictions change their policies."  ER-71 (emphasis added).

As discussed above, however, the Orders do no such thing. Executive Order 14,218 does not even apply to funding for States and localities; rather, it only applies to federal public benefits for individuals who are aliens unlawfully present in the United States.  Nor is there any plausible argument that the PRWORA restrictions implemented by that Order have, after applying for nearly 30 years, suddenly transformed into a coercive gun to the head.

As for Executive Order 14,159, it applies only to programs specifically identified by the Departments of Justice and Homeland Security. The Department of Justice has yet to identify any such programs, as the district court acknowledged, and DHS (through FEMA) identified only 12 programs to which the sanctuary jurisdiction condition might apply but exempted many more programs from that condition. Those 12 programs represent a small portion of all FEMA grants. ER-119. *See Dole*, 483 U.S. at 211 (noting that "the argument as to coercion is shown to be more rhetoric than fact" when only "5% of the funds" of the given program were at stake). In addition, refusal to comply with a sanctuary-jurisdiction condition would affect the funds available for that particular program, but it would not "threat[en] to terminate other … grants" to which the sanctuary jurisdiction condition does not apply. *NFIB*, 567 U.S. at 580 (plurality opinion).

In short, the district court's incorrect Tenth Amendment analysis was predicated entirely on its mistaken view that the Executive Orders applied

65

broadly to all federal funding government-wide. Shorn of that erroneous understanding, the court's Tenth Amendment analysis evaporates.

E.    Fifth Amendment

The district court held that the Executive Orders violate the Fifth Amendment because some of their terms are unconstitutionally vague and because they fail to comply with the requirements of procedural due process. Both conclusions are baseless.

1.    *Vagueness.*

The district court reasoned the Executive Orders are unconstitutionally vague because neither defines what qualifies as a sanctuary jurisdiction. ER-73. While the Executive Orders themselves do not define "sanctuary jurisdictions," both the Bondi and Noem Directives do, by specifying that it includes jurisdictions that refuse to comply with 8 U.S.C. § 1373. ER-144-145, ER-147.

The district court nonetheless held that the Bondi Directive was vague because it defined sanctuary jurisdictions to "include" those that refuse to comply with Section 1373 or refuse to comply with "other

66

applicable federal immigration law." ER-73. Those words, in the court's view, made it unclear precisely what other conduct or other statutory non-compliance might qualify. Whatever additional conduct or statutory non-compliance might trigger a sanctuary jurisdiction condition, however, would be unambiguously set forth in the grant conditions offered to States and localities, as required by the Spending Clause, *see supra* at 58-61, thus dispelling any remaining ambiguity. Grant recipients are not asked to comply with the Executive Orders or Bondi Directive themselves, but only with the conditions for specific programs as spelled out in the terms of the grant — and thus any vagueness concerns would be resolved by the grant terms provided to applicants in advance.

Moreover, the purpose of the vagueness doctrine is to provide "fair notice of what is prohibited," *Holder v. Humanitarian Law Project*, 561 U.S. 1, 18 (2010), but that Order is not a law regulating or prohibiting private conduct and it does not "prohibit" anything at all. It is merely an internal Executive Branch directive to the Departments of Justice and Homeland

67

Security to "evaluate" on a grant-by-grant basis whether a sanctuary-jurisdiction condition would be an appropriate "lawful action[]." ER-99. Even if the President's instructions to his subordinate Executive Branch officers were unclear, the vagueness principles of the Fifth Amendment's Due Process Clause have no application to a President's instructions to his Cabinet officers.

In addition, the district court's reasoning relies on a misunderstanding of the constitutional standard for vagueness. "[P]erfect clarity and precise guidance have never been required," *Humanitarian Law Project*, 561 U.S. at 19; instead, the question is whether the words used give "a person of ordinary intelligence fair notice of what is prohibited," *id*. at 20. The Bondi and Noem Directives easily meet that standard. *See National Endowment for the Arts v. Finley*, 524 U.S. 569, 589 (1998) ("In the context of selective subsidies, it is not always feasible for Congress to legislate with

clarity.").  Once again, any remaining uncertainty would be clarified by specific grant conditions provided to applicants in advance.[11]

