No. 25-3889

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

**CITY AND COUNTY OF SAN FRANCISCO, *et al.*,**

**Plaintiffs - Appellees,**

**v.**

**DONALD J. TRUMP, President of the United States, *et al.*,**

**Defendants - Appellants.**

---

### ON APPEAL FROM THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF CALIFORNIA

---

### PROPOSED *AMICUS CURIAE* BRIEF OF IMMIGRATION REFORM
### LAW INSTITUTE'S IN SUPPORT OF DEFENDANTS-APPELLANTS

---

JONATHON P. HAUENSCHILD
Immigration Reform Law Institute
25 Massachusetts Ave., NW, Suite 335
Washington, DC 20001
Telephone: (202) 232-5590
jhauenschild@irli.org

Attorney for *Amicus Curiae* Immigration
Reform Law Institute

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, *amicus curiae* Immigration Reform Law Institute makes the following disclosures:

1) For non-governmental corporate parties please list all parent corporations: None.

2) For non-governmental corporate parties please list all publicly held companies that hold 10% or more of the party's stock: None.

DATED: July 28, 2025                    Respectfully submitted,

                                        /s/ Jonathon P. Hauenschild

i

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ....................................................... i

TABLE OF CONTENTS ............................................................................................ ii

TABLE OF AUTHORITIES ................................................................................. iii

INTEREST OF AMICUS CURIAE .......................................................................1

SUMMARY OF ARGUMENT .................................................................................1

ARGUMENT .............................................................................................................3

    A.   The District Court erred in determining that Plaintiffs have protected property interests in future federal grants. ............................................................3

    B.   This Court should harmonize the statute with the President's inherent constitutional authority ............................................................................................5

    C.   The States delegated authority over immigration and naturalization to the Federal government ..............................................................................................6

    D.   The communication requirements of the INA do not commandeer municipal governments ..........................................................................................................11

    E.   Plaintiffs sanctuary policies are preempted .................................................15

CONCLUSION .......................................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Arizona v. United States,*
    567 U.S. 387 (2012)..................................................................... passim

*Board of Regents v. Roth,*
    408 U.S. 564 (1972)...........................................................................3

*Bond v. United States,*
    564 U.S. 211 (2011)......................................................................7, 15

*Cazarez-Gutierrez v. Ashcroft,*
    382 F.3d 905 (9th Cir. 2004) ............................................................8

*Chicago & Southern Air Lines, Inc. v. Waterman S.S. Corp.,*
    333 U.S. 103 (1948)...........................................................................9

*Chirac v. Lessee of Chirac,*
    15 U.S. (2 Wheat.) 259 (1817) .........................................................8

*City of New York v. United States,*
    179 F.3d 29 (2nd Cir. 1999) ......................................................13, 15

*Crosby v. Nat'l Foreign Trade Council,*
    530 U.S. 363 (2000)...................................................................16, 17

*Foss v. Nat'l Marine Fisheries Serv.,*
    161 F.3d 584 (9th Cir. 1998) ............................................................3

*Gade v. Nat'l Solid Wastes Mgmt. Ass'n,*
    505 U.S. 88 (1992)...........................................................................16

*Gregory v. Ashcroft,*
    501 U.S. 452 (1991).......................................................................7, 11

*Harisiades v. Shaughnessy,*
    342 U.S. 580 (1952)...........................................................................9

*Hernandez v. Mesa*,
   589 U.S 93 (2020)................................................................8

*Hines v. Davidowitz*,
   312 U.S. 52 (1941).............................................................16

*Holt Civic Club v. Tuscaloosa*,
   439 U.S. 60 (1978).............................................................7

*Kentucky Dep't of Corrections v. Thompson*,
   490 U.S. 454 (1989)...........................................................3

*Knox v. Brnovich*,
   907 F.3d 1167 (9th Cir. 2018) ...........................................16

*Murphy v. NCAA*,
   584 U.S. 453 (2018)..........................................................15

*National Foreign Trade Council v. Natsios*,
   181 F.3d 38 (1st Cir. 1991).................................................17

*New York v. United States*,
   505 U.S. 144 (1992)............................................... passim

*Nixon v. Missouri Municipal League*,
   541 U.S. 125 (2004)...........................................................7

*Printz v. United States*,
   521 U.S. 898 (1997)............................................ 6, 12, 13, 14

