No. 25-3889

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

CITY AND COUNTY OF SAN FRANCISCO, et al.,

*Plaintiffs-Appellees*

v.

DONALD J. TRUMP, et al.,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the Northern District of California
No. 25-cv-01350
Hon. William H. Orrick

## PLAINTIFFS-APPELLEES' ANSWERING BRIEF

DAVID CHIU, SBN 189542
City Attorney
YVONNE R. MERÉ, SBN 173594
Chief Deputy City Attorney
MOLLIE M. LEE, SBN 251404
Chief of Strategic Advocacy
SARA J. EISENBERG, SBN 269303
Chief of Complex and Affirmative Litigation
NANCY E. HARRIS, SBN 197042
KARUN A. TILAK, SBN 323939
Deputy City Attorneys
Fox Plaza
1390 Market Street, 7th Floor

TONY LOPRESTI, SBN 289269
County Counsel
KAVITA NARAYAN, SBN 264191
Chief Assistant County Counsel
MEREDITH A. JOHNSON, SBN 291018
Lead Deputy County Counsel
STEFANIE L. WILSON, SBN 314899
RAJIV NARAYAN, SBN 334511
Deputy County Counsels
BILL NGUYEN, SBN 333671
Litigation Fellow
70 W. Hedding Street
East Wing, 9th Floor

n:\cxlit\li2025\250739\01862833.docx

San Francisco, CA 94102-5408
(415) 554-3308
Karun.Tilak@sfcityatty.org

San José, CA 95110
(408) 299-5900
Tony.Lopresti@cco.sccgov.org

*Attorneys for Plaintiff-Appellee*
CITY AND COUNTY OF SAN
FRANCISCO

*Attorneys for Plaintiff-Appellee*
COUNTY OF SANTA CLARA

*[Additional counsel listed in
signature block]*

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................. iii

INTRODUCTION ............................................................................... 1

BACKGROUND ................................................................................. 3

    I.    The Trump Administration's Efforts to Withhold Funding from Sanctuary Jurisdictions ........................................................... 3

        A.    President Trump Issues Executive Orders Threatening Sanctuary Jurisdictions ............................................... 3

        B.    Agencies Implement the Executive Orders to Expansively Condition Funding ...................................... 6

    II.    Defendants' Actions Place Plaintiffs at Risk of Catastrophic Funding Withdrawals ..................................................... 11

    III.    District Court Proceedings ................................................. 14

STANDARD OF REVIEW .................................................................. 18

SUMMARY OF ARGUMENT ............................................................. 18

ARGUMENT ...................................................................................... 20

    I.    The District Court Correctly Construed the Executive Orders ........... 20

        A.    The Orders Direct Agencies to Broadly Withhold Federal Funding ........................................................... 21

            1.    EO 14,159 ...................................................... 21

            2.    EO 14,218 ...................................................... 23

        B.    Defendants Have Publicly Emphasized that the Executive Orders Categorically Strip Federal Funding ........................... 26

        C.    Agencies' Implementation of the Executive Orders Further Confirms Their Categorical Reach ............................... 28

    II.    Plaintiffs are Likely to Succeed on the Merits of Their Claims ......... 34

        A.    Defendants Cannot Avoid Judicial Review by Invoking Savings Clauses .......................................................... 35

        B.    Separation of Powers ........................................................ 37

        C.    Spending Clause ............................................................... 40

            1.    Ambiguity ...................................................... 40

2. Lack of Nexus .................................................. 42

3. Coercion ........................................................... 43

D. Tenth Amendment .................................................. 44

E. Fifth Amendment ................................................... 46

1. Vagueness ...................................................... 46

2. Procedural Due Process ................................... 48

F. Administrative Procedure Act .................................. 49

III. Plaintiffs Demonstrated Irreparable Harm ...................... 52

IV. The District Court's Injunction Satisfies the Requirements of Federal Rule of Civil Procedure 65 ............................. 54

A. The Injunction Is Sufficiently Specific .................... 54

B. The Injunction Is Not Overbroad .......................... 58

CONCLUSION ..................................................................... 61

STATEMENT OF RELATED CASES

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

## TABLE OF AUTHORITIES

**Cases**

*Arizona v. Tohono O'odham Nation*
  818 F.3d 549 (9th Cir. 2016)................................................................22

*Armstrong v. Exceptional Child Ctr., Inc.*
  575 U.S. 320 (2015) .........................................................................61

*Bassidji v. Goe*
  413 F.3d 928 (9th Cir. 2005) ......................................... 20, 26, 28

*Bennett v. Spear*
  520 U.S. 154 (1997) .........................................................................50

*Bronitsky v. Saldana*
  No. 24-905, 2025 WL 1727392 (U.S. June 23, 2025) .........................25

*Building & Constr. Trades Dep't. v. Allbaugh*
  295 F.3d 28 (D.C. Cir. 2002) ..............................................................36

*Carroll v. Safford*
  44 U.S. 441 (1845) ............................................................................61

*City and County of San Francisco v. Barr*
  965 F.3d 753 (9th Cir. 2020)..............................................................58

*City and County of San Francisco v. Trump*
  897 F.3d 1225 (9th Cir. 2018)................................................... passim

*City of Los Angeles v. Barr*
  929 F.3d 1163 (9th Cir. 2019) .......................................... 16, 56, 59

*County of Santa Clara v. Trump*
  250 F. Supp. 3d 497 (N.D. Cal. 2017).......................................... 42, 53

*Cole v. Young*
  351 U.S. 536 (1956) .......................................................... 22, 27

*Del Webb Cmtys., Inc. v. Partington*
  652 F.3d 1145 (9th Cir. 2011)..............................................................57

*Enyart v. Nat'l Conf. of Bar Examiners, Inc.*
  630 F.3d 1153 (9th Cir. 2011)..............................................................18

*FCC v. Fox Television Stations, Inc.*
  567 U.S. 239 (2012) .........................................................................46

*Fortyune v. Am. Multi-Cinema, Inc.*
  364 F.3d 1075 (9th Cir. 2004)............................................... 54, 56, 58

*Franklin v. Massachusetts*
  505 U.S. 788 (1992) .........................................................................61

*Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers
  Loc. No. 70 of Alameda Cnty.*
  415 U.S. 423 (1974) .........................................................................54

*Hills v. Guatreaux*
  425 U.S. 284 (1976) .........................................................................58

*Holder v. Humanitarian Law Project*
  561 U.S. 1 (2010) .............................................................................48

*Immigr. & Naturalization Serv. v. Chadha*
  462 U.S. 919 (1983) .........................................................................38

*In re Google Play Store Antitrust Litig.*
  No. 24-6256, 2025 WL 2167402 (9th Cir. July 31, 2025)...................57

*In re Saldana*
  122 F.4th 333 (9th Cir. 2024)............................................................25

*Inst. of Cetacean Research v. Sea Shepherd Conservation Soc'y*
  774 F.3d 935 (9th Cir. 2014)..............................................................55

*Islamic Republic of Iran v. Boeing Co.*
  771 F.2d 1279 (9th Cir. 1985)............................................................28

*L.A. Haven Hospice, Inc. v. Sebelius*
  638 F.3d 644 (9th Cir. 2011)..............................................................58

*Lamb-Weston, Inc. v. McCain Foods, Ltd.*
  941 F.2d 970 (9th Cir. 1991)..............................................................54

*McComb v. Jacksonville Paper Co.*
  336 U.S. 187 (1949) .........................................................................58

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*
   463 U.S. 29 (1983) ................................................51

*Nat'l Fed'n of Indep. Bus. v. Sebelius*
   567 U.S. 519 (2012) ........................................ 40, 43, 44, 45

*Old Dominion Branch 496, Nat'l Ass'n of Letter Carriers, AFL-CIO v. Austin*
   418 U.S. 264 (1974) ................................................28

*Oregon Natural Desert Ass'n v. U.S. Forest Serv.*
   465 F.3d 977 (9th Cir. 2006) ................................................50

*Reno Air Racing Ass'n., Inc. v. McCord*
   452 F.3d 1126 (9th Cir. 2006) ................................................55

*San Luis & Delta-Mendota Water Authority v. Locke*
   776 F.3d 971 (9th Cir. 2014) ................................................51

*Shell Offshore, Inc. v. Greenpeace, Inc.*
   709 F.3d 1281 (9th Cir. 2013) ................................................52

*Shomberg v. United States*
   348 U.S. 540 (1955) ................................................35

*South Dakota v. Dole*
   483 U.S. 203 (1987) ........................................ 40, 41, 43

*Southwest Voter Registration Educ. Project v. Shelley*
   344 F.3d 914 (9th Cir. 2003) ................................................18

*Trump v. American Federation of Government Employees*
   145 S. Ct. 2635 (2025) ................................................37

*United States v. Peninsula Commc'ns., Inc.*
   287 F.3d 832 (9th Cir. 2002) ................................................18

*United States v. Williams*
   553 U.S. 285 (2008) ................................................46

*Villanueva v. California*
   986 F.3d 1158 (9th Cir. 2021) ................................................24

*Virginia v. American Booksellers Assoc.*
   484 U.S. 383 (1988) ................................................52

*Youngstown Sheet & Tube Co. v. Sawyer*
  343 U.S. 579 (1952) ........................................................................................61

**Statutes**
8 U.S.C.
  § 1373 ...............................................................................................passim
  § 1611(c)(1) ...........................................................................................26
  § 1601 ....................................................................................................24
  § 1611 ...............................................................................................24, 43

23 U.S.C.
  § 121 ......................................................................................................25

34 U.S.C.
  § 10406 ..................................................................................................26

52 U.S.C.
  § 20901 ..................................................................................................25

**Executive Orders**
Executive Order 13,768
  82 Fed. Reg. 8799 (Jan. 30, 2017)........................................................39

Executive Order 14,159
  90 Fed. Reg. 8443 (Jan. 29, 2025)............................................... passim

Executive Order 14,218
  90 Fed. Reg. 10581 (Feb. 25, 2025)............................................. passim

Executive Order 14,247
  90 Fed. Reg. 14001 (Mar. 25, 2025) ....................................................26

Executive Order 14,287
  90 Fed. Reg. 18761 (May 2, 2025).............................................. passim

**Other References**
Black's Law Dictionary (12th ed. 2024) ...................................................25

# INTRODUCTION

Since taking office in January, President Trump has issued multiple Executive Orders threatening to withhold federal funding from so-called "sanctuary jurisdictions."  This term is not defined by statute or regulation, but is often used to refer to jurisdictions, like Plaintiffs-Appellees ("Plaintiffs"), that have chosen to devote their local resources to addressing local priorities rather than assisting with federal civil immigration enforcement.[1]  Two of the President's Executive Orders are at issue in this appeal.  Executive Order 14,159 ("EO 14,159") directs the Attorney General and the Secretary of Homeland Security to ensure that sanctuary jurisdictions do not have access to "Federal funds."  ER-99. Executive Order 14,218 ("EO 14,218") further directs every federal agency to ensure that "Federal payments" to localities do not "by design or effect" "abet so-called 'sanctuary' policies that seek to shield illegal aliens from deportation."  ER-94.  The Attorney General has also issued a memorandum (the "Bondi Directive") that implements the President's directives by, as relevant here, announcing a freeze on the distribution of all Department of Justice ("DOJ") funding.  ER-146.

---

[1] Not all Plaintiffs use the term "sanctuary" to refer to their policies limiting local officials from participating in federal civil immigration enforcement. Nevertheless, Plaintiffs use the term "sanctuary jurisdiction" throughout this brief to reflect the terminology adopted by the Executive Orders.

While Defendants now claim that the Executive Orders and Directive require only a targeted, case-by-case evaluation of federal funding, those claims cannot be squared with the record. The text of the Orders and Directive threatens federal funding categorically. Defendants have unequivocally confirmed their intent to "withhold all Federal funding" from sanctuary jurisdictions,[2] to "end sanctuary cities," 2-SER-261, and to "pull their federal funding until they comply" with the Administration's demands.[3] And federal agencies implementing the Executive Orders clearly understood them as an expansive directive to withhold federal funding.

Defendants do not attempt to defend the lawfulness of these categorical funding threats. Nor could they. In *City and County of San Francisco v. Trump*, 897 F.3d 1225 (9th Cir. 2018), this Court held that President Trump could not, by Executive Order, unilaterally weaponize federal funding to coerce local governments to assist with federal civil immigration enforcement. The district court did not abuse its discretion in following this binding precedent and enjoining the Orders and Directive as unconstitutional and unlawful.

