No. 25-3889

# United States Court of Appeals
# for the Ninth Circuit

CITY AND COUNTY OF SAN FRANCISCO, ET AL.,

*Plaintiffs-Appellees,*

*v.*

DONALD J. TRUMP, ET AL.,

*Defendants-Appellants.*

On Appeal from the United States District Court for the Northern District of California (No. 3:25-cv-01350-WHO)

**BRIEF OF *AMICI CURIAE* BEHAVIORAL HEALTH CONTRACTORS' ASSOCIATION, CALIFORNIA ASSOCIATION OF NONPROFITS, CALIFORNIA BEHAVIORAL HEALTH ORGANIZATION, COMMUNITY BRIDGES, SAN FRANCISCO IMMIGRANT LEGAL & EDUCATION NETWORK, SAN FRANCISCO INTERFAITH COUNCIL, AND SILICON VALLEY COUNCIL OF NONPROFITS, IN SUPPORT OF APPELLEES AND SEEKING AFFIRMANCE OF THE DISTRICT COURT'S ORDERS GRANTING APPELLEES' MOTION FOR PRELIMINARY INJUNTION**

BELINDA ESCOBOSA
MEGAN VEES
ASIAN LAW CAUCUS
55 Columbus Avenue
San Francisco, CA 94111
(415) 237-1577

MAUREEN P. ALGER
SAMANTHA A. KIRBY
COOLEY LLP
3175 Hanover Street
Palo Alto, CA 94304
(650) 843-5000

*Counsel for Amici Curiae*
*(Additional counsel listed on inside cover)*

AUDREY J. MOTT-SMITH
EVA M. SPITZEN
MADELEINE R. AHLERS
RYAN P. YLITALO
COOLEY LLP
3 Embarcadero Center, 20th Floor
San Francisco, CA 94111
(415) 693-2000

*Counsel for Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, *amici curiae* Behavioral Health Contractors' Association, California Association of Nonprofits, California Behavioral Health Organization, Community Bridges, San Francisco Immigrant Legal & Education Network, San Francisco Interfaith Council, and Silicon Valley Council of Nonprofits, by and through undersigned counsel, state that they are nonprofits and associations of nonprofit organizations and, therefore, are not publicly held corporations that issue stock and do not have parent corporations.

Dated: August 25, 2025

/s/ *Audrey J. Mott-Smith*

AUDREY J. MOTT-SMITH (Cal. Bar No. 300550)
COOLEY LLP
3 Embarcadero Center, 20th Floor
San Francisco, CA 94111
(415) 693-2000

*Counsel for Amici Curiae*

# Table of Contents

**Page**

INTRODUCTION ........................................................................................1

INTEREST OF *AMICI CURIAE* .............................................................2

SUMMARY OF ARGUMENT ...................................................................6

ARGUMENT ..............................................................................................8

I.      LEGAL CONTEXT..............................................................................8

II.     THE ORDERS CAUSE IRREPARABLE HARM TO NONPROFIT
ORGANIZATIONS AND THE COMMUNITIES THEY SERVE BY
CREATING SUBSTANTIAL BUDGETARY UNCERTAINTY. .............10

     A.     Nonprofits Rely on Federal and Local Funding That Is in
Jeopardy...................................................................................12

     B.     Severe Budgetary Uncertainty Caused by the Orders Forces
Nonprofits to Consider Cutting Services. ...........................15

     C.     Nonprofits Will Face More Demand for Services if
Government Services Are Cut, Which They Will Be Unable to
Meet..........................................................................................17

III.    THE ORDERS CAUSE FEAR THAT DETERS COMMUNITY
MEMBERS FROM ACCESSING PUBLIC SERVICES, HARMING
THE PUBLIC INTEREST. ...........................................................19

     A.     Many Immigrants Are Afraid to Access Healthcare and Other
Services....................................................................................20

     B.     When Immigrants Are Afraid to Access Services, Overall
Public Health and Safety Suffer.........................................26

CONCLUSION.........................................................................................30

CERTIFICATE OF COMPLIANCE......................................................31

CERTIFICATE OF SERVICE ...............................................................32

# Table of Authorities

**Page(s)**

## Cases

*Angotti v. Rexam, Inc.*,
No. C 05-5264 CW, 2006 WL 1646135 (N.D. Cal. June 14, 2006) ................... 9

*City & Cnty. of S.F. v. Trump*,
897 F.3d 1225 (9th Cir. 2018) ............................................................. 9

*City of El Cenizo v. Texas*,
890 F.3d 164 (5th Cir. 2018) ............................................................ 21

*Washington v. U.S. Dep't of Transport.*,
No. 2:24-cv-00848, 2025 WL 1742893 (W.D. Wash. June 24, 2025) ............................................................................................. 9

*Winter v. Nat'l Res. Def. Council, Inc.*,
555 U.S. 7 (2008) ............................................................................ 8

## Statutes

8 U.S.C. § 1373 .................................................................................. 7

Fla. Stat. § 395.3027 ......................................................................... 21

## Executive Orders

Exec. Order No. 14,159, 90 Fed. Reg. 8443 (Jan. 20, 2025) .................... 1

Exec. Order No. 14,218, 90 Fed. Reg. 10581 (Feb. 19, 2025) ................. 1

## Rules

Fed. R. App. P. 29 ......................................................................... 2, 32

Fed. R. App. P. 32 ............................................................................ 32

**Table of Authorities**
(continued)

Page(s)

## Other Authorities

*A Dozen Common Sense Solutions to Government-Nonprofit Contracting Problems*, NAT'L COUNCIL OF NONPROFITS (Dec. 5, 2013) ....................................................................................15

Andrew F. Johnson et al., *The COVID-19 Pandemic: A Challenge for US Nonprofits' Financial Stability*, 33(1) J. OF PUB. BUDGETING, ACCT. & FIN. MGMT. 33 (2021) ....................................................13, 14, 16

Beatriz Suro et al., *The Influence of Perceived Immigration Context and Healthcare Utilization Immigration Law Concerns Latinx Immigrants' HIV Testing*, 10(2) J. LATIN PSYCH. 156 (2022) ...........................29

Catalina Amuedo-Dorantes & Esther Arenas-Arroyo, *Police Trust and Domestic Violence Among Immigrants: Evidence from VAWA Self-Petitions*, CTR. FOR GROWTH & OPPORTUNITY AT UTAH STATE UNIV. (Nov. 12, 2020) ............................................................27