Finally, "a plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others."  *Humanitarian Law Project*, 561 U.S. at 20; *accord Kashem v. Barr*, 941 F.3d 358, 375 (9th Cir. 2019).  And as applied to Plaintiffs, the district court's standing analysis rested on the conclusion that Plaintiffs "fit squarely within the scope of the 2025 Executive Orders" and would qualify as sanctuary jurisdictions in light of the fact that Plaintiffs "have sanctuary policies that mirror those challenged" in other enforcement actions brought by the Government.  ER-51, ER-54; *see also* ER-62 (Plaintiffs "each maintain policies that conflict with the Government's federal immigration policy").

---

[11] The district court also expressed confusion as to the words "Federal payments" in Executive Order 14,218, ER-73, but in context those words plainly refer to federal public benefits governed by PRWORA.  *See supra* at 42.  The court similarly thought it was unclear how providing those federal public benefits to unlawful aliens facilitates the "subsidization or promotion of illegal immigration," ER-75, but Congress itself explained why that is so, *see supra* at 39.

2. *Procedural Due Process.*

The Executive Orders do not violate the principles of procedural due process. Contrary to the district court's view, ER-74, Plaintiffs have no "legitimate property interest" in *future* grants that have yet to be approved or awarded, nor would Plaintiffs' future decision to decline any condition imposed on such a grant "deprive" Plaintiffs of any protected property (or other) interest within the meaning of the Due Process Clause. To the extent any constitutionally mandated "process" applies in this context, it is the Spending Clause's requirement that any conditions on grants be provided in advance and with clarity; the Due Process Clause does not impose additional notice requirements for future spending conditions. For the same reasons, the district court wrongly concluded that eligibility for future funding is "largely undefined." ER-74. Any future conditions on federal funding would be spelled out in the grant conditions themselves, as required by the Spending Clause and as the Government began to do before the injunction. The district court's concerns that Plaintiffs would

70

lack notice of any applicable grant conditions are as baseless in the Due Process context as they are in the Spending Clause context.

Even if additional notice or procedures were required, the Bondi Directive specifies that "[i]n carrying out this directive, each component [of the Department of Justice] shall comply with any notice and procedural requirements in the award, agreement, or other instrument."  ER-146.  In addition, federal regulations also require that when a federal agency "terminates [a] Federal award prior to the end of the period of performance due to the recipient's material failure to comply with the terms and conditions of the Federal award," "the Federal agency must provide the recipient with an opportunity to object and provide information challenging the action."  2 C.F.R. §§ 200.340(c), 200.342.[12]

---

[12] To the extent the district court may have been concerned with the due process implications of conditions imposed on previously approved grants rather than future funding, such retroactivity concerns are addressed *infra* at 73-76.

71

F.      Administrative Procedure Act

The district court concluded that the Bondi Directive is final agency action and violates the APA because it fails to provide "a reasonable explanation of the breadth of funding withheld."  ER-75-79.  Both conclusions are incorrect.

1.    *Final Agency Action.*

The Bondi Directive does not "mark the consummation of the agency's decisionmaking process" and does not determine "rights or obligations … from which legal consequences will flow."  *Bennett v. Spear*, 520 U.S. 154, 178 (1997).  Rather than mark a definitive determination to withhold any particular funding from sanctuary jurisdictions, the Bondi Directive states that "[w]ithin 30 days, the Associate Attorney General, in coordination with components that provide Department grants, will report to the Attorney General the grants to which this requirement applies."  ER-147.  On its face, the Directive thus makes clear that it is the first step in a process to determine which grants will have additional conditions attached to them.

72

The district court concluded otherwise, focusing on the Bondi Directive's statement that "the Department of Justice will ensure that, consistent with law, 'sanctuary jurisdictions' do not receive access to Federal funds from the Department" and that the Department "shall pause the distribution of all funds until a review has been completed." ER-146. Based on that language, the court interpreted the Bondi Directive as an instruction to "freeze the distribution of all DOJ funds," including "funds already appropriated," ER-76, ER-78, and held that such definitive action qualified as final agency action.