*Reno v. Condon*,
   528 U.S. 141 (2000)..........................................................13

*S.D. v. Dole*,
   483 U.S. 203 (1987)...........................................................7

*South Carolina v. Baker*,
   485 U.S. 505 (1988)...................................................13, 14

*Trump v. Hawaii*
   585 U.S. 667 (2018)...........................................................8

*United States ex rel. Knauff v. Shaughnessy*,
   338 U.S. 537 (1950) ............................................................................9

*United States v. Singh*,
   979 F.3d 697 (9th Cir. 2020) ..........................................................9

*United States v. Wong Kim Ark*,
   169 U.S. 649 (1898) ........................................................................8

*Wisconsin Pub. Intervenor v. Mortier*,
   501 U.S. 597 (1991) ......................................................................11

## STATUTES

42 U.S.C. § 5780 ................................................................................15

8 U.S.C. § 1357(g) .............................................................................19

8 U.S.C. § 1373 ........................................................................... 17, 18

Immigration and Naturalization Act, 8 U.S.C. §§ 1101, *et seq.* ...............8

## OTHER AUTHORITIES

"Objections to This Constitution of Government" (Sept. 1787) (National Archives) (transcription),
   https://www.archives.gov/files/legislative/resources/education/bill-of-rights/images/mason.pdf ..................................................................12

Connecticut Fundamental Orders of 1638 ............................................10

Journal Notes of the Virginia Ratification Convention Proceedings (June 6, 1788),
   https://consource.org/document/journal-notes-of-the-virginia-ratification-convention-proceedings-1788-6-7/20130122082815/ .......................12

THE FEDERALIST NO. 32 (Alexander Hamilton) ....................................10

THE FEDERALIST NO. 45 (James Madison) ............................................12

## REGULATIONS

2 C.F.R. § 200.340(b) ..........................................................................5

## CONSTITUTIONAL PROVISIONS

1776 Constitution of the Commonwealth of Pennsylvania, Ch. II, Sec. 42............10

ARTICLES OF CONFEDERATION of 1781, art. II .......................................................11

Georgia Constitution of 1777, IX ...........................................................................10

Maryland Constitution of 1776, II ..........................................................................10

Massachusetts Constitution of 1780, Ch. I, Sec. II, Art. II.....................................10

New York Constitution of 1777, XLII......................................................................10

North Carolina Constitution of 1776, XL ................................................................10

South Carolina Constitution of 1778, XIII .............................................................10

U.S. CONST. Art. I, Sec. 8, cl. 4 .............................................................................8

U.S. CONST. art. VI, cl. 2 ......................................................................................16

Vermont Constitution of 1777, Sec. XXXVIII........................................................10

## INTEREST OF AMICUS CURIAE[1]

*Amicus curiae* Immigration Reform Law Institute ("IRLI") is a non-profit 501(c)(3) public interest law firm dedicated to litigating immigration-related cases on behalf of, and in the interests of, United States citizens, and also to assisting courts in understanding and accurately applying federal immigration law. IRLI has litigated or filed *amicus curiae* briefs in a wide variety of cases, including *Trump v. Hawaii*, 585 U.S. 667 (2018); *United States v. Texas*, 599 U.S. 670 (2023); *Ariz. Dream Act Coalition v. Brewer*, 855 F.3d 957 (9th Cir. 2017); *Wash. All. Tech Workers v. U.S. Dep't of Homeland Sec.*, 50 F.4th 164 (D.C. Cir. 2022); and *Matter of Silva-Trevino*, 26 I. & N. Dec. 826 (B.I.A. 2016).

## SUMMARY OF ARGUMENT

The District Court improperly concluded that the Plaintiffs have constitutional rights to enact and maintain sanctuary policies. Both the District Court and Plaintiffs claim that these rights supersede the federal government's constitutional authority to enforce immigration law and its ability to condition future grants on the Plaintiffs' compliance with all federal laws, including those related to immigration.

---

[1] No counsel for a party in this case authored this brief in whole or in part, and no such counsel or party made a monetary contribution intended to fund the preparation of this brief. No person other than *amicus curiae*, its members, or its counsel made a monetary contribution to the preparation or submission of this brief.