Defendants' re-interpretation of the Orders and Directive cannot eliminate

---

[2] Plaintiffs-Appellees' Request for Judicial Notice ("RJN") Ex. A; 1-SER-165; *see also* ER-26 (linking to statement)

[3] RJN Ex. B; see also 2-SER-315 n.2 (linking to statement).

the imminent harm that the Order and Directive create for Plaintiffs, who rely on federal funding to deliver critical public services and whose ability to budget and plan to meet the needs of their nearly ten million residents has been upended by Defendants' categorical funding threats. Nor is it evident that Defendants will give effect to their narrow interpretation absent an injunction. Indeed, the district court has had to issue further orders clarifying the injunction's scope in response to Defendants' ongoing efforts to target sanctuary jurisdictions' funding. Defendants' professed confusion at the scope of the injunction rests on mischaracterizations of the district court's orders, which properly delineate the scope of what is proscribed by the injunction, and what actions Defendants may still pursue. The Court should therefore affirm the district court's preliminary injunction.

## BACKGROUND

### I. The Trump Administration's Efforts to Withhold Funding from Sanctuary Jurisdictions

#### A. President Trump Issues Executive Orders Threatening Sanctuary Jurisdictions

Immediately following his second inauguration, President Trump issued EO 14,159, "Protecting the American People Against Invasion." Section 17 of the Order directs that the Attorney General and Secretary of Homeland Security ("Secretary") "shall, to the maximum extent possible under law, evaluate and undertake any lawful actions to ensure that so-called 'sanctuary' jurisdictions,

which seek to interfere with the lawful exercise of Federal law enforcement operations, do not receive access to Federal funds." ER-99. Section 17 also authorizes the Attorney General and Secretary to take civil and criminal enforcement actions against such jurisdictions. *Id.* "Sanctuary" jurisdictions are not defined by reference to any statute, but instead based on the Administration's subjective judgment about whether a jurisdiction "seek[s] to interfere with the lawful exercise of Federal law enforcement operations." *Id.*

On February 19, 2025, the President redoubled his defunding efforts through EO 14,218, "Ending Taxpayer Subsidization of Open Borders." Section 2(a) of that Order directs the head of every executive department and agency to take three actions. Two of those actions (which are not at issue here) relate to limiting federal public benefits for undocumented immigrants. *See* ER-94. The third action does not reference public benefits to ineligible immigrants, but instead requires all agencies to "ensure, consistent with applicable law, that Federal payments to States and localities do not, by design or effect, facilitate the subsidization or promotion of illegal immigration, or abet so-called 'sanctuary' policies that seek to shield illegal aliens from deportation." *Id.* EO 14,218 does not define "Federal payments" or "sanctuary" policies, clarify what it means for a payment to "abet" "sanctuary policies" by "design or effect," nor explain how funding to localities with "sanctuary" policies "fuel[s] illegal immigration" or

results in taxpayer benefits to "unqualified aliens."  *Id*.

Finally, on April 28, 2025, the President issued Executive Order 14,287 ("EO 14,287"), "Protecting American Communities from Criminal Aliens."  ER-91.[4]  That Order requires the Attorney General and Secretary to publish a list of so-called "sanctuary jurisdictions" and directs "each executive department or agency . . . in coordination with the Director of the Office of Management and Budget and as permitted by law" to "identify appropriate Federal funds to sanctuary jurisdictions, including grants and contracts, for suspension or termination, as appropriate."  ER-91–92.

Defendants have publicly declared that these Executive Orders are intended to prevent sanctuary jurisdictions from receiving any federal funding unless they abandon their policies.  For example, President Trump has told reporters that he planned to "end sanctuary cities" and "end the entire thing altogether," 2-SER-270, and posted on social media: "No more Sanctuary Cities! . . . Working on papers to withhold all Federal Funding from any City or State that allows these Death Traps to exist."  RJN Ex. A.  DOJ has likewise publicly stated that the Administration

---

[4] EO 14,287 was issued after the district court entered its April 24, 2025 preliminary injunction.  The district court subsequently clarified that Defendants may implement EO 14,287 in a manner consistent with the injunction (the "Clarifying Order").  Because Defendants challenge the scope of the district court's Clarifying Order—issued in response to EO 14,287—Plaintiffs include a brief description of that Order here.

intends to withhold federal funding as a threat to coerce localities into abandoning sanctuary policies. For example, the Attorney General told Fox News that the Administration "will continue to pull [sanctuary jurisdictions'] federal funding until they comply." RJN Ex. B. And, in response to Plaintiffs' preliminary injunction motion, DOJ publicly "made it crystal clear" that sanctuary jurisdictions "will be sued and stripped of federal funding." 2-SER-262. Other officials have similarly threatened action against any jurisdiction that declines to deploy its local resources to assist the federal government's aggressive immigration policies. *See* RJN Exs. G–J.

### B. Agencies Implement the Executive Orders to Expansively Condition Funding

Federal agencies have begun implementing these Executive Orders. They have imposed sweeping conditions requiring Plaintiffs and other localities to actively assist with federal civil immigration efforts in order to receive federal funding—making very real the threats in the Executive Orders.

On February 5, 2025, Attorney General Bondi issued the Bondi Directive. In furtherance of the President's immigration enforcement directives, including EO 14,159, the Bondi Directive states that DOJ will "ensure that, consistent with law, 'sanctuary jurisdictions' do not receive access to Federal funds from the

Department." ER-146.[5] The Directive then announces that DOJ would immediately freeze "the distribution of all funds" and would "terminate any agreements that are in violation of law or are the source of waste, fraud, or abuse, and initiate clawback or recoupment procedures, where appropriate." *Id.*[6] DOJ has also effectuated the President's directives by threatening to refer the City of Louisville to the Office of Management and Budget "for termination of grants, contracts, and federal funds as appropriate" pursuant to EO 14,287 unless Louisville agreed to assist federal immigration authorities. RJN Ex. C at 1. These threats worked. Louisville agreed to abandon its policies in part because of "the potential loss of millions of dollars of federal funding for critical city services." RJN Ex. D at 2.

The Department of Homeland Security ("DHS") has also implemented the Executive Orders. On February 19, 2025, Secretary of Homeland Security Kristi Noem issued a directive entitled "Restricting Grant Funding for Sanctuary Jurisdictions" (the "Noem Directive"). ER-144. The Noem Directive instructs all

---

[5] The Directive defines sanctuary jurisdictions by reference to 8 U.S.C. § 1373 and "other applicable federal immigration laws," without specifying those laws. ER-146–47. In fact, the Directive appears to require sanctuary jurisdictions to comply with unspecified "lawful immigration-related directives." ER-148.

[6] The Directive also states that DOJ would invoke its own authority to impose immigration-related conditions on certain DOJ grants. As explained below, Plaintiffs did not challenge this aspect of the Bondi Directive at the preliminary injunction stage. *See* 2-SER-390 n.4; 1-SER-188:11–189:3.

DHS components to determine if any DHS funds "directly or indirectly[] are going to sanctuary jurisdictions" and to "cease providing federal funding to sanctuary jurisdictions." *Id.* at 145. The Directive includes a non-exhaustive and expansive list of criteria, any of which may be sufficient to classify a locality as a sanctuary jurisdiction. *Id.* The criteria require that localities make their resources available for federal civil immigration enforcement, including by "honor[ing] requests for cooperation, such as participation in joint operations, sharing of information, or requests for short term detention of alien pursuant to a valid detainer." *Id.*

DHS has broadly conditioned funding to sanctuary jurisdictions pursuant to the Orders. For instance, on March 20, the Federal Emergency Management Agency ("FEMA") implemented the Secretary's instructions by recommending withholding funds from sanctuary jurisdictions under twelve different grant programs that support critical emergency-preparedness activities for man-made and natural disasters and other emergencies. ER- 111, 130–32; 3-SER-631–34, ¶¶ 7–19; 3-SER-655, ¶¶ 8–11; 4-SER-770–71, ¶¶ 4(k), (n), (o); 4-SER-810–12, ¶¶ 45–47. FEMA recommended applying these conditions even absent any nexus to immigration. *See* ER-111 (recommending immigration conditions on grants if there is a nexus to "national security" or "law enforcement" *or* even if there is no nexus and the statute is silent).

But DHS did not consider FEMA's recommendations to be sufficiently

expansive.  DHS overrode those recommendations on March 27, 2025 by issuing

Fiscal Year 2025 standard terms and conditions ("DHS Standard Terms")

"[applicable] to all new federal awards of federal financial assistance."  ER-133.

The DHS Standard Terms require grant recipients to affirmatively assist with

federal civil immigration enforcement, including the Noem Directive's specific

definition of "sanctuary" jurisdictions.  ER-136; 1-SER-55–58.  Only after the

district court entered the preliminary injunction, and Plaintiffs objected to these

standard terms, did Defendants add perfunctory language to the DHS website

indicating that not all standard terms would apply to all grants—notwithstanding

the plain language of the DHS Standard Terms, which still indicate that they apply

to "all new federal awards."  1-SER-30, 40.

Implementation of the Executive Orders has not been limited to DOJ and

DHS.  On April 24, 2025, the Secretary of the Department of Transportation

("DOT") invoked EO 14,159 to support DOT's new policy of providing federal

funding only to recipients that cooperate "with Federal authorities in the

enforcement of Federal law, including cooperating with and not impeding U.S.

Immigration and Customs Enforcement (ICE) and other Federal offices and

components of the Department of Homeland Security in the enforcement of

Federal immigration law."  1-SER-69.[7]  Pursuant to the Order, DOT added

---

[7] RJN Ex. E; *see also* 1-SER-27 n.1 (linking to statement).

language requiring cooperation with immigration enforcement in standard terms and template grant agreements applicable to all grants across its various operating administrations, including the Federal Transit Administration, Federal Highway Administration, Federal Aviation Administration, and Federal Railroad Administration grants (collectively "DOT Standard Terms"). 1-SER-72–97. These grants have nothing to do with immigration enforcement, but instead support critical transportation infrastructure and accessibility projects. 3-SER-645, ¶ 7; 4-SER-723, ¶ 15; 4-SER-856–57, ¶¶ 10 & 13; 4-SER-859, ¶ 4.

The Department of Housing and Urban Development ("HUD") has also made clear that, pursuant to EO 14,218, the department would not only ensure that federal public benefits only go to eligible recipients, but would also "take steps to ensure that Federal resources are not used to support 'sanctuary' policies of State and local jurisdictions." ER-109. Pursuant to this instruction, HUD has included grant terms targeting sanctuary jurisdictions in grants unrelated to immigration enforcement. For example, in Continuum of Care ("CoC") grants that support critical services for people experiencing chronic homelessness, HUD has lifted language from EO 14,218 requiring that funding not be used "in a manner that by design or effect" "abets so-called 'sanctuary' policies that seek to shield illegal aliens from deportation." 4-SER-748; ER-108 (subsequent version of grant

agreement removing only the word "sanctuary").  More recently, HUD has

announced the same language will be included in various formula grants.[8]

## II. Defendants' Actions Place Plaintiffs at Risk of Catastrophic Funding Withdrawals

Plaintiffs each limit the use of their local resources to assist with federal civil

immigration enforcement.  In general, Plaintiffs' policies prohibit local officials

from inquiring about immigration status, conditioning local services on

immigration status except as required by law, sharing certain sensitive personal

information, or enforcing federal civil immigration laws.[9]  Several Plaintiffs also

limit local law enforcement from detaining an individual who is otherwise eligible

for release from custody based solely on a civil immigration detainer request or an

administrative warrant.[10]  These policies seek to foster respect and trust between

law enforcement and residents; protect limited local resources; encourage

---

[8] These same conditions will be included in the Community Development Block Grant ("CDBG"), the HOME Investment Partnerships Program ("HOME"), the Emergency Solutions Grant ("ESG"), and the Housing Opportunities for Persons with AIDS program ("HOPWA").  RJN Ex. F.  These grants support a variety of services for individuals facing housing instability.  4-SER-756–61, ¶¶ 5–8.

[9] See, e.g., 3-SER-440 § 12H.2; 3-SER-451; 3-SER-457–62 §§ 2.15.010 & 2.15.020; 3-SER-465–467 § III; 3-SER-471 § 2; 3-SER-474–75 §§ 3 & 5; 3-SER-484–85 §§ 1–2; 3-SER-494–95 § 2; 3-SER-515–16 §§ 3 & 5; 3-SER-529 § 2; 3-SER-533 § 4.18.015(A); 3-SER-536–38 §§ 19.20–19.30; 3-SER-541–43 §§ 44.02–44.03; 3-SER-554–55 §§ 1–2; 4-SER-831 § 3.54(C).