*Cuts to Federal Funding for Sanctuary Cities Will Endanger Communities*, US COMMITTEE FOR REFUGEES AND IMMIGRANTS (Jan. 23, 2025) ....................................................................26

*DHS Exposes Sanctuary Jurisdictions Defying Federal Immigration Law*, DEP'T OF HOMELAND SECURITY (May 29, 2025) .........................................7

Dyana Mason & Mirae Kim, *Many Nonprofits Would Be Reeling If Trump Froze That Money*, CHRON. OF PHILANTHROPY (Feb. 7, 2025) ....................................................................................16

Elizabeth Aranda & Liz Ventura Molina, *The Impacts of Florida's SB 1718 on Immigrants' Well-being*, UNIV. S. FLA. (2024) .....................................21

Elizabeth Kiehne & Quinn Hafen, *State and Local Integrationist Policies and the Physical and Psychological Health of Undocumented Immigrants*, 48 CURRENT OPINION IN PSYCH. (2022) .............................................................................28

-ii-

**Table of Authorities**
(continued)

**Page(s)**

Henry O'Lawrence et al., *Impact of Primary Care Utilization and Insurance on Emergency Department Visits*, 5:04 J. CMTY. MED. AND PUB. HEALTH REPORTS (2024)....................................................28

Independent Sector, *The Impact of COVID-19 on Large and Mid-Sized Nonprofits* (June 15, 2020)..........................................................16

Jennifer Medina, *Too Scared to Report Sexual Abuse. The Fear: Deportation.*, NEW YORK TIMES (Apr. 30, 2017)...............................20

Jennifer Tolbert et al., *Impact of Shifting Immigration Policy on Medicaid Enrollment and Utilization of Care Among Health Center Patients*, KFF (Oct. 15, 2019)....................................................22

Jeri Eckhart-Queenan et al., *Momentum for Change: Ending the Nonprofit Starvation Cycle*, THE BRIDGESPAN GROUP (Sept. 2019) .................18

Jonathan Ross et al., *Undocumented African Immigrants' Experiences of HIV Testing and Linkage to Care*, 33(7) AIDS PATIENT CARE AND STDS (2019) ...............................................................29

Kevin Ferreira van Leer et al., *Insight from Latine Community-Based Organizations on Accessing Government Assistance Programs for Low-Income Latine Families in North Carolina*, J. FAM. AND ECON. ISSUES (2025) ..........................................................................10

Laura Tomasko, *Government Funding Cuts Put Nonprofits at Risk Across the Nation*, URBAN INST. (Feb. 21, 2025) ........................................13, 18

Maren S. Fragala et al., *Population Health Screenings for the Prevention of Chronic Disease Progression*, 25(11) AM. J. OF MANAGED CARE (2019) ......................................................................28

May Sudhinaraset et al., *Immigration Enforcement Exposures and COVID-19 Vaccine Intentions Among Undocumented Immigrants in California*, 27 PREVENTIVE MED. REPS. (2022)...............................28

**Table of Authorities**
(continued)

**Page(s)**

*Nonprofit Impact Matters: How America's Charitable Nonprofits Strengthen Communities and Improve Lives*, NAT'L COUNCIL OF NONPROFITS (2019) ............................................................................12

*The Nonprofit Sector at a Crossroads: How Federal Cuts, Tax Changes, and Trade Wars Are Reshaping the Landscape*, FOUNDATION LIST (Mar. 4, 2025) ......................................................18

*Opportunities to Improve HIV Testing, Prevention, and Care Delivery for Medicaid and CHIP Beneficiaries*, MEDICAID (Jan. 15, 2025) ...................29

San Francisco Human Services Network, *A Comprehensive Profile of San Francisco's Nonprofit Human Service Providers*, SAN FRANCISCO URBAN INST. (2002) ......................................................10

*San Francisco Nonprofit Contracts and Spending*, SF.GOV...................................12

Stephanie Kuo, *Undocumented Immigrants Putting 'Health On Hold' Out Of Fear, Anxiety In Uncertain Times*, KERA NEWS (Sept. 18, 2017) ..................................................................................21

Tim Delaney & David L. Thompson, *Nonprofits Need to Stand Together to Push for Smart Public Policies*, CHRON. OF PHILANTHROPY (Jan. 4, 2017)............................................................17

Tom K. Wong, *The Effects of Sanctuary Policies on Crime and the Economy*, CTR. FOR AM. PROGRESS (Jan. 26, 2017) ..........................................27

*Toward Common Sense Contracting*, NAT'L COUNCIL OF NONPROFITS (2014)................................................................................14, 15

*Trump Calls for Judge's Impeachment as Courtroom Battles Over Deportations Escalate*, KQED (Mar. 19, 2025)................................................23

*US Homeland Security Removes List of 'Sanctuary' Cities After Sheriffs' Criticism,* THE GUARDIAN (June 1, 2025) .............................................7

**Table of Authorities**
(continued)

Page(s)

Veronica Cifuentes, *As Chilling Effects of the Public Charge Rule Linger, How Can Health Systems Support Immigrant Families and Increase Their Access to Essential Services?*, CHILDREN'S HOSPITAL OF PHILADELPHIA (Sep. 26, 2024) .......................................................22

Virginia Fay, *Back Into the Shadows: Immigrants Retreat from Needed Services as Deportation Fears Loom*, PENINSULA PRESS (June 12, 2017) ......................................................................................................20

# INTRODUCTION

On January 20, 2025, the President of the United States signed an Executive Order that purports to empower the federal government to withhold funds from "sanctuary" jurisdictions. Exec. Order No. 14,159, 90 Fed. Reg. 8443 (Jan. 20, 2025); ER-96–101. On February 19, 2025, the President issued a second Executive Order targeting these jurisdictions, directing all executive departments and agencies to ensure "Federal payments to States and localities do not . . . abet so-called 'sanctuary' policies[.]" Exec. Order No. 14,218, 90 Fed. Reg. 10581 (Feb. 19, 2025); ER-94–95 (together with Exec. Order No. 14,159, the "Executive Orders"). In connection with the Executive Orders, on February 5, 2025, the United States Attorney General, Pamela Bondi, issued the "Bondi Directive" (together with the "Executive Orders," the "Orders") to withhold all U.S. Department of Justice funds from "sanctuary" jurisdictions. ER-146–148. Together, the Orders aim to freeze or condition federal funds that would otherwise flow to "sanctuary" jurisdictions, imperiling "various public services" in those jurisdictions "and the very fabric of their communities." ER-50.