The district court's analysis is doubly mistaken. First, even if the court were correct that the "immediate" freezing of funding in the "interim" is final agency action, ER-76, ER-78 n.11, it does not follow that the Bondi Directive's instruction to investigate and report on *future* grant conditions would also be final agency action. The court's analysis would, at most, permit APA review of the Bondi Directive's interim decision-making but not the Directive's yet-to-be-determined future funding

73

decisions (if any). Accordingly, the district court's own rationale cannot support its holding that the *entire* Bondi Directive is contrary to the APA, nor can it justify the scope of its preliminary injunction.

More importantly, the district court was wrong that the Bondi Directive (or either Executive Order) has any retroactive effect. The Bondi Directive was focused on *future* conditions, not retroactive ones. *See* ER-147 ("the Department may seek to tailor *future grants*") (emphasis added). The same is true of grant conditions from HUD, ER-109 ("*going forward*, grant agreements will include language that will require compliance with Executive Order 14218") (emphasis added), and the Department of Homeland Security, ER-133 ("apply to all *new* federal awards" for fiscal year 2025) (emphasis added).[13]

---

[13] Any implementation of Executive Order 14,218 cannot have an impermissible retroactive effect. That Order, and any implementation of it, does not impose a new retroactive condition but instead implements decades-old federal law restricting the availability of federal public benefits.

If it were otherwise, the Plaintiffs or the district court would have been able to identify an instance in the 11 weeks between the date the Bondi Directive was issued (February 5, 2025) and the date the preliminary injunction was entered (April 24, 2025) in which funding was retroactively frozen or withdrawn pursuant to the Executive Orders or Bondi Directive. Neither the district court nor Plaintiffs have done so. ER-80 ("[N]either the 2025 Executive Orders nor the Bondi Directive identify *which* federal funds arising from *what* grants will be frozen absent certified compliance with Section 1373."). Plaintiffs concede that they "have not yet suffered a loss of funds or other enforcement action," ER-50, and that concession explains why the district court's standing analysis was not predicated on any injury related to an actual retroactive withdrawal of funding, but was instead based on "pre-enforcement standing," ER-50, related to Plaintiffs' "reasonable fears," ER-52, and "[u]ncertainty about whether [the Orders] *will* be enforced," ER-59. The district court did not explain why, if the Bondi Directive (or the Executive Orders) had required an immediate and

75

retroactive freezing of funding, no such freezing pursuant to the Bondi Directive or Executive Orders had occurred.

In short, Plaintiffs' APA challenge to the Bondi Directive fails for lack of final agency action:  no *future* Department of Justice funding conditions pursuant to the Bondi Directive have been finally determined, and the Bondi Directive has no retroactive operation on *past* funding decisions.

2.     *Reasonable Explanation.*

On the merits of Plaintiffs' APA claim, the district court repeated its earlier errors.  It held that the Bondi Directive "fails to offer a reasonable explanation of the breadth of funding withheld."  ER-78.  As explained above, however, the district court misunderstood the breadth of funding to which the Bondi Directive applied; it does not require a total withdrawal of all federal funding, or even all Department of Justice funding, for sanctuary jurisdictions.  On its face, the Directive merely calls for a future "report" on "the grants to which [the sanctuary jurisdiction] requirement applies."  ER-

76

147.  To date, no such grants have been identified.  Thus, the "breadth" that the district court expected the Directive to explain does not exist.

The district court also faulted the Bondi Directive for failing to explain "the basis for withholding funds that Congress has already appropriated" or considering the "serious reliance interests" in those already appropriated funds.  ER-78.  As explained above, however, the Bondi Directive did not operate retroactively in the way the district court thought it did, and even if it had done so, such effect would not have supported the preliminary injunction barring enforcement of the Bondi Directive even as to prospective future applications.

More broadly, the district court's conclusion misses the point of the Bondi Directive.  It explained that "[u]nlawful border crossings and illegal migration into the United States have reached record levels, resulting in a substantial and unacceptable threat to our national security and public safety."  ER-146.  Combating that threat requires "enforcing federal immigration laws."  ER-146.  Sanctuary jurisdictions adopt policies that

77

frustrate those federal interests. It is not arbitrary or capricious for the Department to confine its discretionary grant awards to jurisdictions that support, rather than frustrate, the Department's law enforcement interests. Plaintiffs undoubtedly weigh those interests differently, but that view does not make the Department's approach arbitrary or irrational.