1

The Plaintiffs lack broad liberty or property interests in future federal grants. Because Plaintiffs lack liberty or property interests in future grants, the Fifth Amendment's Due Process provision does not apply. Furthermore, the challenged Executive Orders merely direct Cabinet Secretaries and the Attorney General to evaluate, consistent with the law, various categories of grants and determine whether *future* grants could be subject to conditions requiring compliance with the Immigration and Naturalization Act – an exercise of authority completely within the President's inherent authorities over which the Courts have no jurisdiction.

States delegated to the federal government authority over immigration and naturalization; prior to the Constitution's ratification several states had naturalization provisions in their state constitutions. As a delegated (and thus enumerated) authority, when Congress and the President act, the Supremacy Clause preempts state and local efforts that interfere with federal laws and policies.

Potentially conditioning future grants, as the law allows, on compliance with federal immigration law does not commandeer state or local governments. The Supreme Court has determined that the federal government may place conditions on the receipt of federal grants, including complying with laws requiring state and local governments to communicate the immigration status of individuals in their custody. Requiring such compliance is not commandeering state or local governments.

## ARGUMENT

### A. The District Court erred in determining that Plaintiffs have protected property interests in future federal grants.

The District Court erred in concluding that Plaintiffs are likely to succeed on their claim that the 2025 Executive Orders fail to provide them with procedural due process in violation of the Fifth Amendment. ER 74-75. In evaluating procedural due process claims, courts ask two questions: 1) whether plaintiffs possess a liberty or property interest that has been interfered with by the government; and 2) whether the procedures attendant upon that deprivation were constitutionally sufficient. *Kentucky Dep't of Corrections v. Thompson*, 490 U.S. 454, 460 (1989); *Foss v. Nat'l Marine Fisheries Serv.*, 161 F.3d 584, 588 (9th Cir. 1998) (A "procedural due process claim hinges on proof of two elements: (1) a protectible liberty or property interest . . .; and (2) a denial of adequate procedural protections."). Here, Plaintiffs fail to show that they have protected property rights in future federal grants or that the government would deprive them of due process in terminating any existing grants.

To "have a [protected] interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Board of Regents v. Roth*, 408 U.S. 564, 577 (1972). "[T]he range of interests

3

protected by procedural due process is not infinite." *Id.* at 570. As the government demonstrates, Opening Brief for Appellants (Gov't Br.) at 70-71, any conditions on future funding would be spelled out in the grant conditions themselves, and Plaintiffs would have the choice to accept or refuse such conditions before applying for such future grant money.[2]

To the extent the District Court determined that termination of any existing grants would deprive Plaintiffs of a protected property interest without due process, ER 70-71, the court was mistaken. The regulations governing termination of federal grants only permit termination under certain circumstances. 2 C.F.R. § 200.340.

Section 200.340(a) lists four circumstances in which a government agency "may" terminate a federal award. This regulation is permissive, not mandatory. Indeed, it does not contain "explicitly mandatory language" that would mandate termination even if "substantive predicates are present." *Ky. Dep't of Corrections*, 490 U.S. at 463. In addition, this regulation only permits termination if the

---

[2]  The District Court declared that the federal government cannot compel local jurisdictions to adopt certain policies. ER 69-70. But the Executive Orders and directives challenged here do not purport to compel Plaintiffs to adopt certain policies that they are otherwise free to adopt. Instead, the Executive Orders merely require Plaintiffs to comply with federal law and not undermine federal immigration enforcement. As discussed below, the Supreme Court has long recognized that the power to regulate immigration falls within the federal government's province under the Constitution.

underlying grant or agreement contains a relevant termination provision. 2 C.F.R. §
200.340(b) ("The Federal agency . . . must clearly and unambiguously specify all
termination provisions in the terms and conditions of the Federal award."). Thus,
Defendants' ability to terminate grants is dependent on the conditions set forth in
the grant agreements themselves, not the regulations. Because Plaintiffs have no
legally protected property interest in conditional grants, the District Court erred in
concluding that the Executive Orders and directives violate the Due Process Clause
of the Fifth Amendment.