[10] See, e.g., 3-SER-445 § 12I.3(b); 3-SER-460 § 2.15.020(B)(2); 3-SER-466 § III.8(c); 3-SER-494 § 2(A)(3); 3-SER-516 § 5(c); 4-SER-831 §§ 3.54(A)–(B); 3-SER-669 § 502.3.1.

cooperation between residents and local officials, including especially law

enforcement and public health officers and employees; and ensure community

security and due process for all.[11]

Plaintiffs' policies put them squarely in the crosshairs of Defendants' attacks

on sanctuary jurisdictions.[12]  Thus, Plaintiffs faced a catastrophic loss of funding if

Defendants were permitted to effectuate the Orders and Directive to categorically

withhold federal funding from sanctuary jurisdictions.  Federal funding accounts

for a significant portion of Plaintiffs' budgets, in many cases hundreds of millions

or billions of dollars.[13]  These federal funds support critical services for Plaintiffs'

communities, including essential healthcare and public health functions, safety-net

services for Plaintiffs' most vulnerable residents, emergency preparedness, and

safe and reliable public infrastructure.[14]  Federal funding, and DOJ funding in

---

[11] See, e.g., 3-SER-443 § 12I.1; 4-SER-721, ¶ 4; 4-SER-716–17, ¶¶ 5–6; 4-SER-787–88, ¶ 9; 4-SER-773–75, ¶¶ 5–11; 3-SER-492–93; 3-SER-528.

[12] Defendants do not dispute that Plaintiffs constitute sanctuary jurisdictions for purposes of the challenged Executive Orders.  Nor could they, given Defendants' guidance expansively defining sanctuary jurisdictions, ER-144–45, 146–47, and DOJ's litigation challenging the lawfulness of similar policies in other jurisdictions, 3-SER-558–98.

[13] See, e.g., 4-SER-728, ¶ 13; 4-SER-805, ¶ 25; 4-SER-856–57, ¶ 10; 3-SER-698–99, ¶¶ 5–6; 3-SER-689, ¶ 6; 4-SER-764, ¶ 4; 3-SER-658, ¶ 7; 3-SER-705–06, ¶ 14.

[14] See, e.g., 3-SER-623–28, ¶ 12; 3-SER-678-80, ¶¶ 21–30; 3-SER-689, ¶¶ 6–7; 3-SER-699-700, ¶¶ 7–10; 4-SER-727–31, ¶¶ 8-29; 4-SR-806-12, ¶¶ 30-47; 4-SER-834-36, ¶ 10; 4-SER-839, ¶ 5; 4-SER-855–57, ¶¶ 7–13.

particular, also plays a critical role in Plaintiffs' efforts to promote public safety in their communities.[15]

The harm created by this threatened funding withdrawal was immediate. Because most federal funds that Plaintiffs receive are reimbursement-based, Plaintiffs were (and are) spending their own funds on services for which they are legally entitled to obtain reimbursement from the federal government.[16] The Orders and Directive threw into doubt whether Plaintiffs would obtain reimbursement for already-incurred expenditures. Moreover, uncertainty about whether or when Plaintiffs would receive federal funds hindered the already-complex task of developing and maintaining a budget for the fiscal year.[17] Plaintiffs therefore faced three untenable choices: (1) budget based on a lack of federal funds, which would require a drastic rollback of critical services; (2) assume that federal funds would be available, risking budgetary disarray from devastating cuts that would be difficult to absorb; or (3) abandon their constitutionally protected local autonomy and redirect their local resources to

---

[15] 3-SER-617-618, ¶¶ 5–12; 3-SER-644–45, ¶ 6; 3-SER-654–55, ¶¶ 4–9; 3-SER-682, ¶ 4; 3-SER-708–12, ¶¶ 3–20; 4-SER-767–71, ¶ 4; 4-SER-775–76, ¶ 12.

[16] *See, e.g.*, 4-SER-728, ¶ 16; 4-SER-805–06, ¶¶ 26–28; 4-SER-855, ¶¶ 8–9; 3-SER-695, ¶ 4; 3-SER-699, ¶ 7; 3-SER-706, ¶ 16; 4-SER-764, ¶ 4; 4-SER-840–41, ¶ 12; 4-SER-833, ¶ 5.

[17] *See, e.g.*, 4-SER-816, ¶¶ 58–60; 4-SER-731–33, ¶¶ 30–39; 3-SER-695, ¶ 6; 3-SER-677, ¶¶ 11–13; 3-SER-645, ¶¶ 11–13; 3-SER-688-89, ¶¶ 4–5; 3-SER-704–05, ¶¶ 9–13; 4-SER-764–65, ¶¶ 7–9.

implementing Defendants' immigration-enforcement preferences.[18]  Plaintiffs

rejected these choices and filed suit.

## III.  District Court Proceedings

Plaintiffs' initial complaint challenged EO 14,159 and the Bondi Directive.

ER-280.  Plaintiffs amended their complaint after the President issued EO 14,218.

ER-281.  Plaintiffs seek declaratory and injunctive relief from Defendants' funding

and enforcement threats on the basis that they violate the U.S. Constitution and the

Administrative Procedure Act ("APA").  ER-223–35.  Given the exigencies

occasioned by Defendants' funding threats, Plaintiffs sought a preliminary

injunction prohibiting Defendants and their agents from taking any action based on

Section 17 of EO 14,159, Section 2(a)(ii) of EO 14,218, or the Bondi Directive to

withhold, freeze, or condition federal funds from Plaintiffs.  2-SER-383.

In opposing Plaintiffs' motion, Defendants asserted—as they do here—that

the Executive Orders and Bondi Directive merely call for an "evaluation" of

funding.  2-SER-346, 355–60.  On that basis, Defendants argued that Plaintiffs'

claims were nonjusticiable and failed to satisfy the requirements for a preliminary

injunction.  2-SER-353–57.  The district court rejected Defendants' narrow

---

[18] *See, e.g.*, 4-SER-731–35, ¶¶ 31–46; 4-SER-744, ¶ 14; 4-SER-816–17, ¶¶ 58–64; 4-SER-857, ¶¶ 11–13; 3-SER-695, ¶ 5; 3-SER-683, ¶ 9; 3-SER-622–23, 628, ¶¶ 9, 11, 14; 3-SER-639–41, ¶¶ 17–18, 26; 3-SER-700, ¶ 11; 4-SER-834–36, ¶¶ 7–11; 3-SER-704, 706, ¶¶ 6–7, 9 & 17; 4-SER-764–65, ¶¶ 6 & 9; 4-SER-840–41, ¶¶ 8, 15; 3-SER-646, ¶ 14.

interpretation and granted Plaintiffs' preliminary injunction motion on April 24, 2025 ("PI Order").  ER-287.  On May 3, the court issued a further order expanding on its reasoning for issuing the preliminary injunction ("Further Order").  ER-289.

The district court carefully examined the text of the Executive Orders and the preamble of the Bondi Directive and found that they "direct, respectively, a freeze on *all federal funding* to sanctuary jurisdictions and a freeze on *all DOJ* funding to the same."  ER-67; *see* ER-53 (noting that "[t]he interpretation of an Executive Order 'begins with its text'" (quoting *City & Cnty. of S.F.*, 897 F.3d at 1238–39)); *see also* ER-21, 23, 51, 61, 65, 67, 73–75.  The district court also found that the Administration's public statements and implementation actions corroborated the expansive language of the Orders and made clear that they "target federal funds and payments at large."  ER-53, 55; *see also* ER 23–26, 86.  As such, the court concluded that Plaintiffs' claims were justiciable, ER 49–62, and that Plaintiffs were likely to succeed on all their claims.  ER-64–67 (Separation of Powers), ER 67–70 (Spending Clause), ER 70–72 (Tenth Amendment), ER 73–75 (Fifth Amendment), ER 75–80 (APA).  Finally, the court concluded that, absent a preliminary injunction, Plaintiffs faced irreparable harm from budgetary uncertainty, constitutional injury, and damage to the relationships they had built with their immigrant communities.  ER-81.

Days after the PI Order, the President issued EO 14,287.  The White House

issued an accompanying fact sheet that once again reiterated the President's "promise to rid the United States of sanctuary cities" and "withhold all Federal Funding" from such jurisdictions. 1-SER-165. Plaintiffs subsequently filed a motion to enforce or modify the preliminary injunction to enjoin the funding threats in that Order. On May 9, 2025, the court issued an order clarifying the preliminary injunction ("Clarifying Order"). The Clarifying Order laid out the undisputed constitutional principles that must be honored when the federal government makes funding decisions. ER-11–12. The Order then distinguished between conduct proscribed by the preliminary injunction (directives to categorically withdraw funding from a jurisdiction simply because of its sanctuary policies) from conduct that is not enjoined (individualized determinations regarding conditions for specific grants). *See* ER-12 ("[T]he Government is entitled to identify particular grants and funding programs that it believes should be conditioned upon compliance with immigration-related objectives."); ER-14 (explaining that the injunction reaches "any subsequent Executive Order or Government action that poses the same coercive threat" as EOs 14,159 and 14,218 but is "not designed to freeze litigation over the propriety of . . . immigration-related conditions on particular government grants and contracts" (citing *City of Los Angeles v. Barr*, 929 F.3d 1163, 1178 (9th Cir. 2019)); *see also* 4-SER-863:20–866:7 (describing the court's reasoning).

Applying these principles, the court noted that EO 14,287's directive to identify funding to sanctuary jurisdictions that may be suspended could be implemented consistent with the injunction if done in an individualized, targeted manner.  ER-16 ("Identification of the funds the Government believes are at issue would, if done in a constitutionally targeted way, provide clarity.").  However, "[w]hat would be inappropriate is if the criterion for identification of funds for 'suspension or termination' was the fact that the so-called "sanctuary" jurisdictions received them."  ER-16.  The court noted that the context surrounding EO 14,287—specifically the President's threat to "withhold all Federal funds" to sanctuary jurisdictions—did not "inspire confidence in the Government's representation that it will limit its implementation of EO 14,287."  ER-17.  As such, the court clarified that its preliminary injunction order "shall be read to apply to *any* Executive Order or agency directive that purports to attempt to cut off federal funding from [sanctuary jurisdictions] in the wholesale, overly broad and unconstitutional manner threatened by" the earlier Executive Orders.  ER-18.  The "Government's counsel acknowledged [that] the Preliminary Injunction reaches the Government's proscribed conduct whether it is based on EO 14,287 or on some as yet unpublished Executive Order."  *Id.*

Defendants filed a notice of appeal on June 20, 2025, seeking appellate review of the April 24 PI Order, the May 3 Further Order, and the May 9

Clarifying Order.[19]

## STANDARD OF REVIEW

This Court's review of an order granting a preliminary injunction is "limited and deferential," *Southwest Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 918 (9th Cir. 2003) (en banc).  Reversal is warranted only if the district court "abused its discretion or based its decision on an erroneous legal standard or on clearly erroneous findings of fact."  *United States v. Peninsula Commc'ns, Inc.*, 287 F.3d 832, 839 (9th Cir. 2002).  This Court may affirm on any ground supported by the record.  *Enyart v. Nat'l Conf. of Bar Examiners, Inc.*, 630 F.3d 1153, 1159 (9th Cir. 2011).

## SUMMARY OF ARGUMENT

Defendants primarily argue that the Executive Orders do not mean what they say.  Despite the plain language of the Orders and the public statements the President and agencies have made about the Orders, Defendants now claim that the Orders merely call for an evaluation of targeted grant conditions (in the case of EO 14,159) and reiterate the requirements of federal law limiting noncitizens' eligibility for public benefits (in the case of EO 14,218).  This litigation position is

---

[19] On June 13, 2025, Plaintiffs sought the district court's guidance on the application of the injunction to certain agency standard terms and conditions.  On June 23, the district issued an order in response to joint briefing from the parties ("June 23 Order").  ER-2.  The June 23 Order is not included in Defendants' notice of appeal.

inconsistent with the language of the Executive Orders and the record before the district court. If there were any doubts about the Orders' meaning, President Trump has publicly confirmed his intent to "withhold all Federal funding" from sanctuary cities, RJN Ex. A, and DOJ responded to pleadings in this very case by telling the public that it was "crystal clear" that sanctuary jurisdictions would be "stripped" of funding, 2-SER-262. Federal agencies' pre-injunction implementation of the Executive Orders further demonstrates that they understood the Orders to require wide-scale funding withdrawals to sanctuary jurisdictions like Plaintiffs. Accordingly, the district court did not abuse its discretion in finding that the Executive Orders plainly command the withholding of federal funding at large from sanctuary jurisdictions.

Properly understood, the challenged Executive Orders are plainly unconstitutional, and Defendants offer no serious argument otherwise. Indeed, their merits arguments are almost exclusively premised on their implausibly narrow interpretation of the Executive Orders. Despite Defendants' efforts to walk back the scope of the Orders and Directive, their categorical defunding directives threaten catastrophic harm to Plaintiffs' ability to plan for and deliver essential public services to their residents. The district court therefore did not abuse its discretion in finding that Plaintiffs established a likelihood of success on their Separation of Powers, Spending Clause, Tenth Amendment, Fifth Amendment, and

APA claims, and showed a likelihood of irreparable harm.