Before the district court preliminarily enjoined the Orders' enforcement, the uncertainty they created caused real and imminent harm to both the nonprofits serving the communities the Orders purport to affect, and the communities themselves. Some of these harms were mitigated by the preliminary injunction but

would recur and intensify if that injunction was lifted before this litigation is finally resolved.

*Amici* are nonprofits and associations of community-based nonprofits, predominantly in the health and human services sector, that work within affected communities and serve many of these communities' most vulnerable members. *Amici* have seen first-hand and can attest to the harms the Orders have caused and will continue to cause if the preliminary injunction is not affirmed.

## INTEREST OF *AMICI CURIAE*[1]

*Amici curiae* include seven nonprofits and nonprofit associations, whose membership includes hundreds of nonprofit organizations in the Bay Area and throughout the state of California: Behavioral Health Contractors' Association, California Association of Nonprofits, California Behavioral Health Organization, Community Bridges, San Francisco Immigrant Legal & Education Network, San Francisco Interfaith Council, and Silicon Valley Council of Nonprofits.

Members of the *amici* nonprofits and nonprofit associations provide a range of services, including homelessness intervention, nutrition support, emergency

---

[1] The parties have consented to the filing of this amicus brief, and *amici* file this brief pursuant to that authority. *See* Fed. R. App. P. 29(a)(2). No party's counsel authored this brief in whole or in part, no party or party's counsel contributed money intended to fund preparation or submission of this brief, and no person other than *amici* and their counsel contributed money intended to fund preparation or submission of this brief. *See* Fed. R. App. P. 29(a)(4)(E).

assistance, senior services, medical care, mental health care, support for survivors of domestic violence, and support for at-risk youth. *Amici* and their members rely on federal funding, largely passed through to them by local governments, local government funding, and private funding—all of which is placed in jeopardy by the Orders at issue in this case. *Amici* and their members are deeply connected with the communities they serve and have directly observed the harms these Orders have had on individuals in their communities and on their communities as a whole—and are uniquely situated to articulate those harms.

**Behavioral Health Contractors' Association** (BHCA) is a Santa Clara County-wide network of community-based nonprofit organizations providing essential mental health and substance use prevention, treatment, recovery, and supportive transitional housing services to children, adolescents and adults, under contract with Santa Clara County's Behavioral Health Services Department. BHCA is comprised of nonprofit providers serving Santa Clara County's most vulnerable residents.

**California Association of Nonprofits** (CalNonprofits) is the leading policy voice for California's nonprofit sector, focusing on advocacy, education, and research to build a more powerful and politically engaged nonprofit network across California. CalNonprofits works with lawmakers, advocates, and nonprofit leaders to advance the health, stability, and effectiveness of the state's nonprofits.

3

CalNonprofits' members include nonprofit organizations of all sizes from small grassroots organizations and volunteer-led projects to statewide alliances and multi-chapter agencies.

**California Behavioral Health Association** (CBHA) promotes comprehensive, responsive, and integrated service systems by enhancing the ability of its members to provide behavioral health services that empower people to lead full and productive lives. CBHA's purpose is to ensure that federal, state, and county programs can support integrated healthcare services for people of all ages. It achieves this purpose through shaping and leading public policy, advocating for legislation and funding, creating a forum for the exchange of information and expertise, and working with all relevant stakeholders.

**Community Bridges** delivers essential services, provides equitable access to resources, and advocates for health and dignity across every stage of life. Serving thousands of children, families, and seniors each year, Community Bridges delivers fundamental resources for people across the central coast in San Benito, Santa Cruz, and Monterey County. Their programs give community members access to transportation, healthy food, health care, and senior adult day health care. They also offer crisis support, case management services, early education, grade school tutoring, and classes in breastfeeding, nutrition, parenting, and literacy.

4

**San Francisco Immigrant Legal & Education Network** (SFILEN) works to provide free legal assistance and community education to San Francisco's low-income immigrant communities. SFILEN is made up of twelve organizations that represent immigrants from African and Afro-Caribbean, Arab, Asian, and Latino communities. SFILEN also seeks to increase cooperation and collaboration between service providers and has increased efficiency, grown new capacity, overcome language barriers and isolation, and improved shared knowledge among immigrant legal service providers in San Francisco.

**San Francisco Interfaith Council** (SFIC) serves San Francisco's broader 800 communities of faith and religious institutions. SFIC serves as their advocate and portal to civic partners and likewise works with civic partners to discern how the needs of the city best match the assets and capacities of faith and religious institutions, religiously affiliated academic institutions, healthcare facilities, and faith-based social service agencies. SFIC also serves as "convener" of the CEOs of twenty major faith-based social service agencies to provide a forum to address issues of common concern.

**Silicon Valley Council of Nonprofits** (SVCN) brings together nonprofits in Santa Clara County to help advance the role, voice, and capacity of the nonprofit community. SVCN works with a network of more than 170 member nonprofit organizations including health and human service agencies that provide a wide array

5

of services to the community, including domestic violence intervention, support for at-risk youth, emergency assistance, food access, senior nutrition and wellness, early childhood and family strengthening services, housing, homeless intervention, and health care services throughout the county.

## SUMMARY OF ARGUMENT

*Amici* request that this Court affirm the district court's orders granting a preliminary injunction (ER-19–90) and clarifying that preliminary injunction (ER-11–18) (together, the "Preliminary Injunction Orders"), which, collectively, enjoined the withholding of federal funds under the Orders. Nonprofit organizations providing vital community services faced this same threat eight years ago and are now forced to grapple with it again. The district court enjoined those efforts then, as now, and this Court affirmed. As before, the current Orders harm *amici* and their members, the communities they serve, and the public interest more broadly, and this Court should once again affirm.

If the district court's preliminary injunction is not affirmed, the Orders would (1) cause irreparable financial harm to nonprofit organizations, limiting their ability to provide crucial services; and (2) exacerbate a climate of fear that discourages immigrant populations from seeking public services, which harms overall public health and safety.