## III. PLAINTIFFS CANNOT SHOW IRREPARABLE HARM

The preliminary injunction also fails because Plaintiffs cannot establish irreparable harm.

The district court found that Plaintiffs suffer irreparable harm because the Orders and the Bondi Directive "threaten all federal funding." ER-81. As repeatedly explained, however, they are far more limited in scope than the district court understood. The assertion that the Executive Orders and Bondi Directive "wreak[] havoc on [Plaintiffs'] budgetary planning process" is therefore vastly overstated. ER-81. That is all the more true because the Orders and Directive do not operate retroactively, *see supra* at 74-76, and any budgetary uncertainty about specific future

78

awards or grants is not an irreparable harm at all, but merely a normal part of the inherently uncertain process of planning a budget when future revenue from yet-to-be-awarded grants is unknown. In addition, with respect to any specific funding that might be withheld in the future, if a grant recipient would "have the wherewithal to keep [its] programs running," then they "would not suffer irreparable harm" from grant termination. *Department of Education v. California*, 145 S. Ct. 966, 969 (2025). The government, by contrast, would suffer harm because it "is unlikely to recover the grant funds once they are disbursed," *id.*, a problem the district court exacerbated by refusing to require a bond as contemplated by Federal Rule of Civil Procedure 65(c), ER-82-83.

Plaintiffs' claim that budgetary uncertainty causes irreparable harm fails completely with respect to Executive Order 14,218, which merely enforces longstanding statutory restrictions on federal public benefits. Plaintiffs have been required to comply with PRWORA for decades and

cannot reasonably claim uncertainty or surprise if enforcement of that existing requirement affects the bottom line of their budgets.

## IV.    THE INJUNCTION IS IMPRECISE AND OVERBROAD

Federal Rule of Civil Procedure 65(d)(1)(B)-(C) requires that every injunction "state its terms specifically" and "describe in reasonable detail … the act or acts restrained or required."  The district court violated this rule and abused its discretion by issuing an injunction that is both imprecise and overbroad.

The district court initially enjoined Defendants "from directly or indirectly taking any action to withhold, freeze, or condition federal funds from [Plaintiffs] based on (1) the first sentence of Section 17 of Executive Order 14,159, (2) Section 2(a)(ii) of Executive Order 14,218, or (3) the Preamble and Section I of [the Bondi Directive] on the basis that [Plaintiffs] have [sanctuary jurisdiction] policies."  ER-89-90.

The district court, however, soon expanded the injunction's scope.  It declared that "[w]hile the *letter* of the Preliminary Injunction refers to

80

specific sections of EO 14,159, EO 14,218, and the Bondi Directive, its *spirit* enjoins the kind of coercion that was evident … in the language of those sections." ER-14. The court thus "clarif[ied]" that the "core purpose of the Preliminary Injunction" extended to action that "poses the same coercive threat to eliminate or suspend federal funding based on the Government's assertion that a jurisdiction is a 'sanctuary' jurisdiction" or that is "used as an end run around the Preliminary Injunction Order." ER-13-14, ER-18. The injunction is thus governed by a subjective and unknowable standard: whether a particular funding restriction, in the district court's view, has the same "kind of coercion" the court found in the Executive Orders and Bondi Directive, or whether a specific grant condition is an "end run around" the injunction. That vague standard is inconsistent with Rule 65's requirements.

The district court's injunction was overbroad as well. The court explained that its injunction extends to "*any* subsequent Executive Order *or Government action*," ER-14 (emphases added), and "appl[ies] to *any*

81

Executive Order or agency directive," ER-18, regardless of whether that action is premised on or pursuant to the Executive Orders or Bondi Directive challenged in this litigation.