### B. This Court should harmonize the statute with the President's inherent constitutional authority

The District Court's reading of the executive order and funding statutes to
preclude the Executive from reconsidering the prior administration's grant
conditions intrudes on the President's inherent and independent authority to
oversee foreign affairs and immigration policy. This Court should seek to
harmonize Congress's enactments with the President's inherent constitutional
authority to terminate direct the federal agencies under his authority and related
spending programs. *See United States v. Hansen*, 599 U.S. 762, 781 (2023)
("When legislation and the Constitution brush up against each other, our task is to
seek harmony, not to manufacture conflict."). "When 'a serious doubt' is raised
about the constitutionality of an Act of Congress, 'it is a cardinal principle that
this Court will first ascertain whether a construction of the statute is fairly

possible by which the question may be avoided.'" *Jennings v. Rodriguez*, 583

U.S. 281, 296 (2018) (quoting *Crowell v. Benson*, 285 U. S. 22, 62 (1932)).

Of course, the "canon of constitutional avoidance comes into play only

when, after the application of ordinary textual analysis, the statute is found to be

susceptible of more than one construction." *Id.* (internal quotation omitted). Here,

the government has persuasively established one such permissible construction—

that the federal statutes in question permit the President to reevaluate conditions

placed on future grants. *See* Brief for Appellants at 20-24. Thus, to avoid the

conflict between the statutes, as interpreted by the district court, and the

Executive's inherent constitutional authority to protect the nation from foreign

threats, this Court should construe the statute as permitting reconsideration of the

prior administration's lack of similar conditions upon federal grants.

## C. The States delegated authority over immigration and naturalization to the Federal government

The District Court improperly determined that the federal government

commandeered Plaintiffs into enforcing federal immigration policies by

threatening the funding of particular types of grants. ER at 46, 70-72. The District

Court erred in three significant ways: First, and most important, immigration and

naturalization are enumerated powers; Second, the Tenth Amendment applies to

states and individuals, not municipalities such as cities and counties. *Printz v.*

*United States*, 521 U.S. 898, 930-32 (1997) (Tenth Amendment reserves power to

individuals or states and concerns whether a federal law interferes with state sovereignty), *Bond v. United States*, 564 U.S. 211, 222-24 (2011) (States and individuals have standing to allege violations of the Tenth Amendment and collecting cases); and Third, Congress and the Executive are free to "attach conditions on the receipt of federal funds… to further broad policy objectives by conditioning receipt of federal moneys upon compliance by the recipient with federal statutory and administrative directives." *S.D. v. Dole*, 483 U.S. 203, 206 (1987). Municipalities are creations of the state and possess only such authorities as people of a state may grant. *Nixon v. Missouri Municipal League*, 541 U.S. 125, 140 (2004), *Holt Civic Club v. Tuscaloosa*, 439 U.S. 60, 71 (1978).

The first question when a party invokes the Tenth Amendment is whether the federal government's power in question was enacted "within the powers granted it under the Constitution." *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991), *see also*, *New York v. United States*, 505 U.S. 144, 155 (1992) ("In some cases the Court has inquired whether an Act of Congress is authorized by one of the powers delegated to Congress in Article I."). If Congress acts within its constitutional powers, through the Supremacy Clause "Congress may impose its will on the States." *Gregory*, 501 U.S. at 460. The second question is whether the party invoking the Tenth Amendment has the right to do so. *E.g., Gregory*, 501 U.S. at 455-56 (individual Missouri state judges), *Bond*, 564 U.S. at 222 ("States are not

7

the sole intended beneficiaries of federalism. An individual has a direct interest in objecting to laws that upset the constitutional balance between the National Government and the States.").

When enacting and enforcing the Immigration and Naturalization Act (INA) codified, as amended, at 8 U.S.C. §§ 1101, *et seq*., Congress and the President are acting "within the powers granted [them] by the Constitution." The Constitution gives Congress authority to create "an uniform rule of naturalization." U.S. CONST. Art. I, Sec. 8, cl. 4. *United States v. Wong Kim Ark*, 169 U.S. 649, 701 (1898), *citing Chirac v. Lessee of Chirac*, 15 U.S. (2 Wheat.) 259 (1817) (The power, granted to Congress by the Constitution, 'to establish an uniform rule of naturalization,' was long ago adjudged by this court to be vested exclusively in Congress"), *Cazarez-Gutierrez v. Ashcroft*, 382 F.3d 905, 912-13 (9th Cir. 2004) (same).