Defendants also mischaracterize the scope of the district court's injunction, which the court has clarified due to Defendants' ongoing efforts to withhold funding from sanctuary jurisdictions. The injunction is neither vague nor overbroad, but tailored to Defendants' misconduct and Plaintiffs' need for relief. The district court clearly and repeatedly explained that the injunction prohibits the categorical withholding of funding but still permits Defendants to do an individualized assessment of specific grant programs. Defendants also willfully misread the district court's injunction as erecting a "preclearance" regime, Op. Br. at 23, a claim that has no basis in the district court's orders or the record in this case.

## ARGUMENT

## I.    The District Court Correctly Construed the Executive Orders

As this Court has recognized, "the interpretation of an Executive Order begins with its text, which must be construed consistently with the Order's object and policy." *City & Cnty. of S.F.*, 897 F.3d at 1238 (9th Cir. 2018) (quoting *Bassidji v. Goe*, 413 F.3d 928, 934 (9th Cir. 2005)) (cleaned up). The district court correctly applied these principles in concluding that the challenged Executive Orders direct federal agencies to categorically withhold funding from sanctuary jurisdictions unless they abandon their local policies and use their local resources to assist with federal civil immigration enforcement efforts. Defendants' entire

argument to the contrary is premised on a strained reading of the Orders that ignores key portions of the text, Defendants' contemporaneous public statements, and agencies' implementation of the Orders—all of which confirm the Orders' expansive scope.

### A. The Orders Direct Agencies to Broadly Withhold Federal Funding

#### 1. EO 14,159

On its face, Section 17 of EO 14,159 commands that the Attorney General and Secretary "shall, to the maximum extent possible under law, evaluate and undertake any lawful action" to "ensure" that sanctuary jurisdictions "do not receive access to Federal funds."  Defendants argue this merely calls for a case-by-case evaluation of conditions for a limited set of funds, Op. Br. at 26–27, but this reads the word "evaluate" in isolation.  Section 17 does not simply request a standalone "evaluation" of federal funding.  It also mandates that the Attorney General and Secretary "shall . . . undertake" actions to prevent sanctuary jurisdictions from having "access to Federal funds."

This Court's analysis of the 2017 Executive Order at issue in *City and County of San Francisco* is instructive.  That Order directed that the Attorney General and the Secretary "in their discretion and to the extent consistent with law, shall ensure that jurisdictions that willfully refuse to comply with 8 U.S.C. § 1373 (sanctuary jurisdictions) are not eligible to receive Federal grants."  The phrase "in

their discretion and to the extent consistent with law" ostensibly suggested that these officials engage in a discretionary evaluation of what (if any) action to take. Rather than reading that phrase in isolation, this Court found that other language in the Order stating that these officials "shall ensure" sanctuary jurisdictions "are not eligible to receive Federal grants" evinced a clear command to withhold federal funding from these jurisdictions. *City and Cnty. S.F.*, 897 F.3d at 1239. The same reasoning applies here: the word "evaluate" does not negate the Order's clear instruction that the designated officials "shall . . . undertake" actions to "ensure" sanctuary jurisdictions "do not have access to Federal funds." ER-99.

Section 17's directive that "Federal funds" be withheld to the "maximum extent possible under law" also demonstrates the categorical nature of the directive. *See Arizona v. Tohono O'odham Nation*, 818 F.3d 549, 557 & n.4 (9th Cir. 2016) (applying the interpretive canon that "[g]eneral words are to be understood in a general sense"); *see also Cole v. Young*, 351 U.S. 536, 556 (1956) (an Executive Order's "failure to state explicitly what was meant is the fault of the Government. Any ambiguities should therefore be resolved against the Government."). Defendants try to avoid this expansive language by drawing a false comparison with the 2017 Executive Order. That Order, they note, specifically carved out law-enforcement grants. Op. Br. at 34. This Court concluded that, under the doctrine of *inclusio unius est exclusio alterius*, the

exclusion of law-enforcement grants suggested that the 2017 Executive Order directed the Attorney General and Secretary to cut all other grant programs. *City and Cnty. S.F.*, 897 F.3d at 1239. But it would be perverse to read EO 14,159's failure to include any carveouts as narrowing its reach—particularly given Defendants' statements and agencies' implementation of the Executive Order discussed below. The Administration could narrow or explicitly limit the "Federal funds" at issue, or instruct Executive departments how to narrowly apply this directive, but has in fact done the opposite.

Finally, Defendants argue that EO 14,159 applies only to DOJ and DHS funding. As discussed further below, other federal agencies have invoked EO 14,159 to categorically condition funding to localities on cooperation with immigration enforcement—discrediting Defendants' assertion that it applies only to DHS and DOJ. In any event, the plain language of Section 17 refers to withholding "Federal funds" to the "maximum extent" possible, ER-99, without expressly limiting those funds to only DOJ and DHS funding. Indeed, the 2017 Executive Order assigned DOJ and DHS the responsibility for withholding funding, and this Court determined that those departments were charged with withholding funding more broadly. *City and Cnty. S.F.*, 897 F.3d at 1239–40.

### 2. EO 14,218

The plain text of EO 14,218—which directs every federal agency to ensure

that "Federal payments" do not "abet" "'sanctuary' policies" "by design or effect"—similarly mandates that sanctuary jurisdictions be denied federal funding. Defendants implausibly suggest that the Order merely requires enforcement of the Personal Responsibility and Work Opportunity Reconciliation Act ("PRWORA"). Defendants did not advance this interpretation of the order in opposing the preliminary injunction before the district court, 2-SER-338–72, and it is therefore waived. *Villanueva v. California*, 986 F.3d 1158, 1164 n.4 (9th Cir. 2021). Indeed, Defendants' new gloss only highlights the *post hoc* nature of their efforts to reinterpret the Order's scope.

In any event, Defendants' reading of Section 2(a)(ii) cannot be squared with the text. PRWORA limits the availability of federal public benefits to certain ineligible noncitizens. *See* 8 U.S.C. §§ 1601, 1611. Nothing in PRWORA addresses civil immigration enforcement or requires that local officials assist with federal efforts to detain or deport undocumented immigrants. But that is precisely what Section 2(a)(ii) requires by directing every executive agency to ensure that "Federal payments" "do not, by design or effect, . . . abet so-called 'sanctuary' policies." ER-94. The Order describes "sanctuary policies" as those that purportedly thwart immigration enforcement—i.e., by "shield[ing]" undocumented immigrants from "deportation." *Id.* The Administration's other uses of "sanctuary" also focus on immigration enforcement—not benefits eligibility. *See,*

*e.g.*, ER-99 (EO 14,159); ER-146 (Bondi Directive); ER-144 (Noem Directive); ER-109 (Turner Letter).  And "abet" means to "aid" or "assist."  Black's Law Dictionary (12th ed. 2024).

Thus, Section 2(a)(ii) does not give effect to PRWORA's limitation on public benefits to noncitizens but instead requires that federal funding be denied to jurisdictions with policies that, in the Administration's view, fail to sufficiently assist with the federal government's efforts to deport individuals.  Indeed, to construe Section 2(a)(ii) as Defendants suggest would make it duplicative of Sections 2(a)(i) and (iii)—which do address limiting the provision of benefits to undocumented immigrants.  *See In re Saldana*, 122 F.4th 333, 342–43 (9th Cir. 2024), cert. denied sub nom. *Bronitsky v. Saldana*, No. 24-905, 2025 WL 1727392 (U.S. June 23, 2025) ("[C]ourts must construe a statute 'so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant," and this rule applies "with special force" where a proposed construction "renders an entire subparagraph meaningless.") (cleaned up).

Defendants also advance the flawed argument that the use of the term "Federal payment" refers narrowly to payments for "federal public benefits."  As an initial matter, the term "payment" is used in contexts unrelated to public benefits.  *See, e.g.*, 23 U.S.C. § 121 (payments to States related to highway construction); 52 U.S.C. § 20901 (payments related to election administration); 34

U.S.C. § 10406 (payments to states and localities for juvenile-justice programs);

*see also* Executive Order 14,247, 90 Fed. Reg. 14001 (Mar. 25, 2025) (ordering

changes to Department of Treasury practices to improve "Federal payments").

Even if "Federal payments" were construed by reference to federal public benefits,

it would still cover a broad swath of funding. For example, "federal public

benefit" under PRWORA is defined as "any grant, contract, loan, professional

license, or commercial license provided by an agency of the United States or by

appropriated funds of the United States" and "any retirement, welfare, health,

disability, public or assisted housing, postsecondary education, food assistance,

unemployment benefit, or any similar benefit," subject to certain limitations and

exceptions. 8 U.S.C. § 1611(c)(1). Thus, even accepting Defendants' argument,

Section 2(a)(ii) purports to condition payments to states and localities for a broad

array of funding programs on the condition that those localities assist with federal

civil immigration enforcement.

## B. Defendants Have Publicly Emphasized that the Executive Orders Categorically Strip Federal Funding

The plain language of the Executive Order must be interpreted in a manner

consistent with its "object and policy." *City & Cnty. of S.F.*, 897 F.3d at 1238

(quoting *Bassidji*, 413 F.3d at 934). That object and policy can be found in the

Administration's public statements and agencies' implementation of the Executive

Orders—which confirm that the Orders were understood to withhold substantially

all federal funding from sanctuary jurisdictions.

First, the President has made clear his intention to use Executive authority to deprive sanctuary jurisdictions of funding unless they bend to his demands. Issuing from the author of the Orders and the head of the Executive Branch, the President's statements are particularly probative because they "guide those tasked with enforcing the Executive Order." *City & Cnty. of S.F.*, 897 F.3d at 1242-1243; *see also Cole*, 351 U.S. at 556 (an Executive Order's "failure to state explicitly what determinations are required leaves no choice to the agency heads but to follow the most reasonable inferences to be drawn."). The President's statements confirming his intent to "end sanctuary cities" and to "withhold all Federal Funding" from sanctuary jurisdictions are at odds with a targeted evaluation of funding conditions. RJN Ex. A; 2-SER-270. Rather, using the same expansive language of the Executive Orders, these statements unequivocally direct federal agencies to broadly condition funds as a coercive measure to compel sanctuary jurisdictions to abandon their policies.

Nor are the President's pronouncements isolated. While DOJ argues in court that these Executive Orders call for nothing more than an evaluation of funding, DOJ publicly responded to Plaintiffs' preliminary injunction motion by making it "crystal clear" that sanctuary jurisdictions "will be sued and stripped of federal funding." 2-SER-262. Attorney General Bondi has also stated that the

Trump Administration "will continue to pull [sanctuary jurisdictions'] federal funding until they comply" with Defendants' sweeping demands. RJN Ex. B; *see also* 2-SER-315 n.2.

Defendants attempt to wave away these statements by arguing that they cannot alter the plain meaning of the Order. Op. Br. at 38 n.5. But these statements are entirely consistent with the Orders' categorical directions. And consideration of these public statements is appropriate to identify the object and policy of the Orders. *See City & Cnty. of S.F.*, 897 F.3d at 1243 (looking to public statements to identify object and policy behind 2017 Executive Order); *see, e.g.*, *Old Dominion Branch 496, Nat'l Ass'n of Letter Carriers, AFL-CIO v. Austin*, 418 U.S. 264, 274–75 (1974) (interpreting Executive Order in light of public statements made by agency officials); *Bassidji*, 413 F.3d at 935 (construing term in Executive Order in light of overall purpose of Order, as explained in letter from President to Congressional leaders); *Islamic Republic of Iran v. Boeing Co.*, 771 F.2d 1279, 1284 (9th Cir. 1985) (looking at public statements made by Presidents Carter and Reagan). The district court appropriately took the President and DOJ at their word in interpreting the purpose of the Executive Orders.

### C. Agencies' Implementation of the Executive Orders Further Confirms Their Categorical Reach

Finally, agency actions preceding and contemporaneous with the preliminary injunction confirm that the Orders were understood to require the withholding of

substantially all federal funding from sanctuary jurisdictions.

Defendants argue that EO 14,159 applies only to DOJ and DHS funding, but those were not the only agencies to implement the Order. DOT announced on April 24, 2025 (the same day as the PI Order), that, pursuant to EO 14,159, the Department would require *all* funding recipients to "comply with Federal law enforcement directives and to cooperate with Federal officials in the enforcement of Federal immigration law."[20] 1-SER-70. DOT's Standard Terms across all its subcomponents were updated to require grant recipients to "cooperate" with immigration enforcement, regardless of their specific grants. 1-SER-72–97. Such conduct fatally undermines Defendants' assertions that the "Federal funds" identified in EO 14,159 are limited to DHS or DOJ, and that the Order directs only an "evaluation" of funding.