First, before the Orders were preliminarily enjoined, they were already causing financial uncertainty for *amici's* members and other nonprofits. Many nonprofits depend on direct federal funds and federal funds that states, counties, and municipalities receive and pass through to them to provide services. When the Orders called into question federal funding for "sanctuary" jurisdictions, nonprofits had to alter their budget planning processes, diverting time and resources to contingency planning.[2] Organizations also faced the prospect of cutting vital services at precisely the time demand for those services would be expected to increase due to cuts to county and municipal services. If the district court's

---

[2] As the district court explained, the Orders do not define "sanctuary" jurisdiction, except to the extent that the Bondi Directive states that they "include" "state or local jurisdictions that refuse to comply with 8 U.S.C. § 1373, refuse to certify compliance with § 1373, or willfully fail to comply with other applicable federal immigration laws." ER-73. As such, communities are left to guess whether their jurisdiction is impacted. Executive Order 14,159 includes a vague reference to jurisdictions that "seek to interfere with the lawful exercise of Federal law enforcement operations," and Executive Order 14,218 refers to—but does not define—"sanctuary' policies." Further confounding the issue, following Executive Orders 14,159 and 14,218—and an additional Executive Order issued on April 28, 2025, which directed the Attorney General and DHS to "identify and publicly highlight jurisdictions that refuse to cooperate with federal immigration authorities"—the Department of Homeland Security ("DHS") published a list of more than 500 sanctuary jurisdictions on May 29, 2025, to "expose[e] lawless jurisdictions[.]" *DHS Exposes Sanctuary Jurisdictions Defying Federal Immigration Law*, DEP'T OF HOMELAND SECURITY (May 29, 2025), https://perma.cc/G7EV-DW22. DHS then removed the list from its website three days later, on June 1, 2025. *See US Homeland Security Removes List of 'Sanctuary' Cities After Sheriffs' Criticism*, THE GUARDIAN (June 1, 2025), https://perma.cc/GMP4-QH4Z.

Preliminary Injunction Orders are not affirmed, the threat to nonprofits' funding—and the corresponding cuts to crucial services in response to that threat—will return.

Second, and compounding these problems, the Orders have had direct negative consequences on the communities the nonprofits serve. Individuals became afraid to access both government and nonprofit services—including avoiding medical treatment and declining to contact law enforcement to report crimes, among other things. When community members are afraid to access necessary services, public health and safety suffers.

The immediate and irreparable harm to both the nonprofits and the communities they serve warrant a preliminary injunction to prevent further harm to the public interest while the legality of the Orders is finally adjudicated. The district court's Preliminary Injunction Orders should be affirmed.

## ARGUMENT

### I.  LEGAL CONTEXT.

To obtain a preliminary injunction, a plaintiff must establish that (1) it "is likely to succeed on the merits"; (2) it "is likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the balance of equities tips in [its] favor"; and (4) "an injunction is in the public interest." *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). *Amici* present information on the nature of the irreparable harms at issue and the reasons an injunction serves the public interest.

Nonprofits have already suffered irreparable harm due to the financial

uncertainty caused by the expected loss of funding. Additionally, members of the communities they serve have been afraid to access essential services upon which they rely. Uncertainty itself can constitute irreparable harm. *See City & Cnty. of S.F. v. Trump*, 897 F.3d 1225, 1244 (9th Cir. 2018) ("A total loss of federal funding would be catastrophic, and the Counties' (and their residents') need for certainty renders damages inadequate."); *Washington v. U.S. Dep't of Transport.*, No. 2:24-cv-00848, 2025 WL 1742893, at *29 (W.D. Wash. June 24, 2025) (Executive Branch's "interference with Plaintiff States' ability to budget, plan for the future, and properly serve their residents is itself an intangible, uncompensable harm"); *Angotti v. Rexam, Inc.*, No. C 05-5264 CW, 2006 WL 1646135, at *3, *15–16 (N.D. Cal. June 14, 2006) (retirees faced "the irreparable harm of anxiety" after benefits they believed they would receive for their lifetime were threatened). As the district court recognized, Plaintiffs-Appellees should not be subjected to such harms while waiting for the court to resolve the legal challenges to the Orders, *see* ER-81–82 ("[Plaintiff-Appellees] face present and future budgetary uncertainty, which is wreaking havoc on their budgetary planning process")—and the same goes for the nonprofits and communities affected by the Orders.

## II. THE ORDERS CAUSE IRREPARABLE HARM TO NONPROFIT ORGANIZATIONS AND THE COMMUNITIES THEY SERVE BY CREATING SUBSTANTIAL BUDGETARY UNCERTAINTY.

Nonprofits in the health and human services sector provide crucial services to the most vulnerable members of the community, distinct from those provided by the government. Nonprofits are typically located in the communities they serve, hire people who live in those communities, and enjoy a special level of trust. Their employees often have particular expertise (such as language ability) and cultural understanding that aids their ability to develop strong relationships with community members. *See, e.g.*, Kevin Ferreira van Leer et al., *Insight from Latine Community-Based Organizations on Accessing Government Assistance Programs for Low-Income Latine Families in North Carolina*, J. FAM. AND ECON. ISSUES, 1, 6 (2025) (nonprofits are "cultural brokers" because many immigrants often "lack social relationships that can provide them with support and structure to access government services"); San Francisco Human Services Network, *A Comprehensive Profile of San Francisco's Nonprofit Human Service Providers*, SAN FRANCISCO URBAN INST., 10–11 (2002), https://perma.cc/7NMV-3NK4. As a result, nonprofits play a critical role in their communities by providing an essential safety net for many who do not otherwise have access to vital services.

Many nonprofits rely on government funding to support life-saving and life-sustaining services. After the Orders were issued, nonprofits faced the prospect that

federal funding (both direct and passed through county and municipal governments) would disappear;[3] that direct county and municipal funding would be reallocated to cover the shortfall from the loss of federal funds; and that their ability to raise funds from private sources (many of which match government funding sources) could be reduced.[4] As a result of this severe budgetary uncertainty affecting multiple revenue streams, nonprofit organizations were forced to spend significant resources to develop contingency plans that include cutting services desperately needed in the communities they serve—precisely when those services would likely be needed the most. If the district court's preliminary injunction is not affirmed, nonprofits will face further uncertainty and additional irreparable harm when they are again forced to contemplate cutting staff and services urgently needed in the communities they serve while awaiting a final resolution of the legal challenges to the Orders.[5]

---

[3] Indeed, the district court observed that "[t]his record contains even more credible threats of enforcement than did the 2017 record, which the Ninth Circuit confirmed showed more than an 'imaginary or speculative' threat," ER-53–54, and that the loss of funds the Plaintiffs-Appellees' face if the Orders are enforced is "catastrophic," ER-40 (citation omitted).

[4] Counsel for *amici* have received information from the nonprofits and associations of nonprofits that are filing this brief. Information throughout the brief that relates to the nonprofits and nonprofit associations and their members was obtained through those requests for information.