Further still, the injunction effectively creates a presumption that any federal funding restriction relating to sanctuary jurisdictions is unlawful unless and until proven otherwise and puts the onus on the Government to prove its lawfulness through affirmative litigation. The district court claimed that its injunction is "not intended to hamstring the Government's lawful evaluation of federal funds to States and localities that have sanctuary policies," ER-18, but the court arrogated to itself the authority to oversee that evaluation. According to the court, if the Government "identif[ies] particular grants and funding programs that it believes should be conditioned upon compliance with immigration-related objectives" and "evaluat[es] … if there is a nexus between the funding stream, the jurisdiction's policies, and the desired immigration-related conditions," ER-12, ER-16, the Government must "litigate its position" as it has done in

82

initiating enforcement actions against New York and Illinois, ER-12. *See* ER-6 ("Litigation may be necessary to determine whether the challenged immigration conditions are appropriate to [a particular] grant program.").

The injunction's guilty-until-proven-innocent presumption is evident in the district court's treatment of the 12 specific programs that FEMA identified as candidates for impose a sanctuary-jurisdiction condition, in which FEMA specified the particular statutes authorizing the condition and the program's nexus to immigration activities, law enforcement, or national security. *Supra* at 31-32. The district court acknowledged that FEMA may have identified "individual grants with a meaningful nexus to sanctuary jurisdiction policies," ER-6, and yet the district court did not allow those specific programs to proceed or exempt them from the injunction. To the contrary, those grant conditions are expressly covered by the injunction, because they would "withhold … or condition federal funds from the [Plaintiffs] based on … the first sentence of Section 17 of Executive Order 14,159." ER-89-90. The court's solution, instead, was that

83

"[l]itigation may be necessary to determine whether the challenged immigration conditions are appropriate to that grant program." ER-6. In other words, any individualized grant determinations by FEMA, and others like it, all fall under the injunction's terms and are presumptively unlawful unless and until the Government brings affirmative litigation in which it proves the lawfulness of a specific grant condition.

In this way, the district court effectively established itself as the overseer of all Executive Branch funding decisions government-wide, regardless of the agency imposing the condition, the statutory basis invoked, or whether it purports to implement the Executive Orders or Bondi Directive, and did so with reference to the vague standard of whether it presents the "same coercive threat" as the Executive Order to reflects an "end run around" the injunction. And all of those individual funding decisions are presumed unlawful and enjoined until the Government proves otherwise. Rule 65 does not sanction this sort of pre-clearance review.

84

The district court's abuse of discretion is compounded by the injunction's interference with the President's ability to execute core Executive Branch policies as set forth in the Orders. In Executive Order 14,159, the President merely directed his subordinates to "evaluate" funding on a grant-by-grant basis and impose a sanctuary-jurisdiction condition only if doing so is "lawful." ER-99. In Executive Order 14,218, the President directed his subordinates to enforce existing federal restrictions in PRWORA. The district court abused its authority by entering an injunction that bars those subordinate officers from carrying out the President's directive to effectuate his policy priorities in lawful ways. That injunction should be vacated.

## CONCLUSION

For the reasons stated above, this Court should vacate the district court's preliminary injunction.

Respectfully submitted,

BRETT A. SHUMATE
  *Assistant Attorney General*

CRAIG H. MISSAKIAN
  *United States Attorney*

DANIEL TENNY
JOSHUA WALDMAN
  (202) 514-0236
    *Attorneys, Appellate Staff*
    *Civil Division, Room 7527*
    *U.S. Department of Justice*
    *950 Pennsylvania Ave., N.W.*
    *Washington, D.C.  20530*

July 2025

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of

Appellate Procedure 32(a)(7)(B) because it contains 13,760 words. This

brief also complies with the typeface and type-style requirements of

Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared

using Microsoft Word 2016 in Palatino Linotype 14-point font, a

proportionally spaced typeface.

   /s/  Joshua Waldman
JOSHUA WALDMAN
*Counsel for Appellants*

## CERTIFICATE OF SERVICE

I hereby certify that on July 21, 2025, I caused the foregoing Opening

Brief for Appellants to be filed with the Court through the electronic filing

system.  Counsel for the appellees are registered CM/ECF users and service

will be accomplished by the appellate CM/ECF system.


  /s/  Joshua Waldman     
JOSHUA WALDMAN
*Counsel for Appellants*

## STATEMENT OF RELATED CASES

Appellants are not aware of any related cases pending in this Court.

   /s/  Joshua Waldman

JOSHUA WALDMAN
*Counsel for Appellants*