The federal government's authority over immigration and naturalization is also inherent from constitutional provisions empowering it to regulate foreign commerce, foreign relations, and national security. *See, e.g.*, *Hernandez v. Mesa*, 589 U.S 93, 104 (2020) (Governance and investigation of Border Patrol conduct is a matter "relating to the conduct of foreign relations" and the Executive Branch "has the lead role in foreign policy"), *Trump v. Hawaii*, 585 U.S. 667, 702 (2018) (Immigration related decisions "implicate relations with foreign powers or involve

8

classifications defined in the light of changing political and economic circumstances"); *Harisiades v. Shaughnessy*, 342 U.S. 580, 588-589 (1952) ("[A]ny policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of republican form of government") *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542-43 (1950) (The right to control immigration and naturalization "stems not alone from legislative power but is inherent in the executive power to control the foreign affairs of the nation."); *Chicago & Southern Air Lines, Inc. v. Waterman S.S. Corp*., 333 U.S. 103, 109 (1948) ("The President . . . possesses in his own right certain powers conferred by the Constitution on him as Commander-in-Chief and as the Nation's organ in foreign affairs"), *United States v. Singh*, 979 F.3d 697, 710 (9th Cir. 2020), *citing Arizona v. United States*, 567 U.S. 387, 395 (2012) ("The Constitution grants the federal government an 'undoubted power over the subject of immigration and the status of aliens'").

The Framer's decision to delegate immigration and naturalization authorities to the federal government was deliberate. At the time of the Constitutional Convention, at least three states and Vermont had constitutional provisions relating

to naturalization.[3] Most of the remaining state constitutions, while not expressly

providing for naturalization, had very broad suffrage standards permitting aliens to

vote based on residency within the state or legislative district in addition to other

qualifications.[4]  Ratifying the Constitution required states to surrender jurisdiction

over immigration and naturalization to the federal government and uniform rules

"must necessarily be exclusive, because if each state had power to prescribe a

distinct rule, there could not be a uniform rule." *See* THE FEDERALIST NO. 32

(Alexander Hamilton), 250-51 (John C. Hamilton, ed., 1998).

Since immigration and naturalizations fall within the Constitution's

enumerated powers, Congress may legislate and the President act. When they act,

---

[3]  *E.g.*, New York Constitution of 1777, XLII ("[I]t shall be in the discretion of the legislature to naturalize all such persons, and in such manner, as they shall think proper"); North Carolina Constitution of 1776, XL ("[E]very foreigner, who comes to settle in this State having first taken an oath of allegiance to the same… after one year's residence, shall be deemed a free citizen"); 1776 Constitution of the Commonwealth of Pennsylvania, Ch. II, Sec. 42 ("Every foreigner of good character who comes to settle in this state, having first taken an oath or affirmation of allegiance to the same… after one year's residence, shall be deemed a free denizen thereof"); and Vermont Constitution of 1777, Sec. XXXVIII ("Every foreigner of good character, who comes to settle in this State… after one years residence, shall be deemed a free denizen thereof").

[4]  *E.g.*, Connecticut Fundamental Orders of 1638 (residency in the state), Georgia Constitution of 1777, IX (residency of six months), Maryland Constitution of 1776, II (one year residency in the county in which they seek to vote), Massachusetts Constitution of 1780, Ch. I, Sec. II, Art. II and Sec. III, Art. IV (state inhabitation to vote for senators, residency in a town for at least a year to vote for representatives), South Carolina Constitution of 1778, XIII (one year inhabitancy in the State).

the federal government, through the Supremacy Clause, may impose its will on states. *Gregory*, 501 U.S. at 460. If the federal government can impose its will on states, it certainly can do so to cities and counties such as Plaintiffs.

### D. The communication requirements of the INA do not commandeer municipal governments

For Tenth Amendment claims, the Supreme Court has only recognized two categories of plaintiffs: States and Individuals. The Plaintiffs fall into neither of those categories. Municipalities are "created as convenient agencies for exercising such of the governmental powers of the State as may be entrusted to them." *Wisconsin Pub. Intervenor v. Mortier*, 501 U.S. 597, 607-08 (1991). As creations of states, municipalities lack the same interests as individuals or states – they did not surrender authorities to the federal government or retain any authorities when States ratified the Constitution.

The Constitutional Convention did not propose a provision like the limitation on federal authority as found in the Articles of Confederation.[5] Because of this, scions like Patrick Henry and George Mason feared the federal government would erode the authority of state legislatures.[6] James Madison attempted to

---

[5] "Each state retains its sovereignty, freedom and independence, and every Power, Jurisdiction and right, which is not by this confederation expressly delegated to the United States, in Congress assembled." ARTICLES OF CONFEDERATION of 1781, art. II.