DHS's actions similarly evince an expansive understanding of the Executive Orders. The February 19 Noem Directive, for example, directs all DHS components to review all federal funding that both "directly or indirectly" goes to sanctuary jurisdictions and attempt to "cease providing federal funding to sanctuary jurisdictions." ER-145. FEMA's recommendations in response to this directive are anything but targeted. FEMA recommended that immigration-related conditions be added to twelve grants totaling billions of dollars—including tens of

---

[20] RJN Ex. E; *see also* 1-SER-27 n.1 (providing link to statement).

millions to several Plaintiffs—that support efforts to prepare for and respond to natural disasters, terrorist attacks, and other emergencies. *See, e.g.*, 3-SER-638–40, 655, 811–12; *see also* ER-117–19, 130–32. FEMA recommended that conditions be added to grants even absent *any* nexus to immigration activities. ER–111 (recommending conditions on law enforcement and national security grants, and on any grant where the statute does not limit FEMA's implementation—regardless of nexus to immigration).

Ultimately, DHS concluded that FEMA's recommendations did not go far enough to implement the Orders. DHS overrode FEMA's recommendations on March 27, 2025, when it issued the DHS Standard Terms. Those terms specifically target "sanctuary" jurisdictions by mandating that award recipients "honor requests for cooperation, such as participation in joint operations, sharing of information, or requests for short term detention of an alien pursuant to a valid detainer" and "provide access to detainees" in custody, as a condition for "all new federal awards" for Fiscal Year 2025. ER-133, 136. Defendants re-issued these terms on April 18, 2025, again requiring jurisdictions to agree to cooperate with civil immigration enforcement as a condition for "all new federal awards." 1-SER-55–56. The issuance of these standard terms dispelled any notion that DHS intended to engage in a targeted evaluation of funding. Thus, when the district court issued its preliminary injunction, the extant record evidence showed that

DHS understood the Executive Orders to require categorical immigration enforcement conditions in standard terms applicable to *all* federal awards.

Defendants attempt to avoid the clear import of this action by pointing to language on DHS's website stating that "[n]ot all of DHS's Standard Terms and Conditions apply to every DHS grant program[]."  Op. Br. at 60 n.8.  But that language was added on June 11, 2025—after the district court issued the orders on appeal here.  1-SER-28, 30, 40.  Defendants' *post hoc* effort to narrow DHS's expansive understanding of the Executive Orders should be rejected, particularly where it is inconsistent with the plain language of the standard terms and the very point of having *standard* terms.  *City & Cnty. of S.F.*, 897 F.3d at 1242; *see* ER-5.

Nor does the Bondi Directive support Defendants' cramped construction of the Executive Orders.  To the extent Defendants assert that the Directive constitutes a binding opinion on the scope of the Executive Orders, that argument should be rejected: the Bondi Directive is addressed only to DOJ employees and does not purport to bind DHS or any other department, and thus does not limit the scope of grants at issue from the Executive Branch generally.  *See City & Cnty. of S.F.*, 897 F.3d at 1242 (declining to give deference to DOJ memorandum as interpretation of Executive Order because it had no force outside of DOJ).  Further, the portion of the Bondi Directive challenged in Plaintiffs' preliminary injunction motion is expansive and categorical.  The preamble of the Bondi Directive states

that DOJ will ensure that "'sanctuary jurisdictions' do not receive access to Federal funds from the Department." ER-146. The very next sentence effectuates this threat by directing DOJ to freeze the distribution of "*all* funds" pending departmental review. *Id.* This across-the-board funding freeze—the focus of Plaintiffs' preliminary injunction challenge—would make little sense if DOJ understood the Executive Order as only targeting select funding.

Defendants highlight statements in Section I of the Bondi Directive noting that DOJ would exercise its "own authority" to impose conditions on future grants and directing staff to prepare a report on grants subject to these conditions. Op. Br. at 28. But Plaintiffs did not challenge this portion of the Bondi Directive in their preliminary injunction motion, 2-SER-390 n.4; 1-SER-188:11–189:3, and nothing in the injunction precludes the individualized review pursuant to the agency's own authority—rather than categorical application of the Executive Orders—that this portion of the Bondi Directive contemplates. ER-12, 14. In any event, the Directive's statements about possible applications of conditions to future grants do not override the expansive language of the Executive Orders or the unambiguous public statements of policy reflected in DOJ's and the President's public statements. *See* Argument, Part I.A, B, *supra.* Indeed, DOJ recently—and successfully—threatened to refer the City of Louisville to the Office of Management and Budget "for termination of grants, contracts, and federal funds as

appropriate" if it did not end its sanctuary policies, highlighting DOJ's "crystal clear" policy of threatening catastrophic defunding as a coercive tool against sanctuary jurisdictions.  RJN Ex. C, 2-SER-262.

HUD's actions to implement EO 14,218 similarly demonstrate that the agency understood the Executive Order's funding threat to apply expansively. HUD Secretary Turner's April 4, 2025 letter to all grantees and stakeholders confirms that the conditions on funding to sanctuary jurisdictions are distinct from enforcing PRWORA.  The third paragraph of the letter discusses PRWORA and reminds grantees that various public benefits provided by HUD are not available to ineligible noncitizens.  ER-109.  But the fourth paragraph does not address eligibility for or payment of public benefits or mention PRWORA.  Rather, the Secretary states, pursuant to EO 14,218, HUD will "take steps to ensure that Federal resources are not used to support 'sanctuary' policies" that purportedly "actively prevent federal authorities from deporting illegal aliens"—confirming the immigration-enforcement focus of these conditions.  *Id.*

Consistent with this directive, HUD has included conditions requiring "cooperation" with immigration enforcement in grant agreements for homelessness services and in formula grants like CBDG, ESG, HOME, and HOPWA, which support critical social services.  These grant conditions further undermine Defendants' contention that EO 14,218 merely implements PRWORA.  Indeed, the

HUD CoC grant agreements treat the Order and PRWORA as two distinct authorities.  Grantees are required to comply with any "applicable requirements" that "may [be] establish[ed] from time to time to comply with PRWORA, EO 14218, or other Executive Orders or immigration laws."  ER-108.  If the Order were understood as merely reinforcing PRWORA (rather than establishing its own requirements), mentioning both PRWORA and EO 14,218 as sources of "applicable requirements" would be superfluous.

In sum, the district court's conclusion that the challenged Executive Orders direct the categorical withholding of federal funding from sanctuary jurisdictions is supported by the Orders' plain language and buttressed by Defendants' public statements and agencies' implementation of the Orders.

## II.   Plaintiffs Are Likely to Succeed on the Merits of Their Claims

Defendants offer no defense of the Executive Orders as properly construed by the district court, resting their arguments entirely on their untenably narrow re-interpretation of the Orders.  Nor could they mount a viable defense of the Orders. The district court correctly held that, under this Court's decision in *City & County of San Francisco*, Defendants unlawfully arrogated Spending Clause power reserved to Congress.  The district court likewise correctly found that Defendants attached funding conditions that even Congress could not impose under the Spending Clause, and did so in a manner that is unconstitutionally coercive under

the Tenth Amendment and violative of Plaintiffs' Fifth Amendment due process rights. The portion of the Bondi Directive challenged in Plaintiffs' preliminary injunction motion—the Preamble's across-the-board freeze on all funds—is likewise unconstitutional and unlawful under the APA.

## A. Defendants Cannot Avoid Judicial Review by Invoking Savings Clauses

Defendants argue that the Executive Orders and Bondi Directive must be lawful because they include savings clauses. Op. Br. at 48; *see* ER-99 (directing that the Attorney General and Secretary "undertake any lawful actions"); ER-94 (directing that actions be taken "consistent with applicable law"); ER-146 (stating that the funding freeze would be implemented "[c]onsistent with applicable statutes, regulations, court orders, and terms"). This Court's analysis in *City and County of San Francisco* applies squarely here. As the Court observed, savings clauses must be "read in their context, and they cannot be given effect when the Court, by rescuing the constitutionality of a measure, would override clear and specific language." *City & Cnty. of S.F.*, 897 F.3d at 1239; *see also Shomberg v. United States*, 348 U.S. 540, 547–48 (1955). Here, giving dispositive weight to boilerplate savings clauses would render "judicial review . . . a meaningless exercise"—particularly in light of Defendants' statements and implementation. *City & Cnty. of S.F.*, 897 F.3d at 1240.

This does not mean that savings clauses can never be effective, or that they

must be "ignored as a general matter." Op. Br. at 51. Rather, where, as here, the plain language of the Executive Orders commands action to withhold funding, Defendants have publicly expressed an intent to strip all federal funding, and agencies' implementation reflects their expansive understanding of the Executive Orders, there is more than a "mere possibility" of unlawful action—the actions *are* unlawful, and no inclusion of savings clauses can override the extant facts. Defendants' primary case, *Building & Constr. Trades Dep't. v. Allbaugh*, 295 F.3d 28 (D.C. Cir. 2002), does not teach otherwise, and was distinguished in this Court's decision in *City and County of San Francisco*. The D.C. Circuit in *Allbaugh* rejected a suggestion that the Administration would ignore a savings clause and implement an Executive Order unlawfully because "the present record" did not reveal a prospect of misuse. *Id.* at 33. That is not the case here, and the district court did not err in reading the Executive Orders, alongside Defendants' public statements and implementing actions, as threatening more than a mere possibility of unlawful withholding of broad swaths of federal funding. *See City & Cnty. of S.F.*, 897 F.3d at 1239–40 (distinguishing *Allbaugh* on the grounds that the 2017 Executive Order commanded action such that there was "more than a mere possibility" that an agency might act unlawfully).[21]

---

[21] Defendants also cite Justice Sotomayor's concurrence in the Supreme Court's decision staying a lower court order in *Trump v. American Federation of*

## B.    Separation of Powers

The district court correctly concluded that the 2025 Executive Orders and the Bondi Directive violate the Separation of Powers.  EO 14,159 unilaterally directs the Attorney General and Secretary to deny sanctuary jurisdictions access to Federal funds, ER-99, and EO 14,218 directs all federal agencies to deny "Federal payments" that may "by design or effect" "abet so-called 'sanctuary' policies," ER-94.  The preamble of the Bondi Directive likewise threatens to indefinitely freeze the "distribution of all funds" until they can be reviewed as part of DOJ's efforts to ensure that "'sanctuary jurisdictions' do not receive access to Federal funds from the Department," but identifies no Congressional authorization for such a freeze.  ER-146.

The Orders and Directive therefore present the same question at issue in *City and County of San Francisco*: "whether, in the absence of congressional authorization, the Executive Branch may withhold all federal grants from so-called 'sanctuary' cities and counties."  897 F.3d at 1231.  The answer remains the same: "under the principle of Separation of Powers and in consideration of the Spending

---

*Government Employees*, 145 S. Ct. 2635 (2025).  But, as Justice Sotomayor noted, the agencies' plans "are not before this Court, at this stage, and we thus have no occasion to consider whether they can and will be carried out consistent with the constraints of law," and the district court could consider these questions in the first instance.  Here, in contrast, the district court had before it Defendants' publicly expressed intentions and agency actions reflecting their understanding of their Order.

Clause, which vests exclusive power to Congress to impose conditions on federal grants, the Executive Branch may not refuse to disperse the federal grants in question without congressional authorization." *Id.* Through the Orders and Directive, the Administration "claim[s] for itself Congress's exclusive spending power, [and] attempt[s] to co-opt Congress's power to legislate." *Id.* at 1234. The Executive Orders also violate the Presentment Clause by effectively amending or repealing duly enacted Congressional appropriations, *Immigr. & Naturalization Serv. v. Chadha*, 462 U.S. 919, 951, 954 (1983), and abrogate the President's obligation to take care that enacted laws—including appropriations—are faithfully executed. *See City & Cnty. of S.F.*, 897 F.3d at 1234.

Defendants attempt to distinguish *City and County of San Francisco* on three grounds, each without merit. First, they repeat their refrain that the 2025 Executive Orders do not "assert[] the kind of broad authority that this Court understood to have been claimed by" the 2017 Executive Order. Op. Br. at 52. But, as explained above, that reading is incompatible with the text of the Orders, Defendants' public statements, and agencies' understanding of the Orders' scope.

Second, they argue that the categorical defunding directed by the Executive Orders and Directive is authorized. Not so. With respect to EO 14,218, nothing in PRWORA—a statute focused on eligibility for and administration of federal public benefits—authorizes weaponizing "Federal payments" to require localities to use

their resources for federal immigration enforcement. *See* Argument, Part I.A.2, *supra.* As for EO 14,159, Defendants argue that it is distinguishable from the 2017 Executive Order because the latter Order invoked the statutory authority of 8 U.S.C. section 1373, whereas EO 14,159 does not invoke any statute. Not only is it illogical to argue that an Executive Order citing *no* authority is more targeted than an Order relying on *inapplicable* authority, but Defendants also mischaracterize the 2017 Executive Order. That Order actually defined sanctuary jurisdictions as those that failed to comply with section 1373—i.e., it purported to require compliance with section 1373 and did not invoke § 1373 as statutory authority. Executive Order 13,768, 82 Fed. Reg. 8799, at 8801 (Jan. 30, 2017). As Defendants acknowledge: "compliance with Section 1373 as a condition of funding does not mean that the statutory authority for imposing that condition derives from Section 1373." Op. Br. at 55. The 2017 Executive Order and EO 14,159 equally failed to provide any statutory authority for their categorical funding withdrawals. If anything, EO 14,159 is doubly deficient. Not only does it lack any authority, but it also fails to define sanctuary jurisdiction by reference to any law—instead leaving the definition to the Executive's subjective assessment of whether a jurisdiction is sufficiently compliant with the Executive's enforcement priorities.