[5] As the district court recognized, the preliminary injunction "reaches any subsequent Executive Order or Government action that poses the same coercive threat to eliminate or suspend federal funding based on the Government's assertion that a jurisdiction is a 'sanctuary jurisdiction.'" ER-14. It is imperative that the

### A. Nonprofits Rely on Federal and Local Funding That Is in Jeopardy.

Most nonprofits receive a blend of government, foundation, and other private funding, with about a third of total revenue coming from government grants and contracts. *Nonprofit Impact Matters: How America's Charitable Nonprofits Strengthen Communities and Improve Lives*, NAT'L COUNCIL OF NONPROFITS, 19 (2019), https://perma.cc/2NKX-8QVP. Government sources may be federal, state, or local, or a combination thereof, *id.* at 20, with federal funds for nonprofits often "passed through" counties or other local governments.[6] For instance, San Francisco paid $1.5 billion to 745 nonprofits in the 2024 fiscal year, for services including housing, public health, and youth services, and more. *San Francisco Nonprofit Contracts and Spending*, SF.GOV, https://perma.cc/VPC3-Q8GZ. The contracts varied in size, with some organizations receiving as much as $64 million. *Id.* Nonprofits' reliance on local governments to pass through federal funds means that a determination that a jurisdiction is a "sanctuary" jurisdiction—and will, therefore, lose federal funding pursuant to the Orders—would be devastating.

In addition to losing passed-through federal funding, the threat of a

---

preliminary injunction is affirmed not only to ensure the current Orders are not enforced while the challenges to their legality remain ongoing, but also to avoid any subsequent "end run around the Preliminary Injunction Order." ER-18.

[6] The Bondi Directive also directly cuts federal funds to nonprofits. ER-146–148.

determination that a state, county, or city is a "sanctuary" jurisdiction would further harm nonprofits because those jurisdictions would need to reallocate money to cover essential services, likely resulting in additional cuts to nonprofit funding from the jurisdictions' general funds. To the extent many nonprofits are funded by multiple jurisdictions designated as "sanctuaries," the Orders place even larger portions of their budgets at risk. What is more, these impacts will be magnified by other Executive actions cutting budgets for federal departments, agencies, and programs that fund nonprofits. *See* Laura Tomasko, *Government Funding Cuts Put Nonprofits at Risk Across the Nation*, URBAN INST. (Feb. 21, 2025), https://perma.cc/VP8F-AMYA. This threat to nonprofit funding is even more critical given that it comes just after a period of decreased government funding coupled with increased demand for services because of the COVID-19 pandemic. *See* Andrew F. Johnson et al., *The COVID-19 Pandemic: A Challenge for US Nonprofits' Financial Stability*, 33(1) J. OF PUB. BUDGETING, ACCT. & FIN. MGMT. 33, 36–37 (2021).

The Bay Area nonprofit community would feel these losses acutely. For example, San Francisco formulated its 2024-2025 operating budget based on an expected $2.5 billion in federal funds, most of which support programs in San Francisco's Human Services Agency and Department of Public Health. 4-SER-728–29, ¶¶ 13, 17. San Francisco also expects to receive $1.2 billion in "federal multi-year grants budgeted in prior years"—some of which is for "investments in programs

to address homelessness and affordable housing." 4-SER-728, ¶ 14. If San Francisco loses access to these funds, it will have to make "immediate service cuts, layoffs, and/or cancellation of City contracts[.]" 4-SER-732, ¶ 33; 4-SER-735, ¶¶ 45–46. Indeed, before the Orders were enjoined, San Francisco already considered reducing general fund spending due to the financial uncertainty caused by the Orders. 4-SER-732–35, ¶¶ 32–46.

If federal funding is cut, and local funding is consequently impacted, nonprofits would not be able to simply recoup the budgetary shortfall using contributions from private sources such as foundations. Private donations and grants account for only fifteen percent of nonprofit revenue. Johnson, *supra*, at 34; *see also, e.g.*, *Toward Common Sense Contracting*, NAT'L COUNCIL OF NONPROFITS, at 5 (2014), https://perma.cc/7PZQ-3N7L (foundation grants account for less than three percent of nonprofit revenue). And relationships with private donors "take years to develop into a reliable or significant source of support." Johnson, *supra*, at 40. Moreover, nonprofits rarely have significant reserves because they are disincentivized from building up such reserves, which funders view as "excessive." *Id.* at 35. Thus, if federal funding is lost, nonprofits will not be able to sustain the programs they provide using private funds alone.

In early 2025, the possibility of imminently losing federal, county, municipal, and some private funding simultaneously caused extreme budget uncertainty and

harm to nonprofits, as they scrambled to ascertain the extent of the possible impact, develop contingency plans, and consider freezing hiring. Nonprofits will face the same predicament if the district court's orders are not affirmed, and these stresses on already understaffed and under-resourced organizations will impact their ability to fulfill their missions.

**B.    Severe Budgetary Uncertainty Caused by the Orders Forces Nonprofits to Consider Cutting Services.**

Uncertainty alone can cause irreparable harm to nonprofits by foreclosing programming. Most nonprofits already operate with tight budget constraints and strain to meet community needs. In fact, most have no more than three months of operating funds in the bank. *Toward Common Sense Contracting*, *supra*, at 5. Prior to the district court's injunction, organizations in jurisdictions that may be deemed "sanctuaries" faced severe budget uncertainty because of the Orders, forcing them to immediately curtail development of new programs and decide how they would cut existing programs if the Orders were implemented. If the district court's injunction is not affirmed, they will face this uncertainty again.

Even delayed funding can have a significant effect on services provided by nonprofits. When government funding is late, "many nonprofits are forced to divert efforts away from their missions as they scramble to" pay operating costs and take "extraordinary actions like curtailing operations and laying off employees." *A Dozen Common Sense Solutions to Government-Nonprofit Contracting Problems*,

NAT'L COUNCIL OF NONPROFITS, 11 (Dec. 5, 2013), https://perma.cc/H4BU-AQ4W. The impact of the potential loss of federal funds is similar to the funding shortfalls nonprofits experienced during the COVID-19 pandemic and the accompanying reduction in services: a 2020 survey of nonprofits found that 71% were forced to reduce services, 55% closed offices, and 51% laid off employees. Independent Sector, *The Impact of COVID-19 on Large and Mid-Sized Nonprofits*, (June 15, 2020), https://perma.cc/2E47-WZ44; *see also* Johnson, *supra*, at 33, 35–36. The loss of "federal funding for nonprofits would mean that those in need would get fewer services." Dyana Mason & Mirae Kim, *Many Nonprofits Would Be Reeling If Trump Froze That Money*, CHRON. OF PHILANTHROPY (Feb. 7, 2025), https://perma.cc/QZX5-SXFN.