[6] Journal Notes of the Virginia Ratification Convention Proceedings (June 6, 1788), https://consource.org/document/journal-notes-of-the-virginia-ratification-

assuage these concerns when he argued that "[t]he powers delegated by the proposed Constitution to the federal government are few and defined. Those which are to remain in the state governments are numerous and indefinite." THE FEDERALIST NO. 45 (James Madison), p. 363 (John C. Hamilton, ed., 1998).

The seminal cases delimiting Tenth Amendment rights are *New York* and *Printz*. In *New York*, the Court took up a statute that required states to enact legislation to take possession and dispose of nuclear waste produced in their state. In *Printz*, the Court considered the Brady Act, which required state employees to do background checks of firearm purchasers. The Court ruled that both of these two federal imperatives constituted commandeering in violation of the Tenth Amendment. *New York*, 505 U.S. at 158; *Printz*, 521 U.S. at 935.

Relevantly here, however, the Supreme Court has carved out a safe harbor for federal law controlling state activity when such law regulates information flow in or affecting a domain of federal authority. In this realm, the Court has ruled favorably for federal law both mandating state actions and prohibiting state

---

convention-proceedings-1788-6-7/20130122082815/, (Patrick Henry advocating for a Bill of Rights and what would become the Tenth Amendment); "Objections to This Constitution of Government" (Sept. 1787) (National Archives) (transcription), https://www.archives.gov/files/legislative/resources/education/bill-of-rights/images/mason.pdf (George Mason arguing that Congress could expand its powers "so far as they shall think proper; so that the state legislatures have no security for the powers now presumed to remain to them, or the people for their rights.").

actions. See also *City of New York v. United States*, 179 F.3d 29, 33-35 (2nd Cir. 1999) (distinguishing *New York* and *Printz* and rejecting a Tenth Amendment challenge to § 1373).

In *Reno v. Condon*, 528 U.S. 141 (2000), the Court considered a suit by the State of South Carolina enjoining enforcement of the Driver's Privacy Protection Act of 1994 ("the DPPA"), 18 U.S.C. §§ 2721-25. The DPPA forbade state departments of motor vehicles personnel from disclosing the personal information of drivers for most purposes, though in some circumstances it mandated such disclosure. 18 U.S.C. § 2721. In a unanimous decision, the Court held that the DPPA was consistent with the federalism required by the Tenth Amendment, despite the heavy resource expenditure states needed to enforce the Act, and even states' need to pass laws to comply with it. *Condon*, 528 U.S. at 150 151.

The Court distinguished the federal legislation in *Condon* from that in *Printz* and *New York*. The statute in *Condon* regulated state activities, and the legislation required and man hours employed were a byproduct. *Condon*, 528 U.S. at 150, 151. By contrast, the statute in *Printz* directly required state employers to fulfill a federal law enforcement function, and the statute in *New York* directly commanded state legislative initiatives and expenditures to dispose of property (waste). As the Court held:

> [T]he DPPA does not require the States in their sovereign capacity to regulate their own citizens. The DPPA regulates the States as the

13

owners of databases. It does not require the South Carolina Legislature to enact any laws or regulations, and it does not require state officials to assist in the enforcement of federal statutes regulating private individuals. We accordingly conclude that the DPPA is consistent with the constitutional principles enunciated in New York and Printz.

528 U.S. at 151.

In affirming the validity of the DPPA, the Court noted that the statute requires the disclosure of certain information: "The DPPA's prohibition of nonconsensual disclosures is also subject to a number of statutory exceptions. For example, the DPPA requires disclosure of personal information for use in connection with matters of motor vehicle or driver safety and theft, to carry out the purposes of [federal statutes]." *Id*. at 145 (internal quotation marks and ellipses omitted). The Court explained: "'That a State wishing to engage in certain activity must take administrative and sometimes legislative action to comply with federal standards regulating that activity is a commonplace that presents no constitutional defect.'" *Id*. at 150-51 (*quoting South Carolina v. Baker*, 485 U.S. 505, 514-15 (1988)). *Cf. Arizona*, 567 U.S. at 412-13 (holding that an Arizona law making verification of immigration status by local officials mandatory was not preempted by federal immigration law because 8 U.S.C. § 1644, the constitutionality of which the Court did not question, encouraged the sharing of information).