Lastly, Defendants' invocation of the savings clauses in the Executive

Orders fails for the reasons discussed in Argument, Part II.A, *supra*.

## C. Spending Clause

The district court also correctly found that the Executive Orders and the Bondi Directive violate the Spending Clause by imposing ambiguous, after-the-fact, and coercive conditions with no nexus to the funded programs. ER 67–70.

### 1. Ambiguity

The Spending Clause requires that any conditions imposed on federal funds be unambiguous, so that jurisdictions receiving those funds may "exercise their choice knowingly, cognizant of the consequences of their participation." *South Dakota v. Dole*, 483 U.S. 203, 207 (1987) (internal quotation marks omitted); *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 577 (2012) ("*NFIB*") ("[L]egitimate" exercise of spending power requires the state or local government receiving federal funding to "voluntarily and knowingly accepts the terms of the 'contract.'"). As the district court found, the Executive Orders and Bondi Directive impose unconstitutionally ambiguous conditions in two respects.

First, because the Orders "apply to all 'federal funds' and 'federal payments,' including funds already appropriated by Congress or already awarded to states and localities, they impose immigration-related conditions that localities were unaware of and therefore could not have assented to when choosing to receive federal funding." ER-68; *see, e.g.*, 4-SER-743–44, ¶¶ 8–11; 4-SER-726–27, 731–33, ¶¶ 1–6, 30–39; 4-SER-805–06, 816, ¶¶ 26–28, 58– 60; 4-SER-855, ¶¶

8–9; 3-SER-695, ¶¶ 4, 6; 3-SER-699 , ¶ 7; 3-SER-706, ¶ 16; 4-SER-764–65, ¶¶ 4, 7 –9; 4-SER-840–41, ¶ 12; 4-SER-833, ¶ 5.  The Bondi Directive likewise explicitly directs a freeze on the "distribution of all funds," including within its ambit already awarded funds.  ER-146 (noting the funding freeze would be followed by termination, clawback, and recoupment of funds).  Defendants argue that the conditions are not "after-the-fact" because they are stated in the grant agreements, such as those issued by HUD.  Op. Br. at p. 60.  However, the revised HUD grant agreements implementing EO 14,218 were presented to grant recipients *after* they had been awarded the grants and had begun to expend resources.  4-SER-743–44, ¶¶ 8–11.  Such actions demonstrate that the Orders were understood to apply retroactively, which violates the Spending Clause's requirement that recipients be made aware of the "consequences of their participation."  *Dole*, 483 U.S. at 207.

Second, the conditions fail to define key terms. EO 14,159 does not define when a jurisdiction "interfere[s]" with "Federal law enforcement operations" such that it is subject to defunding.  ER-99.  EO 14,218 similarly does not define what "Federal payments" are at stake or explain what it means for a jurisdiction to use "Federal payments" to "abet so-called 'sanctuary' policies" "by design or effect."  ER-94.  This vague language is replicated in grant agreements across several different programs.  ER-108; RJN Ex. F.  Localities cannot knowingly or

voluntarily accept conditions based on such vacuous and subjective phrases. *See County of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 532 (N.D. Cal. 2017). Defendants conceded this argument below. ER-68 n. 7 (noting that Defendants gave "no response" to the fact that the Executive Orders and Bondi Directive are "ambiguous with respect to critical terms, like what constitutes a 'sanctuary' policy or a 'sanctuary' jurisdiction, and what amounts to 'abet[ting]' such a policy"). Even if Defendants could raise their arguments for the first time before this Court, their arguments lack merit. For example, Defendants claim that EO 14,218 is clear because it implements PRWORA, but that statute does not use the phrase "sanctuary policy" or relate to immigration enforcement. *See* Argument, Part I.A.2, *supra*.

## 2. Lack of Nexus

The district court also properly found that the Executive Orders and Bondi Directive violate the Spending Clause "because they are conditions without a nexus to the affected funds." ER-68. The record shows that Plaintiffs rely on "the threatened federal funding for critical social and public health services, law enforcement, child welfare services, transportation, programs that shelter the homeless, anti-terrorism programs, and natural disaster preparedness programs, to name just a few." ER-69 (citing Plaintiffs' declarations). These programs "have *nothing to do* with immigration enforcement." ER-69.

Defendants' attempts to identify a nexus fail. As discussed above, their efforts to connect EO 14,218's directives on "sanctuary policies" with PRWORA have been waived, and in any event lack merit. PRWORA concerns public welfare and similar assistance programs, and limits eligibility for those "Federal public benefits" to certain "qualified aliens," 8 U.S.C. § 1611. PRWORA has nothing to do with requiring states and localities to assist in federal immigration enforcement actions. Likewise, the March 25 FEMA memo demonstrates that Defendants are applying the Executive Orders to programs with no nexus to immigration—instead including grants with a general law-enforcement or national-security purpose and even programs with no such connection. ER-108, 130–32. And, whatever FEMA purported to recommend, DHS changed course and issued Standard Terms applying immigration-enforcement conditions to "all new federal awards," confirming that the agency understood the Executive Orders to apply broadly regardless of nexus. ER-133, 136.

### 3. Coercion

Lastly, the district court found that, by withholding all federal funding, the Executive Orders violated the Spending Clause's prohibitions on "financial inducement that is 'so coercive as to pass the point at which pressure turns into compulsion." *NFIB*, 567 U.S. at 580 (quoting *Dole*, 483 U.S. at 211). Defendants respond to this argument in addressing the district court's Tenth Amendment

holding. As discussed *infra*, Defendants do not demonstrate that the district court erred in finding that the Executive Orders violate the Tenth Amendment. They therefore cannot establish any error in the district court's finding that the Executive Orders violate the Spending Clause's proscription on coercion.

### D. Tenth Amendment

Because the district court correctly found that the Executive Orders threatened the categorical withholding of federal funding from sanctuary jurisdictions, it also correctly held that this existential funding threat violated the Tenth Amendment's prohibition on "commandeering" local officials to help enforce federal law. Holding substantial amounts of federal funding hostage unless Plaintiffs cave to enforcing the federal government's immigration policies is precisely the kind of "economic dragooning that leaves [Plaintiffs] with no real option but to acquiesce." *NFIB*, 567 U.S. at 582; *see* Background, Part II nn. 13–15, *supra* (discussing Plaintiffs' reliance on federal funding). Defendants have freely acknowledged the coercive purpose of these Executive Orders. *See* Argument, Part I. B, *supra* (detailing the President's and Attorney General's public statements); RJN Exs. A, B; 2-SER-262, 270.

Defendants' arguments in response rest entirely on their unsupported interpretation of the Executive Orders. Defendants' assertion that EO 14,218 "does not even apply to funding for States and localities" but only to "federal

public benefits for individuals who are aliens unlawfully present in the United States," Op. Br. 64, cannot be reconciled with the text of the Executive Order, which expressly threatens "Federal payments to States and localities" and directs that those "Federal payments" not be used to "abet" or support sanctuary policies "by design or effect." PRWORA does not place any restriction on providing federal funding to sanctuary jurisdictions and conditioning funding that Plaintiffs use to provide safety-net services on Plaintiffs' abandonment of their own local policies is a "coercive gun to the head." *NFIB*, 567 U.S. at 581. As for EO 14,159, the record before the district court demonstrated that agencies understood the directive to restrict sanctuary jurisdictions' access to Federal funds expansively. Both DHS and DOT had effectively conditioned *all* their federal funds on jurisdictions agreeing to enforce federal immigration-enforcement initiatives. ER-133, 136; 1-SER-55–58; 1-SER-68–71. Those funds support critical emergency-preparedness activities and necessary public infrastructure and transportation projects. *See* Background, Part II, n. 14 *supra*. The district court's conclusion that the Executive Orders "wield critical federal funding as a cudgel with which to coerce localities that do not wish to cut essential programs into accepting the federal government's conditions" was not an abuse of discretion. ER-71.

### E.    Fifth Amendment

#### 1.    Vagueness

The District Court properly held that the Executive Orders and Bondi Directive are unconstitutionally vague because they hinge Plaintiffs' access to federal funds on their compliance with "expansive, standardless language" that is susceptible to "arbitrary and discriminatory enforcement."  ER-73 (quoting *United States v. Williams*, 553 U.S. 285, 304 (2008)); *see also FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253–55 (2012) (change in agency policy without reasonable notice violated due process).  EO 14,159 does not define sanctuary jurisdictions by reference to any statute or regulation but instead leaves the Administration to subjectively determine whether jurisdictions "seek[] to interfere" with "the lawful exercise of Federal Law Enforcement operations."  ER-99.  EO 14,218's definition of sanctuary policies as whatever the Administration concludes "shield illegal aliens from deportation" suffers from the same standardless ambiguity.  ER-94.  And other key terms, such as what it means for a "Federal payment" to a locality to "abet" a sanctuary policy "by design or effect," are undefined and vague.  *Id.*  The only statute cited by Defendants, PRWORA, provides no guidance on sanctuary policies or what it means for Federal payments to abet those policies.

Defendants respond that the Bondi and Noem Directives provide the necessary clarity by defining sanctuary jurisdictions to "include[] jurisdictions that

refuse to comply with 8 U.S.C. § 1373." Op. Br. at 66. But both Directives define sanctuary jurisdictions more amorphously. As the district court noted, the Bondi Directive's "vague definition for so-called 'sanctuary' jurisdictions" also includes those that "willfully fail to comply with other applicable federal immigration laws," without "explain[ing] what other federal immigration laws are 'applicable,'" and "leav[ing] open the possibility that jurisdictions that *do* comply with Section 1373 and/or whatever federal immigration laws are deemed 'applicable' may *also* be subject to loss of funds." ER-73. The Noem Directive list different criteria for sanctuary jurisdictions, to "include," *inter alia*, "honoring requests for cooperation" and "sharing of information," ER-144–45—apparently permitting DHS to subjectively determine whether a jurisdiction is sufficiently cooperative and forthcoming and to add additional conditions as DHS sees fit.

Defendants promise that future federal funding documents will "clarify" the Executive Orders' and Bondi Directive's conditions. Op. Br. at 69. The record evidence belies this unsupported assertion, as HUD has implemented grant conditions that parrot the same ambiguous language of EO 14,218, ER-108; DOT has implemented EO 14,159 across its standard grant agreements to generally require "cooperation" with immigration enforcement (without specifying what that means), 1-SER-69; and DHS has conditioned all grants on the same ambiguous, open-ended definition of sanctuary jurisdictions in the Noem Directive, ER-133,

136.  Further, contrary to Defendants' claims, Plaintiffs *are* directly impacted by the Executive Orders' and Bondi Directive's imprecision.  Where large swaths of Plaintiffs' funding turn on whether they meet these amorphous definitions, the Constitution requires that they be provided "fair notice of what is prohibited." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 18 (2010).  The district court did not "misunderstand[] the constitutional standard for vagueness" by requiring "perfect clarity and precision," Op. Br. at 68; it correctly held that Defendants have failed to specify what is prohibited in a manner that would give "a person of ordinary intelligence fair notice," *Humanitarian Law Project*, 561 U.S. at 20.

Finally, Defendants assert that Plaintiffs cannot raise a vagueness challenge because they "engage . . . in some conduct that is clearly proscribed."  Op. Br. at 68-69 (quoting *Humanitarian Law Project*, 561 U.S. at 20).  But Plaintiffs do not seek to challenge "the vagueness of the law as applied to the conduct of others," *Humanitarian Law Project*, 561 U.S. at 20.  Rather, Plaintiffs seek clarity for themselves.  The vague language makes it impossible to determine exactly what conduct is proscribed and how (if at all) Plaintiffs could avoid the crushing funding consequences that the Executive Orders and Bondi Directive threaten.

### 2.    Procedural Due Process

Defendants' procedural due process arguments are also meritless. Defendants assert that Plaintiffs have no property interest in "*future* grants" and

any "process" required would be provided by the future grant conditions. Op. Br., at 70. This argument misses the mark, because the Executive Orders and Bondi Directive, by their terms, apply to all federal funding, which includes current (and past) awarded funds. Argument, Part I, *supra*; ER-74. In fact, the Executive Orders have been applied retroactively. Defendants' reliance on savings clauses in the Orders and Directive to assure the Court that they *will* comply with due process, also fails for the reasons explained by the district court and above. ER-75; Argument, Part II.A, *supra*.

### F. Administrative Procedure Act

Plaintiffs are likely to succeed on the merits of their APA claim against the Bondi Directive because, as explained above with respect to Plaintiffs' other claims, it exceeds statutory authority, is contrary to the Constitution and law, and is arbitrary and capricious. *See* ER-75–80.