When the Orders were issued in January and February 2025, the financial uncertainty they caused was far reaching and *amici's* nonprofit members faced the prospect that they would need to imminently reduce services and staff. For instance, members of *amicus* Silicon Valley Council of Nonprofits ("SVCN") rely on food bank donations to support people experiencing food insecurity. Food banks receive federal funds directly from the federal government and via pass-through funding from local jurisdictions. Thus, if the federal government withheld funds, SVCN's members feared they would have to reduce or eliminate their efforts to combat hunger. Similarly, member nonprofit mental health service providers would have to

make drastic cuts if funding were reduced—including to staff and programs that support high-risk mentally ill adults, increasing the risk of homelessness.

The uncertainty caused by the Orders has already forced nonprofits to take time away from realizing their missions to plan for cutting—or even completely shuttering—programs, impairing the ability of these organizations to provide vital services to the neediest members of their communities. These harms will return and expand if this Court does not affirm the district court's injunction.

### C. Nonprofits Will Face More Demand for Services if Government Services Are Cut, Which They Will Be Unable to Meet.

At the same time nonprofits were planning for service cuts due to the likelihood of lost funding, they anticipated increased demand for those services due to simultaneous cuts to government services (because of the same lost federal funding). History has shown that when government services are cut, community needs increase. But if nonprofits lose funding at the same time, they will not be able to step in to fill the gaps, and the most vulnerable members of their communities will be without the assistance they need.

These pressures and demands are not speculative: "reducing government budgets doesn't lower the number of people in need of social services; it just adds more pressures on nonprofits to keep up with ever-growing demands." Tim Delaney & David L. Thompson, *Nonprofits Need to Stand Together to Push for Smart Public Policies*, CHRON. OF PHILANTHROPY (Jan. 4, 2017), https://bit.ly/4iQl7AK.

Government funding cuts result in more people who need nonprofit services, but less funding for the nonprofits to deliver those services. *See The Nonprofit Sector at a Crossroads: How Federal Cuts, Tax Changes, and Trade Wars Are Reshaping the Landscape*, FOUNDATION LIST (Mar. 4, 2025), https://perma.cc/5SXC-2U25. This increased demand is difficult, if not nearly impossible, for nonprofits to meet without additional resources.

But, far from increasing their services to offset lost government ones, in the face of funding cuts, "some nonprofit leaders are deciding whether to close their doors; adjust staff size, services, and programs," and "[m]any of these options would diminish nonprofits' ability to carry out their missions." Tomasko, *supra*, at 2; *see also* Jeri Eckhart-Queenan et al., *Momentum for Change: Ending the Nonprofit Starvation Cycle*, THE BRIDGESPAN GROUP, 2 (Sept. 2019), https://perma.cc/G4LH-HNRX (40 percent of nonprofits in a 2017 study had fewer than three months of reserves precluding adding services without new funding).

For example, in early 2025 San Francisco concluded that if it loses federal funding, "[t]housands of San Francisco's most vulnerable residents would lose access to meals, medical care and other lifesaving social safety net services." 4-SER-735, ¶ 45. *Amici's* members will be unable to meet the increased need generated by these cuts if they come to fruition. SVCN members, for instance, have struggled to determine how they could possibly meet the increased need if federal

funding to Santa Clara County is cut. If Santa Clara County loses federal funding and SVCN members lose pass-through funds, members will have to close some of the very programs that could help those turned away by the County. Other organizations that provide vital services in these areas also fear that they, too, will be unable to meet the increased need if federal funds are lost. These anticipated pressures on services, occurring simultaneously with the threat of the loss of major funding streams, create a precarious situation for nonprofits.

If the preliminary injunction is not affirmed, many health and human services nonprofits will again face the prospect of having to meet increased need with diminished resources, and many of the most vulnerable members of the community will lose access to essential services.

## III. THE ORDERS CAUSE FEAR THAT DETERS COMMUNITY MEMBERS FROM ACCESSING PUBLIC SERVICES, HARMING THE PUBLIC INTEREST.

The harms *amici* have observed are not limited to the potential loss of funding and services. In a political climate increasingly hostile to immigrants, intensified by the Orders, many in the communities these nonprofits serve are fearful of deportation and afraid to access public services. The fear the Orders have caused endangers public health and safety because it disincentivizes vulnerable community members from accessing critical services, including medical and mental health clinics, senior and child nutrition programs, education services, disability services, and support for domestic violence survivors. If the Orders are enforced pending resolution of the

challenges to their legality, these fears will only increase, and even fewer immigrants will use crucial public services, harming those individuals and their communities at large. Affirming the preliminary injunction would prevent further harm while the legality of the Orders is adjudicated and would thus serve the public interest.

### A. Many Immigrants Are Afraid to Access Healthcare and Other Services.

The current Administration's policies—including the Orders and increased immigration enforcement activity—are causing high levels of anxiety in the communities *amici's* member nonprofits serve, and many community members are avoiding healthcare services, refraining from reporting crimes, and even staying home from school.

This turn away from vital services is consistent with past experience. Looking back to the time of the similar 2017 Executive Order, nonprofits observed a drop in immigrants seeking medical care, even in dire situations. *See* Virginia Fay, *Back Into the Shadows: Immigrants Retreat from Needed Services as Deportation Fears Loom*, PENINSULA PRESS (June 12, 2017), https://perma.cc/Z8M2-DSNA. In early 2017, nonprofits also noted a drop in women reporting incidents of sexual assault. *See* Jennifer Medina, *Too Scared to Report Sexual Abuse. The Fear: Deportation.*, NEW YORK TIMES (Apr. 30, 2017), https://bit.ly/4hI0WnB.

The effects of other past immigration enforcement measures are also instructive. For example, in May 2017 Texas passed SB4, which prevented localities

20

from adopting policies that "prohibit[ed] or materially limit[ed]" immigration enforcement. *City of El Cenizo v. Texas*, 890 F.3d 164, 173–75 (5th Cir. 2018) (affirming, in part, grant of preliminary injunction). SB4 immediately created anxiety in Texas's immigrant community, causing immigrants to avoid accessing healthcare services. Stephanie Kuo, *Undocumented Immigrants Putting 'Health On Hold' Out Of Fear, Anxiety In Uncertain Times*, KERA NEWS (Sept. 18, 2017), https://perma.cc/5822-VWML (describing "[h]igher no-show rates" for medical appointments in North Texas and around the nation in the wake of SB4).