Indeed, finding Plaintiffs' sanctuary policies contravene the Federal Constitution and statutes protected under the Tenth Amendment, as did the District

14

Court, would mark something of a revolution in Tenth Amendment jurisprudence. For example, the Crime Control Act of 1990 compels states to report missing children and prohibits them from allowing their state law enforcement agencies to delay or delete missing child reports. 42 U.S.C. § 5780.

If Plaintiffs' sanctuary policies are protected by the Tenth Amendment, so too would be state laws mandating the withholding of federally required information about missing children, or any other state or local refusal to adhere to federal information-sharing requirements.

Only individuals and states have standing to allege violations of the Tenth Amendment. *New York*, 505 U.S. at 163-65, *Bond*, 564 U.S. at 225. Even if the Plaintiffs could claim a right under the Tenth Amendment, it would not save their sanctuary policies as nothing in the amendment or Supreme Court's jurisprudence allows the District Court to find that the information-sharing provisions of the INA improperly commandeer state or local resources. *See Murphy v. NCAA*, 584 U.S. 453 (2018) and *City of New York*, 179 F.3d at 35.

**E. Plaintiffs sanctuary policies are preempted**

Because the power to create uniform rules of immigration and naturalization fall within the federal government's enumerated powers, the Supremacy Clause allows Congress to preempt contrary state and local laws. *Arizona*, 567 U.S. at 399

15

(citing *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000)); *see also Hines v. Davidowitz*, 312 U.S. 52 (1941).

Broadly, the Supremacy Clause provides that federal law "shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. CONST. art. VI, cl. 2. Preemption may be either express or implied, and implied preemption includes both field preemption and conflict preemption. *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 98 (1992), *Knox v. Brnovich*, 907 F.3d 1167, 1174-75 (9th Cir. 2018) (broadly discussing preemption). Conflict preemption can occur in one of two ways: where "compliance with both federal and state regulations is a physical impossibility," or "where the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Knox*, 907 F.3d at 1175, *see also*, *Arizona*, 567 U.S. at 399. "If the purpose of the act cannot otherwise be accomplished—if its operation within its chosen field else must be frustrated and its provisions be refused their natural effect—the state law must yield to the regulation of Congress within the sphere of its delegated power." *Savage v. Jones*, 225 U.S. 501, 533 (1912), quoted in *Hines*, 312 U.S. at 67 n.20.

The judgment of courts about what constitutes an unconstitutional impediment to federal law is "informed by examining the federal statute as a whole

16

and identifying its purpose and intended effects." *Crosby*, 530 U.S. at 373. As

stated by the First Circuit, preemption "will be more easily found where states

legislate in areas traditionally reserved to the federal government." *National*

*Foreign Trade Council v. Natsios*, 181 F.3d 38, 73 (1st Cir. 1991).

Underlying the doctrine of obstacle preemption is the necessity of

cooperation between state and federal sovereignties for our federal system to

function properly. As the Second Circuit has explained:

> A system of dual sovereignties cannot work without informed,
> extensive, and cooperative interaction of a voluntary nature between
> sovereign systems for the mutual benefit of each system. The operation
> of dual sovereigns thus involves mutual dependencies as well as
> differing political and policy goals. Without the Constitution, each
> sovereign could, to a degree, hold the other hostage by selectively
> withholding voluntary cooperation as to a particular program(s). The
> potential for deadlock thus inheres in dual sovereignties, but the
> Constitution has resolved that problem in the Supremacy Clause, which
> bars states from taking actions that frustrate federal laws and regulatory
> schemes.

*City of New York*, 179 F.3d at 35 (internal citations omitted) (holding 8

U.S.C. § 1373 constitutional).

By design, the Plaintiffs' sanctuary policies frustrate the INA in one of its

central purposes—the federal-state cooperation Congress intended to foster in

immigration enforcement. As the Supreme Court has recognized, "consultation

between federal and officials is an important feature of the immigration system."