Defendants argue that the Directive is not "final agency action" because it merely directs components to identify grants for potential future grant conditions. Op. Br. at 72–73, 76. But Defendants misapprehend the portion of the Bondi Directive at issue. Plaintiffs and the district court were clear that the "arguments today focus upon the Bondi Directive's instruction to freeze the distribution of all DOJ funds to implement President Trump's directive to defund 'sanctuary' jurisdictions." ER-76. The direction that DOJ "shall pause the distribution of all

funds" is certainly one from which legal consequences flow, and even Defendants concede it is subject to APA review. Op. Br. at 73 ("The court's analysis would, at most, permit APA review of the Bondi Directive's interim decisionmaking" to freeze funding.); *see Bennett v. Spear*, 520 U.S. 154, 178 (1997).

Defendants also argue that the Directive is not "final" because DOJ did not implement the freeze before the injunction was entered. Op. Br. at 75. But finality of agency decisionmaking does not require immediacy of agency action. Plaintiffs filed their lawsuit challenging the Bondi Directive two days after it was issued. ER-280. DOJ's decision not to implement the freeze in light of ongoing litigation may be sound legal strategy, but it does not alter the finality of the agency's decision. For purposes of the APA, the announced freeze on the distribution is final because it definitively stated the DOJ's intent and required Plaintiffs to immediately react to significantly amend their policies and operations to try to satisfy the funding conditions, or shutter critical programs and forgo the funding. *Oregon Natural Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 982–83 (9th Cir. 2006) (Courts "look to whether the action 'amounts to a definitive statement of the agency's position' or 'has a direct and immediate effect on the day-to-day operations of the subject party, or if 'immediate compliance [with the terms of the agency action] is expected'").

With respect to the Directive's arbitrary and capricious reasoning, Defendants argue that the Directive reasonably explained its command to freeze all funding to, and eventually defund, "sanctuary" jurisdictions. Op. Br. at 77–78. Defendants point to the Directive's hyperbolic claims about "illegal migration," but those assertions were lifted wholesale from the Executive Orders; there is no evidence that they were the product of the agency's own decisionmaking. *Compare* ER-91 (EO 14,287) *with* ER-146 (Bondi Directive); *see San Luis & Delta-Mendota Water Authority v. Locke*, 776 F.3d 971, 994 (9th Cir. 2014) ("We may not automatically defer to an agency's conclusions . . . . [O]ur review must be sufficiently probing to ensure that the agency has" satisfied the standard set forth under *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). Even accounting for those claims, the Bondi Directive provides *no* explanation for why a freeze on *all* DOJ funding is reasonable or necessary to implement what Defendants now (dubiously) claim is a targeted evaluation of specific grants to sanctuary jurisdictions.

Finally, Defendants argue that the Directive merely "weighs" "law enforcement interests" "differently." Op. Br. at 78. It is true that that the arbitrary-and-capricious standard allows the agency to take a "difference in view," *Locke*, 776 F.3d at 994, but the Directive far oversteps this line by running roughshod over

constitutional limits, statutory construction, and serious reliance interests, ER-78–79.

## III.    Plaintiffs Demonstrated Irreparable Harm

Not only are Defendants' efforts to narrow the scope of the Executive Orders and Directive meritless, but they cannot eliminate the real-world harm that Plaintiffs face.  As the district court found, the Executive Orders and the Bondi Directive inflict on Plaintiffs three types of irreparable harm: "present and future budgetary uncertainty," "constitutional injury," and "damage [to] the relationship the Cities and Counties have built with their immigrant communities"—each of which is sufficient to support the preliminary injunction.[22]  ER-81; *see also* ER-58–61.  Defendants focus only on the budgetary harm and ignore the constitutional or relationship injuries.

Defendants' challenge to the district court's determination that Plaintiffs face irreparable budgetary harm relies almost exclusively on their narrow interpretation of the Executive Orders, and should be rejected for the reasons discussed above.  This Court has rejected Defendants' argument that Plaintiffs'

---

[22] Plaintiffs' showing of irreparable harm also establishes their Article III standing.  *See, e.g.*, *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1286–87 (9th Cir. 2013).  This Court has found that the very kinds of injuries caused by Defendants' actions are justiciable.  *City & Cnty. of S.F.*, 897 F.3d at 1236 ("It [is] enough that, if the [Cities and Counties] 'interpretation of the [Executive Order is] correct'… they will be 'forced to either change their policies or face serious consequences.'" (quoting *Virginia v. American Booksellers Assoc.*, 484 U.S. 383, 393 (1988)).

budgetary uncertainty cannot establish irreparable harm in virtually identical circumstances. *See City & Cnty. of S.F.*, 897 F.3d at 1243–44 ("total loss of federal funding" threatened by 2017 Executive Order "would be catastrophic" and need for budgetary certainty "renders damages inadequate"). As explained above, and articulated in detail in the district court's order, federal funding represents not just a significant portion of Plaintiffs' overall budgets but a lifeline for many of Plaintiffs' safety-net services, including healthcare, disease control, emergency management, public benefits, and—especially in the case of DOJ funding—law enforcement. ER-58–59; *see* Background, Part II nn. 13–15, *supra*. The significant and immediate budgetary uncertainty caused by the Executive Orders and Bondi Directive leaves Plaintiffs with the duty—but no good options—to mitigate the risk of loss. Contrary to Defendants' unsupported assertion, Plaintiffs do not have the "wherewithal" to keep their programs running absent the federal funding at stake. *See, e.g.*, 4-SER-733, ¶ 39; 4-SER-806, ¶ 29; 3-SER-677-78, ¶¶ 15–16; *County of Santa Clara*, 250 F. Supp. 3d at 537 (requiring Plaintiffs "to take steps to mitigate the risk of losing millions of dollars in federal funding . . . includ[ing] placing funds in reserve and making cuts to services . . . will cause [Plaintiffs] irreparable harm").

## IV. The District Court's Injunction Satisfies the Requirements of Federal Rule of Civil Procedure 65

Defendants' assurances that they will implement their narrow interpretation of the Executive Orders are cold comfort when the district court has already been called upon to clarify the injunction in light of Defendants' persistent, ongoing threats to withhold sanctuary jurisdictions' funding. District courts have considerable discretion in fashioning injunctive relief, and the court's injunction provides Defendants fair notice of the proscribed conduct and is tailored to remedy the harms threatened by Defendants' ongoing actions. The court's clarification of the injunction is neither imprecise nor overbroad. If Defendants have questions about the scope of the injunction, they can seek clarification from the district court—a recourse they have not sought.

### A. The Injunction Is Sufficiently Specific

Rule 65 requires injunctions to provide "fair and precisely drawn notice of what the injunction actually prohibits." *Fortyune v. Am. Multi-Cinema, Inc.*, 364 F.3d 1075, 1087 (9th Cir. 2004) (quoting *Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Loc. No. 70 of Alameda Cnty.*, 415 U.S. 423 (1974)). Beyond that, a "district court has considerable discretion in fashioning suitable relief and defining the terms of an injunction," so appellate review is "correspondingly narrow." *Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir. 1991). The "inquiry is context-specific" and "there are no magic

words that automatically run afoul of Rule 65(d)." *Reno Air Racing Ass'n., Inc. v. McCord*, 452 F.3d 1126, 1133 (9th Cir. 2006).

Defendants cherry pick isolated phrases from the district court's Clarifying Order, but fail to convey the context giving rise to the district court's order or the detailed guidance that the district court offered to Defendants. Days after the district court issued its preliminary injunction, President Trump signed EO 14,287, again directing federal agencies to withhold federal funds from "sanctuary" jurisdictions. The White House simultaneously issued a fact sheet that reiterated the President's threat to "rid the United States of" sanctuary jurisdictions and "withhold all Federal Funding" from such jurisdictions. ER-13. Defendants took the untenable position that "the Court's April 24, 2025, PI Order does not apply to the April 28 Executive Order," and Plaintiffs therefore sought to modify or enforce or modify the preliminary injunction to apply to EO 14,287. 1-SER-165. The district court subsequently concluded that Defendants could not avoid liability by "hewing to the narrow letter of the injunction" while "simultaneously ignoring its spirit[.]" ER-14 (citing *Inst. of Cetacean Research v. Sea Shepherd Conservation Soc'y*, 774 F.3d 935, 954 (9th Cir. 2014)).[23]

---

[23] While Defendants take issue with references to the "spirit" of the injunction, it is well-established that a court may find that an injunction has been disobeyed based on a "violation of the spirit of the injunction, even though its strict letter may not have been disregarded." *Inst. of Cetacean Rsch.*, 774 F.3d at 949.

Although Rule 65 does not require courts "to elucidate how to enforce the injunction," *Fortyune*, 364 F.3d at 1087, here the district court took that extra step to clarify the injunction for the parties' benefit. The court's Clarifying Order enumerates the constitutional principles within which the federal government's funding decisions must proceed—principles with which Defendants agreed. ER-11–12. The Clarifying Order also clearly delineates conduct that is proscribed by the injunction from conduct that remains permissible. The district court repeatedly distinguished between agency directives that categorically withhold all or substantially all funds from a jurisdiction simply because it has sanctuary policies (which are enjoined) and an agency's individualized decisions to impose conditions on specific grants that have a nexus to immigration (which are not). *See* ER-12 (stating that "the Government is entitled to identify particular grants and funding programs that it believes should be conditioned upon compliance with immigration-related objectives . . . The Preliminary Injunction does not . . . prohibit efforts to a condition regarding the Byrne JAG Act or other specific programs with a plausible nexus to 'sanctuary' policies"); ER-14 (explaining that the injunction prohibits categorical funding threats but is "not designed to freeze litigation over the propriety of . . . immigration-related conditions on particular government grants and contracts" (citing *City of Los Angeles*, 929 F.3d at 1178); *see also* 4-SER-863:20–866:7.

The district court also applied these principles to EO 14,287.  As relevant here, the court took care to note that Section 3 of the Order could still be lawfully implemented because "[t]he requirement to identify funds for potential rescission, by itself, is not inappropriate, following an evaluation of the type of funding involved to determine if there is a nexus between the funding stream, the jurisdiction's policies, and the desired immigration-related conditions, as the Government is constitutionally obligated to do before it acts."  ER-16.  As the court went on to explain, "[w]hat would be inappropriate is if the criterion for identification of funds for 'suspension or termination' was the fact that the so-called 'sanctuary' jurisdictions received them."  ER-16–17.  This risk, in the court's view, was not remote in light of President Trump's statements and actions accompanying EO 14,287 promising to do precisely what was enjoined.  ER-17–18.

This clarification is hardly "too vague to be enforceable."  *Del Webb Cmtys., Inc. v. Partington*, 652 F.3d 1145, 1150 (9th Cir. 2011).  The district court provided a reason for its clarification; offered "explicit instructions on the appropriate means to" avoid noncompliance, *In re Google Play Store Antitrust Litig.*, No. 24-6256, 2025 WL 2167402, at *21 (9th Cir. July 31, 2025); illustrated a scenario elucidating noncompliance; and explained why the President's statements and Defendants' other actions require that the injunction "be read to

apply to any Executive Order or agency directive that purports to attempt to cut off federal funding from States or localities that meet the Government's definition of 'sanctuary' jurisdiction in the wholesale, overly broad and unconstitutional manner threatened by [the enjoined Orders]." ER-18. Not only did the district court's order provide "fair and precisely drawn notice of what the injunction actually prohibits," *Fortyune*, 364 F.3d at 1087, but it was necessary to stop Defendants from "work[ing] out a plan that was not specifically enjoined" and "experiment[ing] with disobedience of the law," *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 192 (1949).

## B. The Injunction Is Not Overbroad

Defendants' overbreadth argument is likewise meritless. District courts may fashion injunctions that "tailor the scope of the remedy to fit the nature and extent of the constitutional violation," *Hills v. Guatreaux*, 425 U.S. 284, 293–94 (1976), so long as the relief "is no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs before the court," *City and County of San Francisco v. Barr*, 965 F.3d 753, 765 (9th Cir. 2020) (quoting *L.A. Haven Hospice, Inc. v. Sebelius*, 638 F.3d 644, 664 (9th Cir. 2011)).

The appealed injunction—which is limited to the named Plaintiffs—falls well within the district court's "considerable discretion in ordering an appropriate remedy." *City & Cnty. of S.F.*, 897 F.3d at 1245. After properly concluding that

EO 14,159 and 14,218 targeted all federal funding to Plaintiffs, ER-11, and that EO 14,287 could be weaponized in a similar manner in light of Defendants' statements, ER 16–17, the district court was justified in applying the injunction to any Executive Order or agency directive that threatened the same categorical defunding of sanctuary jurisdictions.  Indeed, Defendants conceded below that the injunction against categorical withholding of funds applied "whether it is based on EO 14,287 or on some as yet unpublished Executive Order."  ER-18.