More recently, researchers at the University of South Florida surveyed the effect of Florida's SB 1718, passed in 2023, which requires hospitals that receive Medicaid funds to ask about immigration status on patient registration forms. Fla. Stat. § 395.3027. The survey showed that after SB 1718's passage, 74% of non-U.S. citizens were concerned about their ability to get medical care and 66% noted an increased hesitation to seek healthcare. Elizabeth Aranda & Liz Ventura Molina, *The Impacts of Florida's SB 1718 on Immigrants' Well-being*, UNIV. S. FLA., 10–11 (2024), https://perma.cc/52BA-KQPH.

The anxiety caused by the Orders extends to immigrants who are legally in the United States. For example, in 2019, the first Trump administration changed the public charge rule, which impacts immigration decisions for individuals deemed likely to become primarily dependent on government benefits. Surveys found that

after this change, legally present immigrants were declining to enroll in, or were unenrolling from, government programs—even when the public charge rule did not apply to them. Jennifer Tolbert et al., *Impact of Shifting Immigration Policy on Medicaid Enrollment and Utilization of Care Among Health Center Patients*, KFF (Oct. 15, 2019), https://perma.cc/VQ4K-5HP9. This effect lingered for years after the rule was rescinded in 2021. Veronica Cifuentes, *As Chilling Effects of the Public Charge Rule Linger, How Can Health Systems Support Immigrant Families and Increase Their Access to Essential Services?*, CHILDREN'S HOSPITAL OF PHILADELPHIA (Sep. 26, 2024), https://perma.cc/4PWC-9BRB.

In the wake of the Orders, there was similar evidence of anxiety leading to immigrants declining to use public services. For example, in March 2025, a Bay Area business owner shared that, since the President took office, many of his employees felt scared to come into work, seek critical medical care, or generally "be in any sort of office that will have a government official in it," despite having green cards or being citizens. KQED's Forum, *Trump Calls for Judge's Impeachment as Courtroom Battles Over Deportations Escalate*, KQED, at 31:20–33:25 (Mar. 19, 2025), https://perma.cc/WH4Z-CC7Z. A San Francisco resident who works in law enforcement similarly expressed anxiety, explaining that, despite being a naturalized citizen, he experienced fear when traveling because he had opposed the administration's policies on social media. *Id.* at 39:25-4–1:01.

Members of *amicus* organization Behavioral Health Contractors' Association ("BHCA") reported that, following the Orders, many undocumented clients delayed or avoided medical care, including failing to renew their Medi-Cal enrollments, missing medical appointments for their children, resisting going to emergency rooms, and switching to telehealth. Sara Cody, M.D., the Director of Santa Clara County's Public Health Department, is additionally "familiar with reports showing that the fear of deportation has already caused immigrants and their families to miss medical appointments, to avoid going out in public, to avoid utilizing public safety services, and to suffer from increased stress, anxiety and depression." 4-SER-795, ¶ 13. Indeed, a member of BHCA reported that, after the Orders were issued, children of immigrants were "experiencing higher levels of behavior health issues" because of "the toxic stress and complex trauma from the constant fear of deportation and family separation[,] result[ing] in increased signs of anxiety, depression, and other behavioral health issues." Prishni Murillo of the San Francisco Department of Children, Youth, and their Families ("DCYF") also reported that the DCYF saw "a noticeable decrease in young people accessing services," including being "resistant to register" for DCYF-funded programs because they feared potential immigration consequences. 4-SER-716–17, ¶ 6.

*Amici* have received reports that community members fear accessing other important services as well. For example, member organizations of BHCA also

reported that: victims of crimes and domestic violence survivors avoided requesting restraining orders, going to police, and appearing in court; parents were not enrolling their children in school or attending parent-teacher meetings; employees feared reporting labor violations and workplace injuries; clients did not attend their jobs or feared seeking employment; and undocumented immigrants feared using tax-filing services. A member of *amicus* organization San Francisco Immigrant Legal & Education Network ("SFILEN") observed a drop in clients seeking state or municipal identification cards, without which it is difficult to open bank accounts or secure housing. That organization also noted decreased community engagement with the government, including immigrant community members being reluctant to attend community input meetings or provide official public comment. Faith-based organizations belonging to *amicus* organization San Francisco Interfaith Council ("SFIC") similarly reported a reduction in people seeking support, with many expressing fear of attending religious services or appearing at places of worship. SVCN, BHCA, and SFIC's members reported that families avoided being in public and only left their homes when necessary. Member organizations' staff reported similar fears, as some staff are themselves Deferred Action for Childhood Arrivals recipients. One member of SFIC saw one third of its immigration legal services staff leave the organization due to such fears.

These fears were not limited to those who are undocumented—queries also came from member organizations' clients with valid immigration statuses. Immigrant families often include some members who are documented (including U.S. citizens) and others who are not. Member organizations reported that many documented members of such families (often children) feared disclosing any information about their households in connection with accessing services, for fear of being deported with, or separated from, their families (often parents).

The impact of this anxiety goes beyond avoiding government services. Many clients of member organizations are not aware of which programs and services are run by the government, and which are run by independent nonprofits. As a result, SVCN members reported that some clients expressed fear about accessing services from nonprofits and sharing basic personal information with them, such as last names and birthdates. Questions from clients increased, and efforts to counteract these fears and educate the community about the safety of accessing public and nonprofit services cost time and money, increasing the burdens the Orders already placed on nonprofits, discussed above, and further impeding nonprofits' abilities to achieve their missions.

If the preliminary injunction is vacated and the Orders are enforced, these impacts will continue and be amplified, and many immigrants, both documented and undocumented, will stop accessing necessary services.

**B.     When Immigrants Are Afraid to Access Services, Overall Public Health and Safety Suffer.**

When individuals are scared to seek essential services, the risks to public safety increase.  Consequently, these "cuts are not just an attack on immigrants—they are an assault on the well-being of every resident in these cities." *Cuts to Federal Funding for Sanctuary Cities Will Endanger Communities*, US COMMITTEE FOR REFUGEES AND IMMIGRANTS (Jan. 23, 2025), https://perma.cc/4FEN-8QN2.