*Arizona*, 567 U.S. at 411. For example, in passing the Illegal Immigration Reform

17

and Immigrant Responsibility Act ("IIRIRA"),[7] which includes 8 U.S.C. § 1373,

Congress intended unimpeded communication among federal, state, and local

governments in sharing immigration status information, as well as unobstructed

cooperation in ascertaining the whereabouts of illegal aliens. The Senate Judiciary

Committee Report accompanying IIRIRA makes this general intent clear:

> Effective immigration law enforcement requires a cooperative effort
> between all levels of government. The acquisition, maintenance, and
> exchange of immigration-related information by State and Local
> agencies is consistent with, and potentially of considerable assistance
> to, the Federal regulation of immigration and the achieving of the
> purposes and objectives of the Immigration and Nationality Act.

S. Rep. No. 104-249, at 19-20 (1996) (emphasis added), quoted in *City of*

*New York*, 179 F.3d at 32-33. Thus, in drafting § 1373, Congress intended a

cooperative effort among local, state, and federal law enforcement to enforce

immigration law.

A review of additional federal immigration provisions further underscores

this intent. Shortly before enacting IIRIRA, Congress enacted the Personal

Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA).[8]

Entitled "Communication between State and local government agencies and

Immigration and Naturalization Service," Section 434 of this law, now 8 U.S.C. §

1644, is nearly identical to § 1373. This provision of PRWORA forbids any

---

[7] Division C of Pub. L. No. 104-208 (2012).
[8] Pub. L. No. 104-193 (1996).

18

prohibitions or restrictions on the ability of state or local governments to send to or

receive from the federal government information about the immigration status,

lawful or unlawful, of an alien in the United States. Going further than the Senate

Judiciary Committee Report accompanying IIRIRA, in the Conference Report

accompanying PRWORA, Congress made clear its intent in passing Section 434:

to bar any restriction on local police in their communications with ICE. The scope

includes the whereabouts of illegal aliens, which obviously includes notice of their

release from detention.

> The conference agreement provides that no State or local government entity shall prohibit, or in any way restrict, any entity or official from sending to or receiving from the INS information regarding the immigration status of an alien or the presence, whereabouts, or activities of illegal aliens. It does not require, in and of itself, any government agency or law enforcement official to communicate with the INS. The conferees intend to give State and local officials the authority to communicate with the INS regarding the presence, whereabouts, or activities of illegal aliens. This provision is designed to prevent any State or local law, ordinance, executive order, policy, constitutional provision, or decision of any Federal or State court that prohibits or in any way restricts any communication between State and local officials and the INS. The conferees believe that immigration law enforcement is as high a priority as other aspects of Federal law enforcement, and that illegal aliens do not have the right to remain in the United States undetected and unapprehended.

H.R. Rep. No. 104-725 (1996) (Conf. Rep.) at 383 (1996) (emphases added),

quoted in *City of New York*, 179 F.3d at 32.

Another federal statute also has the purpose of fostering cooperation in

immigration enforcement. In 8 U.S.C. § 1357(g), Congress made clear that no

agreement is needed for state or local law enforcement officials "to communicate with [federal immigration authorities] regarding the immigration status of any individual, including reporting knowledge that a particular alien is not lawfully present in the United States." § 1357(g)(10)(A). Likewise, Congress has refused to require any formal agreement for state and local officials to "cooperate with [federal immigration authorities] in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States." § 1357(g)(10)(B).

In short, by mandating non-cooperation in immigration enforcement, the laws stand as an obstacle to the congressional purpose of fostering such cooperation and thus violating the Supremacy Clause.

## CONCLUSION

For the foregoing reasons, this Court should vacate the district court's preliminary injunction.

DATED: July 28, 2025

Respectfully submitted,

/s/ Jonathon P. Hauenschild
Jonathon P. Hauenschild

Immigration Reform Law Institute
25 Massachusetts Ave., NW, Suite 335
Washington, DC 20001
Telephone: (202) 232-5590

Attorney for *Amicus Curiae*

20

## CERTIFICATE OF COMPLIANCE

1.     The foregoing brief complies with the type-volume limitation of Fed.

Fed. R. App. P. 29(a)(5) because:

This brief contains 4,735 words, including footnotes, but excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

This brief has been prepared in a proportionally spaced typeface using Microsoft Word 365 in Times New Roman 14-point font.

DATED: July 28, 2025               Respectfully submitted,

                                   /s/ Jonathon P. Hauenschild

## CERTIFICATE OF SERVICE

I certify that on July 28, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate ACMS system. All parties were served electronically through the ACMS system.

/s/ Jonathon P. Hauenschild