Defendants' characterization of the injunction as a "pre-clearance" regime is hyperbole unsupported by the language of the court's injunction and the record. Nothing in the court's injunction requires Defendants seek court approval before imposing a grant condition.  The district court's order makes clear that *Plaintiffs* would need to bring separate challenges to individualized grant determinations. *See* ER-14 (noting that the injunction did not "freeze litigation" over individualized grant determinations and pointing to this Court's decision in *City of Los Angeles*, 929 F.3d at 1178—a challenge brought by grant recipients); *see also* 1-SER-179:16–22 (distinguishing litigation challenging the Executive Order from "litigation that happened last time on specific grants," like the Byrne JAG program); 4-SER-866:4–7 (the injunction does not "interfere with . . . the Byrne JAG grants . . . litigation that occurred eight years ago over specific individual programs").  Nor does the record show that Defendants have sought approval from

the district court before conditioning federal funding in compliance with the injunction. In fact, Defendants have imposed immigration-related conditions—including the DOT Standard Terms and HUD grant terms—without first seeking pre-approval. 1-SER-73, 84, 88, 92, 96, 105; RJN Exs. E, F.

Defendants attempt to shoehorn a challenge to the district court's June 23, 2025 Order into their brief, even though that Order is not included in their Notice of Appeal in this case. *See* Op. Br. at 83. Even if that Order were properly before this Court, it does not support Defendants' imagined "pre-clearance" regime. There too, the district court reiterated that "nothing in the Preliminary Injunction Order precludes defendants from trying to impose [grant conditions] on an individual basis." ER-6; *see id.* (discussing Targeted Violence and Terrorism Prevention Grant Program as an example). Nor did the district court's order declare "any individualized grant determinations by FEMA" to be "presumptively unlawful." Op. Br. at 84. Instead, the district court's order addressed the DHS Standard Terms, which the district court concluded violated the injunction because they applied to all federal awards regardless of whether an individual grant has a meaningful nexus to sanctuary jurisdiction policies. ER-6. Nothing in the Court's June 23 Order supports Defendants' claims that the injunction requires them to bring affirmative litigation before imposing a grant condition.

Finally, the injunction does not interfere with "the President's ability to execute core Executive Branch policies as set forth in the Orders." Op. Br. at 85. As discussed above, Defendants' assertion that the district court "established itself as the overseer of all Executive Branch funding decisions" is unsupported hyperbole. Moreover, the district court enjoined only Executive officials and agencies, not the President. ER 83 n.14 ("Defendant President Donald J. Trump is not enjoined by this Order with respect to the 'performance of his official duties.'") (citing *Franklin v. Massachusetts*, 505 U.S. 788, 802–03 (1992)). Injunctive relief not only can run against executive officials and agencies, *Franklin*, 505 U.S. at 802–03, citing *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 588–89 (1952), but cases that involve an agency official acting pursuant to unlawful Executive direction necessitate such injunctions "to prevent an injurious act by a public officer." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015) (quoting *Carroll v. Safford*, 44 U.S. 441, 463 (1845)).

In short, the district court's injunction was commensurate with Defendants' sweeping threats and ongoing conduct, and no more burdensome than necessary to accord Plaintiffs relief.

## CONCLUSION

For the foregoing reasons, this Court should affirm the district court's preliminary injunction.

Dated:     August 18, 2025          Respectfully submitted,

                                    DAVID CHIU
                                    City Attorney
                                    YVONNE R. MERÉ
                                    Chief Deputy City Attorney
                                    MOLLIE M. LEE
                                    CHIEF OF STRATEGIC ADVOCACY
                                    SARA J. EISENBERG
                                    Chief of Complex and Affirmative
                                    Litigation
                                    NANCY E. HARRIS
                                    KARUN A. TILAK
                                    Deputy City Attorneys

                          By:       */S/ DAVID CHIU*
                                    DAVID CHIU
                                    City Attorney

                                    Attorneys for Plaintiff-Appellee
                                    CITY AND COUNTY OF SAN
                                    FRANCISCO


                                    TONY LOPRESTI
                                    County Counsel
                                    KAVITA NARAYAN
                                    Chief Assistant County Counsel
                                    MEREDITH A. JOHNSON
                                    Lead Deputy County Counsel
                                    STEFANIE L. WILSON
                                    RAJIV NARAYAN
                                    Deputy County Counsels
                                    BILL NGUYEN
                                    Litigation Fellow

                          By:       */S/ TONY LOPRESTI*
                                    TONY LOPRESTI
                                    County Counsel

                                    Attorneys for Plaintiff-Appelee
                                    COUNTY OF SANTA CLARA

ROBERT TAYLOR
City Attorney

By:    */S/ NAOMI SHEFFIELD*               
NAOMI SHEFFIELD
Chief Deputy City Attorney
1221 SW Fourth Avenue, Room 430
Portland, OR 97204
(503) 823-4047
Naomi.Sheffield@portlandoregon.gov

Attorneys for Plaintiff-Appellee
CITY OF PORTLAND


SHANNON BRADDOCK
King County Executive

By:    */S/ DAVID J. HACKETT*            
DAVID J. HACKETT
General Counsel to King County
Executive
Chinook Building
401 5th Avenue, Suite 800
Seattle, WA 98104
David.hackett@kingcounty.gov

PAUL J. LAWRENCE
Pacifica Law Group
1191 2nd Avenue, Suite 2000
Seattle, WA 98101-3404
(206) 245-1708
Paul.Lawrence@pacificalawgroup.com

Attorneys for Plaintiff-Appellee
MARTIN LUTHER KING, JR. COUNTY


PATRICIA KING
Corporation Counsel

By:    */S/ PATRICIA KING*                
PATRICIA KING
Office of the Corporation Counsel
165 Church Street-4th Floor
New Haven, CT 06510
(203) 946-7951
Pking@newhavenct.gov

Attorneys for Plaintiff-Appellee
CITY OF NEW HAVEN

RYAN RICHARDSON
City Attorney
MARIA BEE
Chief Assistant City Attorney
JAMIE HULING DELAYE
Supervising City Attorney
H. LUKE EDWARDS
Deputy City Attorney
One Frank H. Ogawa Plaza, 6th Floor
Oakland, CA 94612
(510) 238-6629
RRichardson@OaklandCityAttorney.org

By: _/s/ RYAN RICHARDSON_
RYAN RICHARDSON
City Attorney

Attorneys for Plaintiff-Appellee
CITY OF OAKLAND


JOHN I. KENNEDY
City Attorney

By: _/s/ JOHN I. KENNEDY_
JOHN I. KENNEDY
City Attorney
333 Park Ave
Emeryville, CA 94608-3517
(510) 596-4381
John.Kennedy@emeryville.org

Attorney for Plaintiff-Appellee
CITY OF EMERYVILLE


NORA FRIMANN
City Attorney

By: _/s/ ELISA TOLENTINO_
ELISA TOLENTINO
Chief Deputy City Attorney
200 E Santa Clara St
San José, CA 95113-1905
(408) 535-1900
cao.main@sanjoseca.gov

Attorneys for Plaintiff-Appellee
CITY OF SAN JOSE

HEATHER FERBERT
City Attorney

By:     */S/ MARK ANKCORN*
        MARK ANKCORN
        Senior Chief Deputy City Attorney
        JULIE RAU
        Deputy City Attorney
        1200 Third Avenue, Suite 1100
        San Diego, CA 92101-4100
        (619) 533-5800
        mankcorn@sandiego.gov

        Attorneys for Plaintiff-Appellee
        CITY OF SAN DIEGO


SUSANA ALCALA WOOD
City Attorney

By:     */S/ ANDREA VELASQUEZ*
        ANDREA VELASQUEZ
        Supervising Deputy City Attorney
        915 I St, FL 4
        Sacramento, CA 95814-2621
        (916) 808-5346
        AVelasquez@cityofsacramento.org

        Attorneys for Plaintiff-Appellee
        CITY OF SACRAMENTO


ANTHONY P. CONDOTTI
City Attorney

By:     */S/ ANTHONY P. CONDOTTI*
        ANTHONY P. CONDOTTI
        City Attorney
        CATHERINE M. BRONSON
        Senior Chief Deputy City Attorney
        CLAIRE HARD
        Deputy City Attorney
        PO Box 481
        Santa Cruz, CA 95061
        (831) 423-8383
        Tcondotti@abc-law.com
        Cbronson@abc-law.com
        Chard@abc-law.com

        Attorneys for Plaintiff-Appellee
        CITY OF SANTA CRUZ

SUSAN K. BLITCH
County Counsel

By:   */s/ HENRY BLUESTONE SMITH*
HENRY BLUESTONE SMITH
Deputy County Counsel
168 W Alisal St, Fl 3
Salinas, CA 93901-2439
(831) 755-5045
SmithHB@countyofmonterey.gov

Attorneys for Plaintiff-Appellee
COUNTY OF MONTEREY


ANN DAVISON
City Attorney

By:   */s/ ANN DAVISON*
ANN DAVISON
City Attorney
KERALA COWART
DALLAS LEPIERRE
REBECCA WIDEN
Assistant City Attorneys
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200
Ann.Davison@seattle.gov

Attorneys for Plaintiff-Appellee
CITY OF SEATTLE


KRISTYN ANDERSON
City Attorney

By:   */s/ KRISTYN ANDERSON*
KRISTYN ANDERSON
City Attorney
SARA J. LATHROP
SHARDA ENSLIN
Assistant City Attorneys
350 South Fifth Street, Room 210
Minneapolis, MN 55415
(612) 673-3000
Kristyn.Anderson@minneapolismn.gov
Sara.Lathrop@minneapolismn.gov
Sharda.Enslin@minneapolismn.gov

Attorneys for Plaintiff-Appellee
CITY OF MINNEAPOLIS

LYNDSEY OLSON
City Attorney

By:    */s/ LYNDSEY OLSON*
LYNDSEY OLSON
City Attorney
ANTHONY G. EDWARDS
Assistant City Attorney
400 City Hall and Courthouse
15 Kellogg Boulevard West
Saint Paul, MN 55102
(651) 266-8710
Anthony.Edwards@ci.stpaul.mn.us

Attorneys for Plaintiffs-Appellees
CITY OF SAINT PAUL


ERIN K. McSHERRY
City Attorney

By:    */s/ ERIN K. McSHERRY*
ERIN K. McSHERRY
City Attorney
200 Lincoln Avenue
Post Office Box 909
Santa Fe, NM 87504-0909
(505) 955-6512
ekmcsherry@santafenm.gov

Attorney for Plaintiff-Appellee
CITY OF SANTA FE


By:    */s/ NAOMI TSU*
NAOMI TSU
JILL HABIG, SBN 268770
Public Rights Project
490 43rd Street, Unit #115
Oakland, CA 94609
(510) 738-6788
Naomi@publicrightsproject.org
Jill@publicrightsproject.org

Attorneys for Plaintiffs-Appellees
CITIES OF MINNEAPOLIS, NEW
HAVEN, PORTLAND, ST. PAUL, SANTA
FE, and SEATTLE

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form17instructions.pdf*

**9th Cir. Case Number(s)** 25-3889

The undersigned attorney or self-represented party states the following:

☒ I am unaware of any related cases currently pending in this court.

☐ I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

☐ I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

Dated: August 18, 2025

> DAVID CHIU
> City Attorney
> YVONNE R. MERÉ
> Chief Deputy City Attorney
> MOLLIE M. LEE
> CHIEF OF STRATEGIC ADVOCACY
> SARA J. EISENBERG
> Chief of Complex and Affirmative Litigation
> NANCY E. HARRIS
> KARUN A. TILAK
> Deputy City Attorneys

> By: */s/ DAVID CHIU*
> DAVID CHIU
> Deputy City Attorney

> Attorneys for Plaintiff-Appellee
> CITY AND COUNTY OF SAN FRANCISCO

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)**  25-3889

I am the attorney or self-represented party.

This brief contains 13,895 words, excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

☒ complies with the word limit of Cir. R. 32-1.

☐ is a cross-appeal brief and complies with the word limit of Cir. R. 28.1-1.

☐ is an amicus brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

☐ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

☐ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one):*

☐ it is a joint brief submitted by separately represented parties;

☐ a party or parties are filing a single brief in response to multiple briefs; or

☐ a party or parties are filing a single brief in response to a longer joint brief.

☐ complies with the length limit designated by court order dated _____.

☐ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

Signature  */S/ DAVID CHIU*  Date  August 18, 2025

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

## CERTIFICATE OF SERVICE

I, SARAH L. GUTIERREZ, hereby certify that I electronically filed the following document with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECFsystem on .

### PLAINTIFFS-APPELLEES' ANSWERING BRIEF

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Executed August 18, 2025, at San Francisco, California.


*/s/ Sarah L. Gutierrez*
SARAH L. GUTIERREZ