Significantly, this fear extends to reporting crime.  When crime is underreported because victims and witnesses are afraid to approach law enforcement, the public's safety is put at risk.  "Local law enforcement leaders consistently emphasize that trust between police and the communities they serve is critical to public safety.  Sanctuary policies help foster this trust by ensuring that individuals can report crimes and cooperate with authorities without fear of deportation or family separation." *Id.*  As Jeffrey Rosen, the District Attorney for Santa Clara County, explained, "[f]ear of deportation by victims, witnesses, and families and friends of undocumented victims and witnesses poisons our ability to detect and prosecute crime, thereby making the entire community less safe." 4-SER-774–75, ¶ 11; *see also* 4-SER-787–88, ¶ 9.

Research continues to show that sanctuary policies make communities safer. For example, a 2020 study found that "adopting a policy that limits how local police enforcement works with federal immigration officials, usually called a sanctuary

policy, increases [Violence Against Women Act] petitions from battered women by 2.24 percent." Catalina Amuedo-Dorantes & Esther Arenas-Arroyo, *Police Trust and Domestic Violence Among Immigrants: Evidence from VAWA Self-Petitions*, CTR. FOR GROWTH & OPPORTUNITY AT UTAH STATE UNIV. (Nov. 12, 2020), https://perma.cc/2EV4-2Z5G. Additionally, a 2017 report found that sanctuary counties have fewer crimes, higher median household incomes, lower poverty rates, and lower unemployment rates than non-sanctuary counties. Tom K. Wong, *The Effects of Sanctuary Policies on Crime and the Economy*, CTR. FOR AM. PROGRESS (Jan. 26, 2017), https://perma.cc/Y647-MMDT.

In addition to depressing crime reporting, anxiety about accessing public services creates considerable risks to public health. When individuals do not seek preventive care (including vaccines), fill vital prescriptions, or pursue care for acute conditions until they experience an emergency, the cost of care and the risk of public health crises rise. Indeed, preventive care, including immunizations, is critical to public health—particularly given the "ongoing outbreaks of measles, pertussis and tuberculosis in communities around the country." 3-SER-648–49, ¶¶ 4–6 ; *see also* May Sudhinaraset et al., *Immigration Enforcement Exposures and COVID-19 Vaccine Intentions Among Undocumented Immigrants in California*, 27 PREVENTIVE MED. REPS., 2–3, 6 (2022), https://perma.cc/8W55-F9A4 (immigration enforcement exposures increase vaccine hesitancy and "growing literature demonstrat[es] the

harmful effects of the immigration enforcement regime on health behaviors and health outcomes"). Keeping up with preventive care also can stop chronic diseases from developing and decreases emergency room visits—both of which lower healthcare costs for the community. Maren S. Fragala et al., *Population Health Screenings for the Prevention of Chronic Disease Progression*, 25(11) AM. J. OF MANAGED CARE (2019), https://perma.cc/TQZ6-Y2ZM; Henry O'Lawrence et al., *Impact of Primary Care Utilization and Insurance on Emergency Department Visits*, 5:04 J. CMTY. MED. AND PUB. HEALTH REPORTS, 1–2 (2024), https://perma.cc/92GT-SBSP. When immigrants fear deportation, they underutilize preventive services; but state and local "immigrant integration initiatives" lessen those fears and increase preventive care utilization. Elizabeth Kiehne & Quinn Hafen, *State and Local Integrationist Policies and the Physical and Psychological Health of Undocumented Immigrants*, 48 CURRENT OPINION IN PSYCH. 1–4 (2022).

The concern for public health and safety is exemplified by the experience of SVCN member organizations that serve refugees and others diagnosed with HIV. Many of these organizations' immigrant clients fled horrendous persecution in their home countries due to HIV+ status or sexual orientation and are reluctant to seek medical care, leading them to avoid treatment and miss opportunities for preventive care. *See also* Beatriz Suro et al., *The Influence of Perceived Immigration Context and Healthcare Utilization Immigration Law Concerns Latinx Immigrants' HIV*

28

*Testing*, 10(2) J. LATIN PSYCH. 156 (2022). This avoidance poses danger not only to individuals but also to the community at large, which is at risk from the spread of disease when a significant portion of the community cannot access preventive services or treatment. *See Opportunities to Improve HIV Testing, Prevention, and Care Delivery for Medicaid and CHIP Beneficiaries*, MEDICAID, 3–4 (Jan. 15, 2025), https://perma.cc/J8RT-P5MS. Nonprofits play an essential role in overcoming this fear to help immigrants get HIV testing and care. *See* Jonathan Ross et al., *Undocumented African Immigrants' Experiences of HIV Testing and Linkage to Care*, 33(7) AIDS PATIENT CARE AND STDS, 336, 339 (2019), https://perma.cc/GK2A-7FX2.

\*\*\*

In communities with significant immigrant populations, the uncertainty caused by the Orders affects the health, safety and wellbeing of the community as a whole. Anxiety caused by the Orders imperils the progress nonprofits have made toward encouraging actions that promote public health and safety. Affirming the preliminary injunction blocking implementation of the Orders will prevent further anxiety that would cause irreparable harm to *amici*'s member organizations and their communities, and is in the public interest.

## CONCLUSION

On behalf of their member organizations and the communities they serve, *amici curiae* urge this Court to affirm the district court's preliminary injunction to prevent further harm and damage to the public interest while the status of the Orders is finally adjudicated.

Dated:     August 25, 2025          COOLEY LLP


By: */s/ Audrey J. Mott-Smith*
     Audrey J. Mott-Smith

BELINDA ESCOBOSA
MEGAN VEES
ASIAN LAW CAUCUS
55 Columbus Avenue
San Francisco, CA 94111
(415) 237-1577

MAUREEN P. ALGER
SAMANTHA A. KIRBY
COOLEY LLP
3175 Hanover Street
Palo Alto, CA 94304
(650) 843-5000

AUDREY J. MOTT-SMITH
EVA M. SPITZEN
MADELEINE R. AHLERS
RYAN P. YLITALO
COOLEY LLP
3 Embarcadero Center, 20th Floor
(415) 693-2000

*Counsel for Amici Curiae*

30

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### FORM 8. CERTIFICATE OF COMPLIANCE FOR BRIEFS

**9th Cir. Case Number(s):** <u>25-3889</u>

I am the attorney or self-represented party.

**This brief contains <u>6,575</u> words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[X] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** <u>/s/ Audrey J. Mott-Smith</u>      **Date** <u>August 25, 2025</u>

## CERTIFICATE OF SERVICE

I hereby certify that on August 25, 2025, I electronically filed the foregoing Brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the CM/ECF system, which will accomplish service on counsel for all parties through the Court's electronic filing system.

*/s/ Audrey J. Mott-Smith*
Audrey J. Mott-Smith
*Counsel for Amici Curiae*
